IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | CRIM. NO.:  1:16-CR-65 |
| v. | : | |
| | : | |
| | : | |
| ASHA R. MAURYA, | : | |
| | : | |
| Defendant. | : | |

## DEFENDANT ASHA MAURYA'S SENTENCING MEMORANDUM

Counsel for Asha R. Maurya ("Ms. Maurya") hereby respectfully submits this Sentencing Memorandum to provide support for Ms. Maurya's objections to the Presentence Investigation Report (the "PSR") and to assist the Court in determining a reasonable sentence pursuant to 18 U.S.C. § 3553(a).

## INTRODUCTION

On February 9, 2016, a grand jury in this district returned a thirty-four count indictment charging Ms. Maurya and co-defendant Nathan Hardwick (PSR ¶ 1). [1] The thrust of the Government's allegations was that Hardwick, the managing partner of Morris Hardwick Schneider, LLC and its affiliated title closing company (collectively, "MHS"), directed Ms. Maurya to make unauthorized distributions,

---

[1] On October 12, 2018, Hardwick was convicted after a jury trial on multiple counts of fraud and making false statements.

1

bonuses, and other payments to him from the firm's bank accounts for his personal benefit. (PSR ¶ 3-4).

On May 11, 2017, Ms. Maurya entered a negotiated guilty plea to conspiracy to commit with wire fraud (Count 1) (Doc. 112) (PSR ¶ 23, 2).  The PSR calculated a total offense level of 28 and a Criminal History Category of I, resulting in an Advisory Guidelines range of 78 to 97 months. The Government agreed in the plea agreement to recommend a one-level downward variance based on Ms. Maurya's expeditious guilty plea. (Doc. 112, p.10).  In its sentencing memorandum, the Government indicated that it would be filing a motion pursuant to §5K1.1 and ask for a further one-level deduction (Doc. 318, p. 2).  If the Court adopts the PSR's calculations and the Government's recommendation, the sentencing range would be 63 to 78 months.  The Government also agreed to recommend the low end of this range which would be 63 months (Doc. 112, p. 10).

Counsel for Ms. Maurya objects to the total offense level calculated in the PSR.  In particular, we object to the proposed loss amount of $22,207,431 (PSR ¶ 78, 90). We also object to the recommended two-level enhancement for causing financial hardship based on financial losses suffered by MHS partners Mark and Gerard Wittstadt. (PSR ¶ 91). Finally, we object to the PSR's calculations of the restitution amount under the Mandatory Victims Restitution Act ("MVRA").  We contend that the Advisory Guidelines range should be level 20, yielding a range of 33 to 41 months.  With the Government's recommended one-level downward

variance for expeditiously entering a guilty plea, Ms. Maurya's Advisory sentencing Guidelines range would be 30 to 37 months, before receiving any credit for her cooperation.

In addition to addressing these objections, this memorandum seeks to contrast the differing roles that Hardwick, as the managing partner, and Ms. Maurya, as his employee, played in the charged conspiracy as well as the very different routes these two individuals took once the fraud came to light.  While Hardwick sought to shift blame, Ms. Maurya accepted responsibility and immediately began to assist Fidelity National Financial ("Fidelity") and then the Government in their respective investigations.  This memorandum also highlights the marked changes that Ms. Maurya has undergone since the time of her arrest and shows that she is capable of being a productive member of society.

Given Ms. Maurya's limited role in this offense and her willingness to assist Fidelity and the Government, we respectfully request that the Court impose a sentence that is below the Advisory Guidelines range.

## ADVISORY GUIDELINES ISSUES

A.     The Loss Amount

Application Note 3(A) of §2B1.1 states that "*loss is the greater of actual loss or intended loss*."  Actual loss is defined as "*the reasonably foreseeable pecuniary harm that resulted from the offense*."  Intended loss is defined as "*the pecuniary harm that the defendant purposely sought to inflict...*"  Here, the PSR

appears to adopt an actual loss amount as calculated by Fidelity, MHS's leading title insurance underwriter.  Fidelity contends that it suffered a net loss of $22,207,431 resulting from its decision to fund the shortages in MHS's escrow accounts. (PSR ¶ 71, 78). We object to the PSR's conclusion that Ms. Maurya should be held accountable for this amount. (PSR ¶ 90).

"Under the guidelines, actual loss is defined as the reasonably foreseeable pecuniary harm that resulted from the offense… This definition incorporates a causation standard that, at a minimum, requires factual causation (often called but for causation) and provides a rule for legal causation (*i.e.*, guidance to courts regarding how to draw the line as to what losses should be included and excluded from the loss determination.)" *United v. Stein*, 846 F.3d 1135, 1152 (11th Cir. 2017) (citations and quotations omitted).  Accordingly, the Government must prove the actual loss amount caused by Ms. Maurya's conduct by a preponderance of the evidence, and while the Court may reasonably estimate the loss amount, "it cannot speculate about the existence of facts and must base its estimate on reliable and specific evidence." *Id*.

There are several problems with using Fidelity's calculations as the total loss amount in this offense.  To begin with, the PSR asks the Court to assume that all of the payments made by Fidelity in connection with MHS were made to fund shortages caused by Hardwick's scheme. Neither the Government nor Fidelity,

however, have provided proof that these escrow shortages resulted from Hardwick's scheme or that every dollar Fidelity spent was a result of that scheme.

The Probation Office has recently provided Counsel with a list of money transfers that Fidelity made to MHS accounts from August 2014 through August 2016, which Fidelity claims to have made to fund escrow shortages caused by Hardwick and Ms. Maurya. None of these transfers specify whether the shortage was a result of Hardwick's scheme, whether it occurred through the course of the firm's legitimate business, or whether the deposits were made to cover an escrow shortage as opposed to an operating expense. There is simply insufficient evidence tying each of the escrow shortages or wire transfers to Hardwick or Ms. Maurya's conduct, let alone "reliable and specific evidence." *See*, *United States v. James*, 592 F.3d 1109, 1115 (10th Cir. 2010), noting that, "a loss estimate is reasonable only when it is calculated under a reasonable method."

The Government has also filed a Sentencing Memorandum in which it attaches various summary exhibits showing transfers made to or for the benefit of Hardwick (Doc. 318).  In calculating actual loss amounts, it is well-established that "value may be rendered even amid fraudulent conduct," and as such, the loss amount cannot include "any money returned or the fair market value of… services rendered." *United States v. Campbell*, 765 F.3d 1291, 1301 (11th Cir. 2014).  In describing the wire transfers Ms. Maurya made from MHS accounts in the course of Hardwick's scheme, the PSR asserts that, "[w]ith rare exceptions, the amount of

5

the wire transfers do not appear to bear any relationship to the amounts of Hardwick's expected partnership distributions…<u>making it almost impossible to separate 'legitimate' distributions from 'fraudulent' ones</u>." (PSR ¶ 44) (Emphasis added).

As the PSR fully acknowledges, much of the money that was sent via wire transfer was legitimate.  Any legitimate funds that were sent (*e.g.*, money withdrawn to fund the partners' legitimate distributions and expenses, the firm's operating expenses, or shortages caused by errors, double counting, or other funding issues) should not be calculated toward the loss amount.  But there has been no attempt to deduct these expenses from the PSR's proposed loss amount and, as the PSR notes, that may be due to the fact that it is "almost impossible" to accomplish.  Under these circumstances, the loss amount asserted in the PSR is too speculative to pass muster without more specific and reliable facts.

Counsel for Hardwick also recently filed a Supplement to Defendant Hardwick's Sentencing Memorandum (Doc. 317) which gives detailed reasons as to why the PSR's loss amount is not reliable, including:  MHS' accounts were never properly reconciled; the co-mingled escrow account ("Suntrust 7328") was used to make payroll and to fund payments to other partners; Fidelity's acquisition of the title company and coverage of the escrow shortages was actually an "investment" in a profitable title agency; there is a difference in the amount Fidelity funded versus the amount the Government claims Hardwick received; and

the Government never accounted at trial for what portion Hardwick was entitled to. These issues simply underscore the point that the Government cannot show by a preponderance of the evidence how much of the missing funds were unlawfully received by Hardwick.

Even if the Court were to find that the actual loss amount proposed in the PSR is based on reliable and specific evidence, Ms. Maurya's scope of criminal activity was narrower than Hardwick's, and a lack of foreseeability makes the actual loss amount an inappropriate measure.  Application Note 3(A)(iv) of §2B1.1 defines "reasonably foreseeable pecuniary harm" as "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense."  The Eleventh Circuit has explained: "A district court may hold participants in a conspiracy responsible for the losses resulting from the reasonably foreseeable acts of co-conspirators in furtherance of the conspiracy." *United States v. Shade*, 513 F. App'x 921, 923 (11th Cir. 2013) (unpublished opinion); *Quoting*, *United States v. Mateos,* 623 F.3d 1350, 1370 (11th Cir.2010) (internal quotation marks omitted); *see also* U.S.S.G. § 1B1.3(a)(1)(B).

Moreover, "[o]nly after the district court makes individualized findings concerning the scope of criminal activity the defendant undertook is the court to determine reasonable foreseeability." *United States v. Hunter*, 323 F.3d 1314, 1319 (11th Cir. 2003).  The Eleventh Circuit has reasoned that "a relevant factor in

determining whether an activity is jointly undertaken is whether the defendant assisted in designing and executing the scheme." *Hunter*, 323 F.3d at 1321.

Ms. Maurya was not Hardwick's equal.  She was his employee.  She did not design Hardwick's fraudulent scheme nor did she execute the scheme. Rather, she was a conduit for Hardwick and simply followed Hardwick's orders to send wire transfers.  And while it was obvious that Hardwick was stealing from MHS, Ms. Maurya was not always in a position to know if a particular wire transfer (or if a portion of a wire transfer) was for illegitimate purposes.  After all, some of the wired funds were for a legitimate purpose.  In the end, only Hardwick was in a position to know whether each dollar that was being transferred was for a legitimate purpose.  As the scope of criminal activity was narrower for Ms. Maurya, and as she could not have reasonably foreseen what Hardwick would do with each transferred dollar, the actual loss amount is not the appropriate measure.

Application Note 3(A) of § 2B1.1 instructs courts to use the amount gained from an offense "if there is a loss but it reasonably cannot be determined."  For the reasons set forth above, Counsel for Ms. Maurya contends that the $900,000 gain Ms. Maurya received is the proper measurement for the loss amount (PSR ¶ 44, 90).  Accordingly, a 14-level increase to Ms. Maurya's base offense level instead of the PSR's proposed 20-level increase is warranted.

B.    Financial Hardship

The PSR recommends enhancing Ms. Maurya's offense level by two pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(iii), which applies when an offense "resulted in substantial financial hardship to one or more victims." (PSR ¶ 91). Application Note 4(F) lists several factors a court should consider when seeking to apply this enhancement, including whether the victim became insolvent, filed for bankruptcy, suffered substantial losses in their savings or investment funds, were forced to make substantial changes in their employment or living arrangements, or suffered substantial harm to their credit. U.S.S.G. § 2B1.1 cmt. N4(F)(i-vi).

But in determining whether a victim's financial losses caused substantial hardship, courts are directed to measure the financial harm in proportion with a specific victim's financial position. *United States v. Castaneda-Pozo*, 877 F.3d 1249,1252 (11th Cir. 2017) ("the same dollar harm to one victim may result in a substantial financial hardship, while for another it may be only a minor hiccup") (quotes and citations omitted); *see also United States v. Poulson*, 871 F.3d 261, 268 (3rd Cir. 2017) ("§ 2B1.1's increased emphasis on individual harm means that 'substantial financial hardship' is measured on a sliding scale that is also fairly subjective").

In *Castaneda-Pozo*, victims only lost $400-$800 as a result of the defendant's offense. 877 F.3d at 1252. Nonetheless, the Court found that these victims experienced a substantial financial hardship because "they were made

insecure in life's basic necessities." *Id*. at 1252-3. Conversely, it follows that relatively wealthy victims, such as Mark and Gerard Wittstadt, can lose much more without suffering a "substantial financial hardship." *Poulson*, at 269 ("loss of a large volume of savings that is quickly regained or has minimal effect on the victim is likely not a substantial financial hardship").

MHS's bankruptcy alone does not warrant a finding that the Wittstadts personally suffered a substantial hardship as a result of Ms. Maurya's offense. While the Wittstadts certainly suffered financial and reputational harm, we are not aware of any evidence that they have been struggling financially to the extent envisioned by the Eleventh Circuit in *Castaneda-Pozo*. There is no evidence that they have become insolvent or been forced to postpone their retirements or relocate their homes, let alone that they "were made insecure in life's basic necessities." *Castaneda-Pozo*, at 1252-3.

Moreover, according to the PSR, the brunt of the reputational and financial harm appears to have been caused by Hardwick who submitted false affidavits in connection with the lawsuits that were filed following the charged conspiracy.  In these affidavits, the PSR notes that Hardwick stated "*that he had no knowledge of any problems with the escrow accounts prior to August 2014 and that the Wittstadts consented to allow the firm to guaranty two loans, publicly accusing the Wittstadts of lying about both the theft and the loans*." (PSR ¶ 73).  The PSR continues: "*The allegations destroyed the Wittstadts reputations and caused their*

10

*financial institution clients (Citibank, Bank of America, etc.) to move their legal work elsewhere. The law firm filed for bankruptcy...*"  (PSR ¶ 73).  Ms. Maurya, of course, was in no way involved with the false claims that Hardwick made against the Wittstadts during the pendency of these lawsuits.

For these reasons, a two-level enhancement for financial hardship is unwarranted as it relates to Ms. Maurya.

## RESTITUTION

The PSR recommends holding Ms. Maurya liable for $22,207,431 in restitution to Fidelity (PSR ¶ 83, 86).  In its letter to the Court, Fidelity wrote that "*shortly after the discovery of the shortages in the escrow accounts, Fidelity agreed to fund the entire shortage*." (PSR ¶ 83).  The PSR further explains that Fidelity also decided to acquire the title company after Hardwick's scheme came to light (PSR ¶ 71-72).

Under 18 U.S.C. § 3663A(a)(2), a victim is defined as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered…"  At the time that Fidelity began to replenish the escrow accounts and acquire the title company, it was well aware of Hardwick's theft, but it nonetheless agreed to fund the shortages.  Because Fidelity was aware of the theft, Counsel for Ms. Maurya contends that Fidelity was not directly and proximately harmed as a result of the fraud charged in the indictment, and

therefore Fidelity is not a victim under the Mandatory Victims Restitution Act ("MVRA").[2]

Even if Fidelity can be considered a victim, the PSR fails to employ a proper method in calculating restitution.  18 U.S.C. § 3664(e) provides, in part: "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence.  The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government."  The Eleventh Circuit has explained: "A restitution award under 18 U.S.C. § 3664 must be based on the loss that a victim actually suffers, and the Government bears the burden of proving that loss. To ensure that a victim is compensated only for its actual loss, the court must deduct, as an offset, any value that the victim may have derived from the fraudulent scheme. Otherwise, the victim will receive a windfall." *United States v. Cavallo*, 790 F.3d 1202, 1239 (11th Cir. 2015).

Essentially, the Government bears the burden of proving that the money Fidelity spent to refund MHS's escrow accounts replaced a dollar that had been fraudulently withdrawn by Hardwick or Ms. Maurya. The restitution award in this case must therefore be calculated using only the shortages that the Government can

---

[2] *See*, *United States v. Faran*o, 749 F.3d 658 (7th Cir. 2014), a mail and wire fraud case in which the Seventh Circuit found that refinancing lenders could not be counted as victims for restitution purposes in the absence of evidence of reliance on fraudulent representations made by defendants to obtain original loans.

prove that were caused by the charged conduct, as opposed to the amount of money Fidelity claims to have spent cleaning up after Hardwick's scheme. As explained in the loss amount portion of this memorandum, the PSR has failed to properly calculate the actual loss amount.

The final PSR also recommends $6,000,000 in restitution for Mark Wittstadt (PSR ¶ 86).  Counsel for Ms. Maurya again contends that this figure has not been properly calculated under the MVRA, and therefore the Government cannot meet its burden in awarding restitution to Mr. Wittstadt.

Moreover, the MVRA provides that: "If the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant." 18 U.S.C. § 3664(h).

As previously argued, Hardwick is far more culpable for the damage that was inflicted as a result of the illegal conduct set forth in the indictment.  He created the scheme to steal large sums of money from MHS, and he is the one who primarily benefited from it.  Ms. Maurya is also in a poor position to pay back a large sum of restitution.  She is currently receiving partial permanent disability due to injuries she sustained at work in June 2017 (PSR ¶ 83), and her total monthly expenses exceed her total monthly income (PSR ¶ 132).  For these reasons, should this Court award restitution, we respectfully request that the restitution be

apportioned to reflect Ms. Maurya's significantly lesser culpability and her inability to pay a large amount of restitution.

We also note that the Government seized two bank accounts maintained by Ms. Maurya containing $130,011.03, which Ms. Maurya did not contest. We would request that the Court take this amount into consideration when ordering any restitution.

## SENTENCING FACTORS UNDER § 3553(a)

As the Court is well aware, 18 U.S.C. § 3553(a) instructs a district court to impose "a sentence sufficient, but not greater than necessary," in consideration of several factors. Among other things, the sentencing court must consider the nature and circumstances of the offense and the history and characteristics of the defendant. We contend that these factors in this case merit a downward variance for the Advisory Guidelines range.

1. <u>Nature of the Offense</u>

Ms. Maurya accepts responsibility for participating in Hardwick's scheme to defraud MHS, but she did not create or organize the scheme. Hardwick's scheme to defraud MHS originated with and was organized by Hardwick. In fact, in the provisions of the PSR describing Hardwick's scheme, Ms. Maurya is only mentioned a handful of times. Of course, Hardwick also held all of the power at MHS. Not only was Hardwick Ms. Maurya's employer and supervisor—he was the managing partner for the entire firm. Perhaps most importantly, Hardwick

14

benefitted from the scheme much more than Ms. Maurya as he received the vast majority of the stolen funds which allowed him to take lavish vacations on private jets.

Upon discovery of the missing money, Ms. Maurya admitted to falsifying a document. (PSR ¶ 54, 56). When confronted by other MHS shareholders upon discovery of the missing money, Ms. Maurya acknowledged her wrongdoing and admitted that "*Nat would ask for money, and I just sent it to him*." She expressed that she "*felt pressured"* by Hardwick, who also instructed her to falsify distribution reports to conceal his scheme. (PSR ¶ 61). She also worked with Fidelity to recover the losses and explain Hardwick's scheme. (PSR ¶ 69).

In contrast to Ms. Maurya's actions, Hardwick tried to cover up his fraud by committing more fraud. As the PSR indicates, Hardwick sought to replenish the missing funds by obtaining loans from others through false statements and omissions. (PSR ¶ 63-67). MHS was again left on the hook for Hardwick's fraud when the defrauded lenders filed lawsuits against the firm. (PSR ¶ 73).

Since his fraudulent scheme first came to light, Hardwick has sought to blame Ms. Maurya for the entire scheme. (PSR ¶ 60). That was also his primary defense at trial. The jury, however, clearly believed that it was Hardwick who engineered the scheme.

Hardwick was also involved in several other schemes that did not involve Ms. Maurya. Shortly after merging his firm with Morris & Schneider to create

MHS, Hardwick arranged for MHS to advance him the money to repay a $3 million loan, though "*Hardwick never actually reimbursed the firm for the advances*." (PSR ¶ 33). Between 2009 and 2011, Hardwick defrauded two banks by making false statements to the banks in order to secure loans. Hardwick was charged with bank fraud and making false statements in connection with these schemes. (PSR ¶ 9-15).

Of course, Ms. Maurya also took actions to defraud MHS for her own benefit independently from Hardwick. (PSR ¶ 16-21). But the amount she received was far less than that received by Hardwick. If the Court does adopt the PSR's loss amount, we would contend that the loss amount overstates Ms. Maurya's role in the offense, and ask that the Court vary downward accordingly. It is also true that Ms. Maurya has a troubling history of stealing from her employers. (PSR ¶ 34-36). But as detailed below, Ms. Maurya has made great strides over the past several years to become a productive member of society.

2.   History and Characteristics of the Defendant

Before her indictment in this case, Ms. Maurya was arrested in Gwinnett County in 2015 and prosecuted for using her employer's company credit cards for personal expenses. (PSR ¶ 101).[3]   The 2015 arrest was a wakeup call that finally

---

[3] Ms. Maurya pled guilty to theft by taking under Georgia's First Offender Act in October 2016. Her probation terminated early in December 2018 after she paid her restitution amount, and she was discharged of the offense.

forced Ms. Maurya to confront her propensity to steal from employers as well as unresolved mental health issues.

Attached to this memorandum is a series of letter from a member of Ms. Maurya's family, her partner, her co-workers, and her therapist.  The choices Ms. Maurya made leading up to this offense have their origins in Ms. Maurya's chaotic upbringing. As the PSR indicates, Ms. Maurya suffered significant physical and emotional abuse at the hands of her father, and after he abandoned the family, from her brother, both of who suffered from untreated bi-polar disorder. (PSR ¶ 110).

According to Carrie Maurya, Ms. Maurya's sister-in-law, "*[l]ife in the Maurya house, for the children, was one of uncertainty and constant, never ending control and aggression…With her old siblings away at college, Asha was left to absorb the brunt of her father's increasingly disturbing behavior as he had become practically unhinged and maniacal.*" Carrie Maurya also describes how Ms. Maurya continued to be victimized by her brother, boyfriends, and others, which left her life "*void of a true support system*" and "*not equipped to turn away from this train wreck*."  (*See*, Exhibit 1, Letter from Carrie Maurya).

Ms. Maurya has seen a counselor for the past ten years to address her own struggles with mental health, including depression and anxiety. (PSR ¶ 118). In a letter to this Court, Ms. Maurya's counselor, Jeff Engberg of The Link Counseling Center, writes that "*the abuse and the myriad of chronically stressful events were particularly impactful*" and that "*the abuse manifested in several ways including*

*her inability to set boundaries.*" Due to that history of abuse, Ms. Maurya has

"*sought out narcissistic superiors not for the sake of gaining wealth, but to find her*

*impossible 'Golden Ticket,' acceptance and approval.*" (*See*, Exhibit 2, Letter from

Jeff Engberg). This made Ms. Maurya particularly susceptible to participating in

Hardwick's scheme, which made her feel accepted and needed.  Aside from her

flaws, Ms. Maurya has many positive qualities, including a deep sense of empathy.

Mr. Engberg and Carrie Maurya both describe Ms. Maurya's empathy in the way

that she cares for her ailing mother who lives out of state.



*Ms. Maurya (middle) with her mother and niece, Aryanna*

Ms. Maurya has also been in a committed relationship for nearly three years.

James Wilson, her partner, writes in his letter that Ms. Maurya is "*a passionate and*

*resilient person who continues to recognize the needs of anyone or anything.*

*Strangers who meet Asha for the first time often remark of her genuine warmth and*

*are touched by her inclusiveness.*" Mr. Wilson notes that Ms. Maurya "*focuses her*

energy on others, thinking of her mother's well-being and care or of how she will ever make things right with the victims of the case before Your Honor." (*See*, Exhibit 3, Letter from James Wilson).  Davita Shin, a former coworker, describes Ms. Maurya as "*selfless and generous in nature*" and he describes how Ms. Maurya stayed by his side during several painful surgeries in 2016. (*See*, Exhibit 4, Letter from David Shin).

Ms. Maurya is currently employed at Shiftgig. (PSR ¶ 123). When the company transitioned Ms. Maurya from the office to the field due to her pending criminal charges, Ms. Maurya's former supervisor, Mindy Gulledge, writes that she "*fought this decision, as I believed that Asha had accepted the responsibility for her actions and was prepared for the road ahead of her to fix the damage of the victims of fraud, and was not a risk to be in her role of Office Admin*." Ms. Gulledge describes Ms. Maurya as "*efficient, reliable, and dependable*" and describes how Ms. Maurya was forthright and candid about her pending criminal case "*and was very humble in recognizing her faults*." Because of that, Ms. Gulledge maintains that Ms. Maurya "*would be an asset to any organization looking for someone to fill a role who is highly intelligent, dependable, organized, trustworthy, communicative, and dedicated to her work*. (*See*, Exhibit 5, Letter from Mindy Gulledge).  Attached are three other letters from co-workers who can attest to Ms. Maurya's character (*See*, Exhibits 6, 7, and 8, Letters from Mary Kathryn Mitchell, Lolah Figueredo, and Timothy McJunkin).

The Court should also be aware that Ms. Maurya was injured on the job in June 2017, sustaining a variety of injuries including a torn rotator cuff in her right shoulder.  Her doctors have indicated that surgery would be helpful (PSR ¶ 117) (*See also*, Exhibits 9 and 10, medical records indicating the need for surgery).  It is Counsel's understanding, however, that Ms. Maurya has a pending worker's compensation case, and that the surgery has been delayed by her employer's insurance company pending the outcome of sentencing in the instant case.

## SUBSTANTIAL ASSISTANCE

Counsel for Ms. Maurya expects that the Government will file a motion pursuant to U.S.S.G. § 5K1.1, based on Ms. Maurya's substantial assistance to the Government in connection with the investigation and prosecution of Hardwick. While the Government will likely seek a one-level reduction, we believe that a three-level reduction is more appropriate given the extent of Ms. Maurya's cooperation with Fidelity and the Government in this investigation, and the impact this cooperation has had on her personally.

Under §5K1.1, the appropriate reduction is determined by the Court, and the Court may take into account: "(1) the court's evaluation of the significance and usefulness of the defendant's assistance… (2) the truthfulness, completeness, and reliability of any information or testimony provided… (3) the nature and extent of the defendant's assistance…(4) any injury suffered, or any danger or risk of injury to the defendant… (5) the timeliness of the defendant's assistance."

Ms. Maurya's cooperation began immediately following the discovery of the fraud. Between August 10, 2014 and August 29, 2014, Ms. Maurya worked with Fidelity's Internal Investigations Unit on an almost daily basis. On most of these days, she worked with Fidelity from 8:30 am to 6:00 pm or later. She verified bank account lists, explained escrow transactions, discussed the mismanagement of MHS, and verified various loss amounts. She provided clarity for Fidelity in a time of great confusion. This assistance no doubt later benefited the Government in its investigation.

The assistance did not stop there. Between August 21, 2014 and November 7, 2014, Ms. Maurya continued to assist Fidelity on an almost daily basis by helping Fidelity run MHS and Land Castle (*e.g.*, training new staff, bonus calculations, balance sheet and income statements, cash flow projections and requirements, firm cost analysis by division, preparing P&L statements, software setup, rent analysis, cash flow projections, etc). Again, most of these days lasted from 8:30 am to 6:00 pm or later. All of this occurred before Ms. Maurya's first meeting with the Government.

While Counsel did not represent Ms. Maurya at the time, it is our understanding that Ms. Maurya first met with the Government in January 2015. Between January 2015 and September 2018, Ms. Maurya met with the Government more than ten times to answer their questions, explain Hardwick's scheme, provide context and details to numerous emails and documents, and to

21

otherwise help the Government prepare its case against Hardwick.  She also spent countless hours on her own reviewing discovery materials and preparing to testify at trial.  Never once did she complain about having to meet with the Government to answer their questions.

Throughout her time cooperating with the Government, Ms. Maurya was under the belief that she would be testifying at Hardwick's trial.  This caused Ms. Maurya a great deal of mental anxiety over many months.  She was especially concerned about being cross-examined by one of the best defense attorneys in the State on a variety of embarrassing issues.  Nonetheless, she was more than willing to assist the Government by testifying.  Though ultimately she was not called as a witness at trial, it is our position that her assistance helped the Government's case-in-chief, especially in establishing Hardwick's knowledge and criminal intent.

Based on Ms. Maurya's immediate and extensive cooperation, we respectfully submit that a three-level reduction is appropriate in this case.

## CONCLUSION

Ms. Maurya committed a serious crime.  But in the wake of that crime she took meaningful steps to mitigate the damages and accept responsibility by cooperating with Fidelity and the Government.  She has also demonstrated that she has the ability to be a productive member of society despite her checkered past and unfortunate upbringing.  For these reasons, we respectfully request that the Court impose a sentence below the Advisory Sentencing Guidelines.

This 5th day of February, 2019.

PATE & JOHNSON, LLC

/s/ Jess B. Johnson

Pate & Johnson, LLC                         Page A. Pate
101 Marietta Street, Suite 3300             Georgia Bar No.: 565899
Atlanta, Georgia 30303
(404) 223-3310                              Jess B. Johnson
                                            Georgia Bar No.: 322066

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day electronically filed the foregoing Notice with the Clerk of Court using the CM/ECF system which will automatically send email notifications of such filing to all counsel of record in this matter.

This 5th day of February, 2019.

PATE & JOHNSON, LLC

/s/ Jess B. Johnson

Pate & Johnson, LLC                         Page A. Pate
101 Marietta Street, Suite 3300             Georgia Bar No.: 565899
Atlanta, Georgia 30303
(404) 223-3310                              Jess B. Johnson
                                            Georgia Bar No.: 322066