1            UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
2                    ATLANTA DIVISION

3

4    UNITED STATES OF AMERICA

5
         -VS-                    DOCKET NO. 1:16-CR-00065-ELR-CMS
6

7    ASHA R. MAURYA (2),

8
              DEFENDANT.
9

10

11            TRANSCRIPT OF SENTENCING PROCEEDINGS
          BEFORE THE HONORABLE ELEANOR L. ROSS
12                UNITED STATES DISTRICT JUDGE
                    FEBRUARY 12, 2019
13
     APPEARANCES:
14
     ON BEHALF OF THE GOVERNMENT:
15
         LYNSEY MORRIS BARRON, ATTORNEY AT LAW
16       ASSISTANT UNITED STATES ATTORNEY

17       JOHN RUSSELL PHILLIPS, ESQ.
         ASSISTANT UNITED STATES ATTORNEY
18
         KELLY KATHLEEN CONNORS, ATTORNEY AT LAW
19       ASSISTANT UNITED STATES ATTORNEY

20
     ON BEHALF OF THE DEFENDANT:
21
         JESS BRANDEL JOHNSON, ESQ.
22       PAGE ANTHONY PATE, ESQ.

23

24   ELIZABETH G. COHN, RMR, CRR
     OFFICIAL COURT REPORTER
25   UNITED STATES DISTRICT COURT
     ATLANTA, GEORGIA

1          (ATLANTA, FULTON COUNTY, GEORGIA; FEBRUARY 12, 2019,

2     AT 11:00 A.M. IN OPEN COURT.)

3          THE COURT:  THANK YOU, SIR.

4          THANK YOU.  GOOD MORNING.  PLEASE BE SEATED.

5          ALL RIGHT.  I NOW CALL THE CASE OF THE UNITED STATES

6     OF AMERICA VERSUS MS. ASHA MAURYA.  THIS IS ACTION 16-CR-65.

7          AND ON MAY 11TH, 2017, MS. MAURYA DID ENTER A WRITTEN

8     NEGOTIATED PLEA OF GUILTY TO ONE COUNT OF CONSPIRACY TO COMMIT

9     WIRE FRAUD.

10          GOOD MORNING AGAIN.  ON BEHALF OF THE GOVERNMENT,

11     PLEASE ANNOUNCE YOUR APPEARANCE FOR THE RECORD AND IDENTIFY

12     EVERYONE AT COUNSEL TABLE, SIR.

13          MR. PHILLIPS:  GOOD MORNING, YOUR HONOR.

14          RUSSELL PHILLIPS, LYNSEY BARRON, AND KELLY CONNORS

15     FOR THE UNITED STATES.

16          THE COURT:  ALL RIGHT.  AND THE AGENTS?

17          MR. PHILLIPS:  YOUR HONOR, THE CASE AGENTS ARE SCOTT

18     CARUANA AND CHIP CROMER FROM THE FBI.

19          THE COURT:  ALL RIGHT.  THANK YOU.

20          AND ON BEHALF OF MS. -- IS IT MAURYA OR MAURYA?

21          MR. JOHNSON:  MAURYA, YOUR HONOR.

22          THE COURT:  OKAY.

23          MR. JOHNSON:  GOOD MORNING.  JESS JOHNSON AND PAGE

24     PATE ON BEHALF OF MS. MAURYA.

25          THE COURT:  ALL RIGHT.  GOOD MORNING TO ALL OF YOU.

1    ALSO, ON BEHALF OF PROBATION, WE HAVE OFFICER

2    ALEXANDER MOODY.  GOOD MORNING TO YOU AS WELL, SIR.

3    THE PROBATION OFFICER:  GOOD MORNING.

4    THE COURT:  ALL RIGHT.  MS. MAURYA, I HAVE REVIEWED

5    THE PRESENTENCE INVESTIGATION REPORT, MA'AM.  HAVE YOU ALSO

6    REVIEWED IT WITH YOUR ATTORNEYS?

7    THE DEFENDANT:  I HAVE.

8    THE COURT:  ALL RIGHT.  THE ADVISORY CUSTODY

9    GUIDELINE RANGE WAS CALCULATED BY PROBATION AS 78 TO 97 MONTHS,

10   WITH A FINE GUIDELINE RANGE OF $12,500 TO $125,000, AND A

11   SUPERVISED RELEASE RANGE OF ONE TO THREE YEARS.

12   MS. MAURYA'S CRIMINAL HISTORY CATEGORY WAS FOUND TO

13   BE I.

14   THESE CALCULATIONS ARE BASED ON A TOTAL OFFENSE LEVEL

15   OF 28 THAT STARTS WITH A BASE OFFENSE LEVEL OF SEVEN.  THAT'S

16   PURSUANT TO U.S.S.G. 2B1.1(A)(1).

17   A 20-LEVEL INCREASE HAS BEEN ADDED IN BASED ON LOSS

18   AMOUNT, WHICH PROBATION DETERMINED TO BE GREATER THAN $9.5

19   MILLION BUT LESS THAN $25 MILLION.  AND THAT'S PURSUANT TO

20   2B1.1(B)(1)(K).

21   THERE IS ALSO A TWO-LEVEL INCREASE BECAUSE THE

22   OFFENSE RESULTED IN FINANCIAL HARDSHIP TO OTHERS.

23   THEN A TWO-LEVEL INCREASE FOR SOPHISTICATED MEANS.

24   THERE IS THEN A TWO-LEVEL DECREASE FOR MS. MAURYA'S

25   ROLE IN THE OFFENSE AS A MINOR PARTICIPANT.

1      THEN A TWO-LEVEL INCREASE FOR ABUSE OF TRUST?  YES,

2  THAT ONE HAS BEEN INCORPORATED HERE.

3      AND THEN A THREE-LEVEL DECREASE FOR MS. MAURYA'S

4  ACCEPTANCE OF RESPONSIBILITY.

5      ARE THERE ANY OBJECTIONS TO THOSE CALCULATIONS AND/OR

6  THE FACTUAL FINDINGS IN THE PRESENTENCE REPORT ON BEHALF OF THE

7  GOVERNMENT?

8      MS. BARRON:  NO, YOUR HONOR.

9      THE COURT:  ALL RIGHT.  AND ON BEHALF OF MS. MAURYA.

10      MR. JOHNSON:  YOUR HONOR, WE OBJECT TO THE LOSS

11  AMOUNT AS WELL AS THE FINANCIAL HARDSHIP ENHANCEMENT.

12      THE COURT:  ALL RIGHT.  ARE YOU READY TO BE HEARD

13  FURTHER ON THAT, OR DO YOU WANT THE COURT TO SIMPLY RELY ON THE

14  PLEADINGS?  ARE YOU READY TO ELABORATE ON THAT FOR THE COURT?

15      MR. JOHNSON:  ON THE LOSS AMOUNT, YOUR HONOR?

16      THE COURT:  YES.

17      MR. JOHNSON:  JUST BRIEFLY.

18      THE COURT:  ALL RIGHT.  LET'S HEAR IT.

19      MR. JOHNSON:  YOUR HONOR, IN OUR SENTENCING

20  MEMORANDUM, WE RAISED A NUMBER OF OBJECTIONS TO THE

21  GOVERNMENT'S PROPOSED LOSS AMOUNT, THE $22 MILLION.  AND, OF

22  COURSE, YESTERDAY THE COURT RULED ON THAT SPECIFIC OBJECTION AS

23  IT RELATED TO MR. HARDWICK AND FOUND THAT THE GOVERNMENT HAD

24  NOT PROVEN BY A PREPONDERANCE OF THE EVIDENCE THAT THE

25  GOVERNMENT HAD MET ITS BURDEN.

1          INSTEAD, THE COURT RELIED UPON THE SUBSTANTIVE WIRE

2    FRAUD COUNTS IN THE INDICTMENT, I BELIEVE, AND ARRIVED AT THE

3    $6 MILLION FIGURE.  AND I CERTAINLY UNDERSTAND HOW THE COURT

4    ARRIVED THERE.  WE WOULD STILL CONTEND THAT THE MOST CONFIDENT

5    SUREST WAY TO APPLY A LOSS AMOUNT AS IT RELATES TO MS. MAURYA

6    WOULD BE TO USE HER GAIN, WHICH WE KNOW WHAT THAT IS.  IT WAS

7    $900,000.  THAT'S WHAT SHE TOOK FROM THE FIRM.

8          AND WE WOULD SUBMIT TO THE COURT THAT THE $900,000

9    AND A 14-LEVEL INCREASE IS APPROPRIATE.

10          THE COURT:  ALL RIGHT.  ARE YOU GOING TO ARGUE

11    HARDSHIP SEPARATELY?  OR DO YOU TAKE POSITION THAT THEY GO HAND

12    IN HAND?

13          MR. JOHNSON:  I WOULD ARGUE IT SEPARATELY, YOUR

14    HONOR.

15          THE COURT:  ALL RIGHT.  THEN I'LL HEAR FROM THE

16    GOVERNMENT.

17          MS. BARRON:  THANK YOU, YOUR HONOR.

18          AS WE STATED IN OUR SENTENCING MEMO, YOU ONLY LOOK TO

19    GAIN IF YOU CANNOT DETERMINE THE LOSS AMOUNT AND THERE'S NO

20    REASONABLE METHODOLOGY FOR DOING THAT.

21          MS. BECK, MAY I PLEASE HAVE THE ELMO?  I'M SO SORRY.

22    I SHOULD HAVE ASKED YOU AHEAD OF TIME.

23          AND IN THIS CASE, WE CAN DETERMINE THE LOSS.  AND I

24    UNDERSTAND THE COURT'S FINDINGS FROM YESTERDAY, AND I'M NOT

25    GOING TO QUARREL.  I WOULD LIKE TO MAKE OUR RECORD JUST TO

1    PRESERVE OUR OBJECTION.

2            BUT THE COURT DID RELY ON COUNTS TWO THROUGH 22 OF

3    THE SUPERSEDING INDICTMENT, CALCULATED THE LOSS TO BE OVER A

4    LITTLE OVER SIX MILLION.

5            I HAVE HANDED WHAT I'VE MARKED AS GOVERNMENT'S

6    SENTENCING EXHIBIT 1 TO THE DEFENSE.  THIS BASICALLY IS --

7            THE COURT:  AND LET ME JUST MAKE ONE CORRECTION.  I

8    FOUND IT TO BE AT LEAST SIX MILLION.

9            MS. BARRON:  AT LEAST SIX MILLION, THAT'S CORRECT.

10           THE COURT:  OKAY.  FAIR.

11           MS. BARRON:  AND SO THIS IS JUST -- I JUST WANT TO

12   HAVE IT IN THE RECORD.  THESE ARE THE DOCUMENTS THAT

13   SUBSTANTIATE THE COURT'S FINDINGS FROM YESTERDAY, JUST SO THAT

14   WE HAVE A SEPARATE RECORD IN THIS CASE.  THIS CONSTITUTES WHAT

15   WERE GOVERNMENT'S TRIAL EXHIBITS 2 THROUGH 22 IN MR. HARDWICK'S

16   CASE.  I PUT THEM IN ONE EXHIBIT.  I WOULD OFFER THEM AS AN

17   EXHIBIT IN THIS CASE, JUST AS A FLOOR FOR LOSS.

18           AND I WOULD NOTE THAT --

19           THE COURT:  THANK YOU.

20           MS. BARRON:  -- THAT CONTAINS PROOF OF EVERY SINGLE

21   ONE OF THE WIRE TRANSACTIONS IN COUNTS TWO THROUGH 22,

22   INCLUDING THE E-MAILS AND THE DOCUMENTATION SHOWING THAT MS.

23   MAURYA'S HANDS WAS ON EVERY SINGLE ONE OF THOSE TRANSACTIONS.

24   SO, UNQUESTIONABLY, THOSE TRANSACTIONS ARE TIED TO HER CONDUCT.

25           THE QUESTION FOR THE GOVERNMENT THEN IS, HOW MUCH

1    EXTRA SHOULD SHE BE ACCOUNTABLE FOR.  AND SO I'M GOING TO SHOW

2    -- I UNDERSTAND THAT MR. JOHNSON IS GOING TO STIPULATE THAT

3    THIS IS -- THAT GOVERNMENT'S EXHIBIT 2 IS A SUMMARY OF

4    VOLUMINOUS RECORDS THAT WE HAVE PRODUCED IN DISCOVERY.  IT WAS

5    ALSO INTRODUCED AT TRIAL AS GOVERNMENT'S EXHIBIT 1001, I

6    BELIEVE.

7              THE COURT:  SO STIPULATED, MR. JOHNSON?

8              MR. JOHNSON:  FOR PURPOSES OF ADMISSIBILITY, YES,

9    YOUR HONOR.

10             THE COURT:  OKAY.  ALL RIGHT.  AND I'M SORRY TO

11   INTERRUPT YOU, ALSO, MS. BARRON, BUT JUST BEFORE YOU GO ON, I

12   WANT TO MAKE SURE I UNDERSTAND.  UP TO THIS POINT, YOU ARE

13   SAYING THAT, BASED ON MY FINDINGS YESTERDAY WITH RESPECT TO

14   LOSS AMOUNT IN CONNECTION WITH MR. HARDWICK, FOR ANYTHING THAT

15   I ATTRIBUTED TO HIM AS LOSS AMOUNT, THOSE SAME COUNTS, EVEN

16   THOUGH MS. MAURYA IS NOT CHARGED IN THOSE, SHOULD BE ATTRIBUTED

17   TO HER AS WELL BECAUSE THE EVIDENCE SUPPORTS THAT SHE MADE ALL

18   THOSE TRANSACTIONS HAPPEN?

19             MS. BARRON:  THAT'S CORRECT, YOUR HONOR.  AND I WOULD

20   LIKE TO SAY THAT EVEN THOUGH I KNOW IT WAS A SEPARATE

21   PROCEEDING, DOES NOT APPLY TO MS. MAURYA, WE CHARGED AIDING AND

22   ABETTING ON THOSE SUBSTANTIVE WIRE COUNTS.  MR. HARDWICK WAS

23   FOUND GUILTY OF COMMITTING THOSE COUNTS, AIDED AND ABETTED BY

24   MS. MAURYA.  EVERY SINGLE ONE OF THE E-MAIL TRANSACTIONS AND

25   COMMUNICATIONS IS IN GOVERNMENT'S EXHIBIT 1 TODAY SHOWING THAT

1    HER HANDS WERE ALL OVER EVERY SINGLE ONE OF THOSE TRANSACTIONS.

2              THE COURT:  ALL RIGHT.  THANK YOU.

3              MS. BARRON:  AND I'M NOT TRYING TO QUARREL.  I

4    UNDERSTAND THE COURT'S POSITION.  SO I JUST WANT TO MAKE A

5    QUICK RECORD OF WHAT WE BELIEVE THE LOSS SHOULD BE.

6              THE COURT:  ALL RIGHT.

7              MS. BARRON:  SO WHAT GOVERNMENT'S EXHIBIT 2 SHOWS IS,

8    THIS IS JUST FOR THREE YEARS OF THE CONSPIRACY.  IN THIS COLUMN

9    TITLED MHS'S NET INCOME, THESE ARE BASED ON THE AUDITED

10   FINANCIAL STATEMENTS FOR MHS THAT WERE PREPARED BY WARREN

11   AVERETT.  AND IT SHOWS THE NET INCOME OF THE FIRM.  UNDER THE

12   SHAREHOLDERS AGREEMENT, NET INCOME IS WHAT WAS SUPPOSED TO

13   DETERMINE HOW MUCH THE PARTNERS WERE TO BE DUE IN

14   DISTRIBUTIONS.

15             AND FOR THE SAKE OF EASE, MR. HARDWICK AT TIMES WAS

16   DUE 40 PERCENT OF THE PROFITS, AT TIMES HE WAS DUE 55.  BUT TO

17   BE CONSERVATIVE AND TO CONSTRUE EVERY BENEFIT TO MS. MAURYA'S

18   -- TO HER BENEFIT, EVERY FACT TO HER BENEFIT, I'M GOING TO TAKE

19   THE CONSERVATIVE NUMBER OF 55 PERCENT AND SAY THAT IN EVERY

20   YEAR, MR. HARDWICK WAS DUE 55 PERCENT OF THIS AMOUNT OF MONEY.

21             SO OVER THESE THREE YEARS, HE WAS DUE 55 PERCENT OF

22   $9,982,000 AND CHANGE, WHICH -- I'VE DONE THE MATH; MR. JOHNSON

23   CAN DOUBLE-CHECK ME -- TURNS OUT TO BE $5,490,362.35.  AND THAT

24   IS WHAT HE WAS DUE.

25             THE NEXT COLUMN HERE IS A SUM TOTAL.  AND KIM JOHNSON

1    FROM THE FBI PREPARED THIS EXHIBIT.  I'VE SHARED HER TRIAL

2    TRANSCRIPT WITH MR. JOHNSON.  AND WHAT SHE TESTIFIED IS THAT

3    SHE LOOKED OVER ALL OF THE TRANSACTIONS THAT WERE MADE FROM THE

4    MHS ACCOUNTS TO OR FOR MR. HARDWICK'S BENEFIT, INSTIGATED --

5    ALL OF THEM -- BY MS. MAURYA.  AND THE SUM TOTAL THAT HE

6    RECEIVED WAS $20,563,746.65.  SUBTRACTING THE NUMBER THAT I

7    JUST STATED OF WHAT HE'S ENTITLED TO, FIVE MILLION AND CHANGE,

8    WE SEE THAT HE RECEIVED AN OVERAGE OF FIFTEEN MILLION

9    SEVENTY-THREE DOLLARS THREE HUNDRED -- $15,073,384.20.

10            AND SO USING THE MOST CONSERVATIVE ESTIMATE OF LOSS

11   AND CONSTRUING THE FACTS TO MS. MAURYA'S FAVOR, NOT EVEN

12   INCLUDING 2014, THE LOSS, WE BELIEVE, IS COMFORTABLY IN

13   SUBSECTION (K), BETWEEN 9.5 AND $25 MILLION.

14            AND SO WE BELIEVE -- AND I UNDERSTAND THAT MS. MAURYA

15   DID NOT RECEIVE THE BENEFIT OF ANY OF THAT MONEY.  WE

16   ACKNOWLEDGE THAT.  AND THAT'S WHY WE DID NOT DISPUTE THAT SHE

17   IS ELIGIBLE FOR A MINOR ROLE DEDUCTION, BECAUSE SHE DIDN'T GET

18   ANY OF THAT MONEY.  SHE HAD HER OWN SEPARATE SIDE SCHEME THAT

19   WE'LL TALK ABOUT LATER.

20            BUT MR. HARDWICK WOULD NOT HAVE BEEN ABLE TO STEAL

21   THIS AMOUNT OF MONEY WITHOUT HER HELP.  SHE MADE IT POSSIBLE

22   FOR HIM TO DESTROY THAT FIRM.  AND WE BELIEVE SHE SHOULD BE

23   HELD ACCOUNTABLE FOR THAT FULL LOSS AMOUNT.

24            THANK YOU, YOUR HONOR.

25            THE COURT:  THANK YOU.

1        ANY REPLY TO THAT, MR. JOHNSON?

2        MR. JOHNSON:  YOUR HONOR, JUST BRIEFLY.

3        THE COURT:  AND, IN PARTICULAR, IF YOU WOULD ADDRESS

4   WHY I SHOULD NOT AGAIN AT LEAST MAKE THE FLOOR SIX MILLION AS,

5   AS SUPPORTED BY THE COUNTS OF THE INDICTMENT, EVEN THOUGH I

6   UNDERSTAND, AND AS CLARIFIED BY THE GOVERNMENT, MS. MAURYA IS

7   NOT CHARGED THE SAME WAY THAT MR. HARDWICK IS CHARGED IN THOSE

8   COUNTS.

9        MR. JOHNSON:  WELL, YOUR HONOR, I SUPPOSE, UNLIKE MR.

10  HARDWICK, MS. MAURYA WAS NEVER CONVICTED ON THOSE COUNTS.  I

11  THINK THAT'S ONE DIFFERENCE THAT THE COURT WOULD HAVE TO TAKE

12  INTO ACCOUNT.

13       THAT BEING SAID, I THINK PART OF MS. MAURYA'S

14  AGREEMENT WITH THE GOVERNMENT WAS TO COOPERATE.  AND HAD SHE

15  GONE TO TRIAL AND TESTIFIED, SHE PROBABLY WOULD HAVE TESTIFIED

16  THAT, YEAH, THESE ACCOUNTS, THESE WIRE TRANSFERS I SENT.

17       WAS THE FORESEEABILITY THE SAME AS MR. HARDWICK?

18  PROBABLY NOT.  HIS, HIS ROLE IN THIS CONSPIRACY I THINK WAS A

19  BIT WIDER.  HE KNEW WHAT HE WAS DOING WITH THE MONEY AND

20  WHETHER HE WAS ENTITLED TO THAT OR NOT.  THAT IS ONE -- ANOTHER

21  DIFFERENCE BETWEEN THE TWO OF THEM.

22       AND I DON'T KNOW IF YOUR HONOR WANTS ME TO GO INTO

23  RESPONDING TO THE GOVERNMENT'S ARGUMENTS THAT THEY HAVE TODAY,

24  WHICH I THINK WERE THE SAME AS YESTERDAY, WHICH THE COURT

25  REJECTED.  BUT I CERTAINLY CAN IF THE COURT WOULD --

1    THE COURT:  I THINK YOU NEED TO MAKE A FULL RECORD,

2  SO, YES, SIR.

3    MR. JOHNSON:  THE GOVERNMENT, I THINK, IS ARGUING

4  DIFFERENT METHODS ON HOW THEY ARE ARRIVING AT A LOSS AMOUNT.

5    IN THE PSR, THEY SEEM TO MAKE IT PLAIN THAT WE'RE

6  TALKING ABOUT FIDELITY'S CASH INFUSIONS INTO THE, INTO THE --

7  TO REPLACE THE ESCROW SHORTAGES AFTER THEY TOOK OVER.  AND

8  TODAY THEY ARE TALKING ABOUT MHS'S NET INCOME VERSUS THE AMOUNT

9  PAID TO MR. HARDWICK.  AND I THINK BOTH ARE PROBLEMATIC FOR THE

10  REASONS SPELLED OUT IN OUR SENTENCING MEMORANDUMS.  NEITHER

11  ACCOUNTS FOR HOW MUCH MR. HARDWICK WAS ACTUALLY OWED.  THAT

12  SEEMS TO BE THE BIG MISSING PICTURE HERE.

13    WE HAVE THE SHAREHOLDERS -- EXCUSE ME, SHAREHOLDERS

14  AGREEMENT THAT EVERYONE TALKED ABOUT YESTERDAY.  THE GOVERNMENT

15  TALKED ABOUT 55 PERCENT.  THE PROBLEM, OF COURSE, IS, NOT ALL

16  THE PARTNERS AGREED WITH THAT ALL THE TIME, OR DIDN'T FOLLOW

17  IT, AT LEAST, MANY TIMES.  SO IF YOU ARE NOT FOLLOWING YOUR

18  SHAREHOLDERS AGREEMENT, IT'S KIND OF DIFFICULT TO KNOW HOW MUCH

19  IS EXACTLY OWED.

20    AND MY UNDERSTANDING IS, AT TRIAL, THE GOVERNMENT

21  NEVER TOLD THE COURT HOW MUCH MR. HARDWICK WAS OWED, AND NOR

22  HAVE THEY TODAY.  AT LEAST WHEN YOU TAKE INTO ACCOUNT THE

23  SHAREHOLDERS AGREEMENT THAT WASN'T BEING FOLLOWED, I THINK

24  THAT'S VERY DIFFICULT TO DO.

25    THERE'S ALSO A DIFFERENCE IN WHAT FIDELITY FUNDED

1   VERSUS WHAT THE GOVERNMENT CLAIMS MR. HARDWICK TOOK.  AND THERE

2   SEEMS TO BE NO EXPLANATION FOR THAT.  AND IN THE END, NEITHER

3   ACCOUNTS FOR HOW MUCH MR. HARDWICK WAS ACTUALLY OWED.

4           SO I DON'T KNOW HOW YOU GET AROUND THAT.  THERE HAS

5   TO BE SOME OTHER MEASURE OF LOSS AT THAT POINT.  I DON'T THINK

6   THAT'S RELIABLE ENOUGH TO SAY, WE'RE GOING TO HOLD YOU

7   ACCOUNTABLE FOR THIS LOSS FIGURE.

8           AND THAT'S OUR BASIC ARGUMENT.

9           THE COURT:  ALL RIGHT.  THANK YOU, SIR.

10          MS. BARRON:  YOUR HONOR, MAY I RESPOND VERY BRIEFLY?

11  I DO WANT TO CLARIFY --

12          THE COURT:  YEAH.

13          MS. BARRON:  -- THAT FIDELITY ISSUE AND THE ESCROW

14  ISSUE.

15          MR. JOHNSON SAID THAT IN THE PSR, THE GOVERNMENT TOOK

16  THE POSITION.  THE GOVERNMENT DOES NOT DRAFT THE PSR.  WE

17  AGREED WITH THE LOSS CATEGORY IN THE PSR.  AND THE, THE PSR

18  DOES LOOK AT THE ESCROW HOLE.  IT KIND OF LOOKS AT WHAT WAS THE

19  ACTUAL, YOU KNOW, IN AUGUST 2014, THAT SNAPSHOT, WHAT WAS THE

20  LOSS, WHAT WAS THE DAMAGE TO THE FIRM.

21          WE'RE ASKING THE COURT TO LOOK AT INTENDED LOSS,

22  WHICH IS HOW MUCH MONEY DID MR. HARDWICK TRY TO TAKE.  AND

23  THOSE ARE THE SIMPLE NUMBERS.  IT'S SIMPLE MATH.  WE BELIEVE IT

24  IS AN EASIER WAY TO GET TO LOSS.  AND SO THAT IS WHAT WE ARE

25  RELYING -- THE PSR IS NOT WRONG.  IT'S JUST A DIFFERENT

1    METHODOLOGY TO EVALUATE THE IMPACT OF THE FRAUD.

2              THANK YOU.

3              THE COURT:  THANK YOU.  SO NOTED.

4              ALL RIGHT.  I WILL SUSTAIN DEFENSE'S OBJECTION THERE.

5    AND AS FAR AS A 20-LEVEL ENHANCEMENT, I WILL INSTEAD APPLY A

6    14-LEVEL ENHANCEMENT THERE FOR LOSS AMOUNT.

7              ALL RIGHT.  NEXT OBJECTION, MR. JOHNSON?

8              MR. JOHNSON:  YOUR HONOR, OUR NEXT OBJECTION WOULD BE

9    THE FINANCIAL HARDSHIP.

10             YOUR HONOR, THE APPLICATION NOTES UNDER 2B1.1 NOTE

11   THAT DETERMINING WHETHER THE OFFENSE RESULTED IN A SUBSTANTIAL

12   FINANCIAL HARDSHIP TO A VICTIM, THE COURT SHALL CONSIDER AMONG

13   OTHER FACTORS WHETHER THE OFFENSE RESULTED IN THE VICTIM

14   BECOMING INSOLVENT, FILING FOR BANKRUPTCY, SUFFERING

15   SUBSTANTIAL LOSS OF RETIREMENT OR INVESTMENT FUNDS, MAKING

16   SUBSTANTIAL CHANGES TO HIS EMPLOYMENT, SUCH AS POSTPONING HIS

17   RETIREMENT PLANS, MAKING SUBSTANTIAL CHANGES TO LIVING

18   ARRANGEMENTS, AND SUFFERING HARM TO HIS ABILITY TO OBTAIN

19   CREDIT.

20             THE THRUST OF THE GOVERNMENT'S ARGUMENT FOR WHY THIS

21   ENHANCEMENT SHOULD APPLY SEEMS TO BE THAT -- I'M GOING TO QUOTE

22   FROM THEIR SENTENCING MEMORANDUM -- THE FINANCIAL STATUS OF THE

23   VICTIM SHOULD NOT MATTER.  ALL PERSONS, REGARDLESS OF THEIR

24   WEALTH OR LACK OF IT, ARE ENTITLED TO EQUAL TREATMENT UNDER THE

25   LAW WHEN THEY ARE VICTIMS OF THE CRIME.  BUT THAT'S NOT

1  ENTIRELY TRUE, AND WE KNOW THAT'S NOT TRUE BECAUSE WE HAVE A

2  RECENT ELEVENTH CIRCUIT CASE WHICH WE CITED IN OUR MEMO, UNITED

3  STATES VERSUS CASTANEDA-POZO, WHICH IS A 2017 ELEVENTH CIRCUIT

4  CASE.

5        AND IN THAT CASE, FIRST OF ALL, I THINK IT'S CLEAR

6  THAT THIS IS A RATHER NEW SENTENCING ENHANCEMENT.  I BELIEVE IT

7  WAS PUT INTO PLACE IN 2015 AT THE TIME OF THE CHARGE CONDUCT

8  THAT WASN'T EVEN IN EFFECT.  BUT THE 11TH CIRCUIT, THEY TURN TO

9  A, I BELIEVE IT WAS A THIRD CIRCUIT CASE.  AND THEY STATED THAT

10 THE INQUIRY SPECIFIC TO EACH VICTIM IS THE SAME DOLLAR HARM TO

11 ONE VICTIM MAY RESULT IN A SUBSTANTIAL FINANCIAL HARDSHIP,

12 WHILE, FOR ANOTHER, IT MAY ONLY BE A MINOR HICCUP.

13        AND IN THIS CASE, I BELIEVE THERE ARE FOUR OR FIVE

14 VICTIMS WHO LOST BETWEEN FOUR AND $800.

15        BUT THE POINT WAS, IS THAT THEY LOST THEIR HOMES,

16 THEIR APARTMENTS, THEY WERE KICKED OUT, I BELIEVE.  AND THE

17 11TH CIRCUIT FOUND THAT THAT WAS A SUBSTANTIAL FINANCIAL

18 HARDSHIP BECAUSE THE LOSS DEPRIVED THEM OF LIFE'S BASIC

19 NECESSITIES.

20        I'VE READ GOVERNMENT'S EXHIBIT C, WHICH IS MR.

21 WITTSTADT'S LETTER TO THE GOVERNMENT EXPLAINING HIS LOSSES.

22 AND IT'S CLEAR BASED ON THIS THAT HE WENT FROM $2.2 MILLION IN

23 INCOME IN 2013 TO, IN 2017, HE'S MAKING $172,000.  THAT'S HOW

24 MUCH A MEMBER OF CONGRESS MAKES.  I WOULD SUBMIT TO THE COURT

25 THAT IF YOU'RE MAKING THAT MUCH MONEY, YOU'RE NOT SUFFERING A

1   SUBSTANTIAL FINANCIAL HARDSHIP.

2           AND I WOULD BACK THAT UP BY GOING BACK TO THE

3   APPLICATION NOTES, LOOKING AT WHAT IT SAYS, AND WE HAVE TO ASK

4   OURSELVES, WAS THERE SUBSTANTIAL LOSS OF RETIREMENT FUNDS OR

5   INVESTMENT FUND?  DO WE HAVE TO -- DID HE HAVE TO POSTPONE HIS

6   RETIREMENT PLANS?  DID HE HAVE TO CHANGE HIS LIVING

7   ARRANGEMENTS?  CAN HE NOT OBTAIN CREDIT?

8           THOSE ARE THE FACTORS THAT THE COURT HAS TO CONSIDER.

9   OF COURSE, THE COURT CAN CONSIDER OTHER FACTORS AS WELL.  BUT I

10  DON'T BELIEVE THERE'S BEEN ANY EVIDENCE OF THAT IN THE RECORD.

11          WE HAVE THE BANKRUPTCY OF MHS, BUT ULTIMATELY MHS IS

12  REALLY ITS OWNERS, THE WITTSTADTS.  AND I DON'T THINK THAT WE

13  HAVE ENOUGH EVIDENCE TO SUPPORT THIS ENHANCEMENT.  THERE HAS

14  GOT TO BE A DIFFERENCE BETWEEN AN ELDERLY WIDOW WHO GIVES HER

15  LAST $10,000 TO A PONZI SCHEME FRAUDSTER VERSUS THE WITTSTADTS.

16          EVERYONE SUFFERS FINANCIAL HARM IN A FRAUD CASE.  THE

17  VICTIMS DO ANYWAY.  BUT THAT'S NOT THE QUESTION.  THE QUESTION

18  IS, IS THAT HARM SO EGREGIOUS THAT IT'S A SUBSTANTIAL FINANCIAL

19  HARDSHIP.  ARE THEY GOING WITHOUT LIFE'S BASIC NECESSITIES.

20          WE ALSO BROUGHT UP A SECOND POINT IN OUR SENTENCING

21  MEMORANDUM, AND THAT'S PARAGRAPH 73 OF THE PSR.  PARAGRAPH 73

22  OF THE PSR TALKS ABOUT THE LAWSUITS THAT FOLLOWED IN THE WAKE

23  OF THE MHS SCANDAL AND, IN PARTICULAR, THE PRITCHARD AND THE

24  JOHNSON LAWSUITS.  AND IT TALKS ABOUT THE SALACIOUS CLAIMS MADE

25  BY JOHNSON AGAINST THE WITTSTADTS.

1    IT ALSO TALKS ABOUT WHAT MR. HARDWICK DID IN THOSE

2    LAWSUITS.  IT NOTES THAT MR. HARDWICK SUBMITTED AFFIDAVITS IN

3    THE LAWSUITS IN WHICH HE ACCUSED THE WITTSTADTS OF LYING ABOUT

4    THE THEFT AND THE LOANS.

5    THE PSR THEN GOES ON, THESE ALLEGATIONS DESTROYED THE

6    WITTSTADTS' REPUTATIONS AND CAUSED THEIR FINANCIAL INSTITUTION

7    CLIENTS TO MOVE THEIR LEGAL WORK ELSEWHERE.  AND THEN THE

8    BANKRUPTCY FOLLOWED.

9    MS. MAURYA, OF COURSE, HAD NOTHING TO DO WITH THE

10   JOHNSON LAWSUIT.  SHE HAD NOTHING TO DO WITH MR. HARDWICK

11   FILING THOSE FALSE AFFIDAVITS IN THOSE LAWSUITS, WHICH,

12   ACCORDING TO THE PSR, IS THE THING THAT CAUSED THEIR

13   REPUTATIONS TO BE RUINED, OR TARNISHED.

14   SO FOR THESE REASONS, WE WOULD SUBMIT TO THE COURT

15   THAT THIS ENHANCEMENT IS NOT APPROPRIATE AS IT APPLIES TO MS.

16   MAURYA.

17   THE COURT:  ALL RIGHT.  THANK YOU.

18   GOVERNMENT.

19   MS. BARRON:  THANK YOU, YOUR HONOR.  AND I DO WANT TO

20   NOTE THAT, FOR THE RECORD, THAT THE COURT DID FIND THAT THE

21   FRAUD THAT MR. HARDWICK PARTICIPATED IN, WHICH WAS THE SAME

22   FRAUD THAT MS. MAURYA PARTICIPATED IN, DID CAUSE SUBSTANTIAL

23   HARDSHIP.

24   I WANT TO ADDRESS FIRST THE VERY PERSONAL IMPACT THAT

25   THIS HAD ON THE WITTSTADTS.  SO MR. JOHNSON IS CORRECT TO NOTE

1   THAT IT IS THE FIRM THAT FILED BANKRUPTCY.  BUT THE FIRM WAS

2   OWNED BY TWO PEOPLE, AND THAT WAS ROD AND MARK WITTSTADT.  IT

3   WAS THEIR SOLE SOURCE OF LIVELIHOOD.  AND WHEN THAT FIRM WENT

4   BANKRUPT, THEY WERE OUT OF A JOB.

5           AND SO IT IS ABSOLUTELY TRUE THAT WE ARE LOOKING AT

6   THOSE FACTORS OF SUBSTANTIAL HARDSHIP AND LOSS OF A JOB.

7   THAT'S WHAT HAPPENED.  AND HAD FIDELITY NOT STEPPED IN AND

8   HELPED THE FIRM FLOAT FOR ANOTHER YEAR, THAT FIRM WOULD HAVE

9   GONE BANKRUPT IN AUGUST 2014 AND THEY, ALONG WITH EVERY SINGLE

10  EMPLOYEE, WOULD HAVE BEEN IMMEDIATELY OUT OF A JOB.

11          MR. JOHNSON SAID THAT, ACCORDING TO THE PSR, THE

12  JOHNSON AND PRITCHARD LOANS CAUSED REPUTATIONAL DAMAGE THAT

13  EVENTUALLY CAUSED THE FIRM TO IMPLODE.  AND THAT'S TRUE.  THERE

14  WERE A HOST OF FACTORS.  I MENTIONED YESTERDAY THAT THERE WAS A

15  JUDGMENT ENTERED IN THE PRITCHARD LAWSUIT THAT THE FIRM COULD

16  NOT PAY THAT WAS PART OF THE BANKRUPTCY.  BUT THE QUESTION IS,

17  IS SHE THE PROXIMATE CAUSE OF ALL OF THIS.  AND THE ANSWER TO

18  THAT IS YES.

19          HAD MS. MAURYA NOT HELPED MR. HARDWICK BANKRUPT THAT

20  FIRM AND SEND IT MORE THAN $30 MILLION IN THE HOLE, WOULD ANY

21  OF THAT HAVE HAPPENED.  WOULD MORRIS HARDWICK & SCHNEIDER STILL

22  BE A GOING CONCERN.  WOULD ALL OF THOSE PEOPLE STILL BE

23  EMPLOYED.  AND WOULD THE WITTSTADTS STILL BE MILLIONAIRES.  THE

24  ANSWER TO THAT IS CLEARLY YES.

25          BUT TO ADDRESS THE POINT OF WHETHER THE FACT THAT

1    THEY, YOU KNOW, ONLY MAKE $172,000 NOW, IF THAT'S SUBSTANTIAL

2    HARM, THERE IS NOTHING IN THE GUIDELINES AND THERE'S NOT A

3    SINGLE POINT OF LAW THAT MR. JOHNSON HAS RELIED TO THAT SAYS

4    THAT YOU HAVE TO BE IMPOVERISHED BY THE HARM -- BY THE FRAUD IN

5    ORDER TO BE SUBSTANTIALLY HARMED.  GOING FROM $2 MILLION TO

6    172,000, 172,000 IS STILL A GOOD INCOME, BUT IT'S LESS THAN TEN

7    PERCENT OF WHAT HE MADE BEFORE THE FRAUD.  SO HER CONDUCT

8    CAUSED OVER A 90 PERCENT REDUCTION IN HIS INCOME.

9            AND HE'S GOING TO SPEAK LATER AND ADDRESS THE COURT.

10   BUT I IMAGINE SOME OF THE THINGS HE IS GOING TO TALK ABOUT ARE

11   THE CHANGES IN HIS LIFESTYLE THAT HE'S HAD TO MAKE, THE FACT

12   THAT HE'S STRUGGLING TO PUT HIS DAUGHTER THROUGH A STATE SCHOOL

13   WHEN, BEFORE, HE WOULD NEVER HAVE HAD TO WORRY ABOUT THAT.

14           BUT I ALSO WANT TO POINT THE COURT TO -- AND MR.

15   JOHNSON DIDN'T ADDRESS THIS AT ALL, AND WE BROUGHT IT UP IN OUR

16   SENTENCING MEMO -- THE LETTER FROM MR. TALAGANIS.  NOW, HE

17   DESCRIBES EVENTS THAT TOOK PLACE BEFORE THE PRITCHARD AND

18   JOHNSON LAWSUITS WERE FILED.  HE SAYS THAT -- AND HE MANAGED AN

19   OFFICE IN OHIO.  AND HE SAID THAT THE DAY AFTER THIS NEWS

20   BECAME PUBLIC, HIS CLIENTS STARTED PULLING BACK.  HIS MAIN

21   CLIENTS SAID, WE'LL LET YOU KEEP THE WORK THAT YOU CURRENTLY

22   HAVE, BUT WE'RE NOT SENDING MORE BUSINESS YOUR WAY.

23           NO ONE WANTED TO TOUCH MHS BECAUSE OF THE FACT THAT

24   ESCROW MONEY -- I MEAN, FOR A LAW FIRM, THAT IS, THAT IS THE

25   ONE THING THAT, IF YOU DO NOTHING ELSE RIGHT, THE ONE THING YOU

1   SHOULD NEVER DO IS GO INTO THE ESCROW ACCOUNT.  AND MS. MAURYA

2   KNEW THAT.  SHE IS NOT A LAWYER, BUT SHE KNEW THAT.  SHE HAD

3   WORKED IN TRUST ACCOUNTS BEFORE.

4           AND SO WHEN CLIENTS FIND OUT THAT YOU HAVE BEEN

5   TAMPERING WITH ESCROW MONEY, THAT INSTILLS A FUNDAMENTAL LACK

6   OF TRUST.  THEY DON'T WANT TO DO WORK WITH YOU.  AND THAT'S

7   EXACTLY WHAT HAPPENED AT MHS.

8           AND, YES, THE PRITCHARD AND JOHNSON LAWSUITS ADDED TO

9   THAT.  THE DEFAULT JUDGMENT ADDED TO THAT.  BUT THERE IS NO

10  QUESTION THAT MS. MAURYA WAS THE PROXIMATE CAUSE OF ALL OF THAT

11  HARM, ALL OF THOSE PEOPLE LOSING THEIR JOBS, THE FIRM GOING

12  BANKRUPT AND HAD -- BUT FOR FIDELITY STEPPING IN, THE

13  CATASTROPHIC CONSEQUENCES TO THE ATLANTA REAL ESTATE MARKET

14  THAT WOULD HAVE HAPPENED.

15          THANK YOU.

16          THE COURT:  THANK YOU.

17          I'LL GIVE YOU LAST WORD IF YOU LIKE, MR. JOHNSON.

18  ANY REPLY?

19          MR. JOHNSON:  YOUR HONOR, WITH REGARD TO THE

20  TALAGANIS LETTER, I BELIEVE, THE PROBLEM IS, THERE ARE NO

21  SPECIFICS IN THAT.  IT TALKS ABOUT HARM THAT WAS CAUSED, BUT

22  WHERE ARE THE SPECIFICS, THE NUMBERS.  WE DON'T HAVE THAT FROM

23  THAT LETTER.  AND OTHERWISE LOOKING AT THE PSR, IT SEEMS TO BE

24  THAT IT WAS THESE LAWSUITS AND MR. HARDWICK'S CONDUCT IN THOSE

25  LAWSUITS THAT CAUSED MOST OF THIS FINANCIAL HARM AT THE END OF

1    THE DAY.  AND, AGAIN, MS. MAURYA HAD NOTHING TO DO WITH THAT.

2           THE COURT:  NOW, IN THAT, MAKING THAT POINT, IS IT

3    YOUR POSITION THAT FINANCIAL HARDSHIP HAS TO BE SUPPORTED BY A

4    SPECIFIC DOLLAR AMOUNT?  OR CAN IT BE A GENERAL PROPOSITION OF

5    OR AN IDEA OF THE LOSS OF BUSINESS, A LOT OF BUSINESS, BASED ON

6    THE TARNISHING OF REPUTATION OF THE FIRM AND THE THINGS THAT

7    THE PROSECUTOR JUST POINTED OUT IN TERMS OF THE ACTIONS THE

8    CLIENTS WERE TAKING, JUMPING SHIP ONCE THEY FOUND OUT ALL OF

9    THIS WAS GOING ON?

10          MR. JOHNSON:  WELL, I DON'T THINK WE HAVE A LOT OF

11   CASE LAW TO GO ON IS PART OF THE PROBLEM.  IT'S A NEW

12   ENHANCEMENT.  BUT IF YOU LOOK AT IT, WE'RE TALKING ABOUT, YOU

13   HAVE TO DRAW THE LINE SOMEWHERE BETWEEN JUST FINANCIAL HARM AND

14   A FINANCIAL HARDSHIP, SUBSTANTIAL FINANCIAL HARDSHIP.  AND I'M

15   NOT SURE HOW YOU DO THAT WITHOUT ACTUAL REAL NUMBERS IN

16   COMPARISON, WHERE SOMEONE WAS BEFORE AND WHERE THEY ARE TODAY.

17          SO I THINK YOU DO NEED SOME SPECIFICS THERE.  AND

18   IT'S THE GOVERNMENT'S BURDEN BY A PREPONDERANCE OF THE EVIDENCE

19   TO SHOW THAT TO THE COURT.  AND I DON'T THINK THAT THEY'VE DONE

20   THAT AS IT APPLIES TO MS. MAURYA.

21          THE COURT:  OKAY.  AND I JUST WANT TO MAKE SURE I

22   UNDERSTAND YOU.  SO THE GOVERNMENT HAS NOT DONE THAT SIMPLY BY

23   SHOWING THE LOSS OF INCOME TO PARTICULAR PEOPLE WHO WERE

24   HARMED, WHO DID SUFFER A HARDSHIP, LIKE THE WITTSTADTS, FOR

25   INSTANCE, BASED ON --

1          MR. JOHNSON:  WE HAVE MARK WITTSTADT.

2          THE COURT:  YES.

3          MR. JOHNSON:  WE'VE GOT ONE SET OF NUMBERS GOING FROM

4    2 MILLION TO THE 172.  WE DON'T KNOW WHAT HE MADE LAST YEAR.

5    IT MIGHT BE A LOT MORE.  IT MIGHT BE A LOT LESS.  BUT WE DON'T

6    KNOW.  THAT'S NOT IN THE RECORD.

7          THE COURT:  WHAT ABOUT GOING FROM THE YEARS THAT WERE

8    SHARED WITH US, THOUGH, FROM 2013 AND -- WHAT WAS THE OTHER

9    YEAR -- 2017, THE YEARS THAT WERE REFLECTED IN THE PSR?

10         MR. JOHNSON:  AND I SUPPOSE MY ISSUE WITH THAT IS, IF

11   YOU LOOK AT THE ONE 11TH CIRCUIT CASE THAT WE DO HAVE, IT TALKS

12   ABOUT LIFE'S BASIC NECESSITIES.  DID THEY HAVE TO GO WITHOUT

13   LIFE'S BASIC NECESSITIES.  THAT DIDN'T HAPPEN HERE.  AND IF YOU

14   LOOK AT THE ACTUAL GUIDELINES AND WHAT THEY SAY THAT THE COURT

15   SHOULD CONSIDER, NONE OF THOSE ARE MET EITHER, NOT AS FAR AS

16   I'M AWARE ANYWAY.  AND THAT'S NOT IN THE RECORD IF IT IS.

17         THE COURT:  ALL RIGHT.  THANK YOU.  I UNDERSTAND YOUR

18   ARGUMENT.

19         ALL RIGHT.  I DO FIND THAT THERE WAS A FINANCIAL

20   HARDSHIP THAT HAS BEEN ESTABLISHED BY PREPONDERANCE OF THE

21   EVIDENCE WITH RESPECT TO MARK WITTSTADT, IN PARTICULAR.  AND SO

22   I WILL OVERRULE THAT OBJECTION.

23         MR. JOHNSON, NEXT?

24         MR. JOHNSON:  YOUR HONOR, I BELIEVE THOSE ARE ALL OF

25   THE OBJECTIONS THAT WE HAVE TO THE GUIDELINES AS CALCULATED.

1      THE COURT:  ALL RIGHT.

2      MR. JOHNSON:  THE ONLY REMAINING WOULD BE THE 5K AND

3  THE 3553.

4      THE COURT:  ALL RIGHT.  WE'LL COME BACK TO THAT IN

5  JUST ONE MOMENT.

6      ALL RIGHT.  SO I DO ADOPT THE FACTUAL FINDINGS AS

7  WELL AS THE CALCULATIONS FROM THE PRESENTENCE INVESTIGATION

8  REPORT, WITH THE EXCEPTION OF THE ONE OBJECTION ON WHICH I HAVE

9  RULED.

10      I SUSTAINED THE DEFENDANT'S OBJECTION TO THE LOSS

11  AMOUNT ENHANCEMENT AND CHANGED IT FROM 20 TO 14.

12      OTHER THAN THAT, I DO ADOPT THE CALCULATIONS AND THE

13  FACTUAL FINDINGS.

14      SO I TELL YOU WHAT.  BEFORE I GO AHEAD AND TOTAL

15  EVERYTHING UP AND RE-PRONOUNCE THE CALCULATIONS, LET'S GO AHEAD

16  AND DEAL WITH THE 5K.

17      MS. BARRON:  YOUR HONOR, PURSUANT TO THE PLEA

18  AGREEMENT AND TO SECTION 5K OF THE -- 5K, I BELIEVE IT'S 1.1 OF

19  THE SENTENCING GUIDELINES, THE GOVERNMENT DOES ASK FOR A

20  ONE-LEVEL DOWNWARD DEPARTURE FOR MS. MAURYA.  AND THIS IS BASED

21  ON HER PROVIDING SUBSTANTIAL ASSISTANCE TO THE GOVERNMENT.

22      THIS IS AN UNUSUAL CASE.  TYPICALLY WHEN WE HAVE A

23  COOPERATING CODEFENDANT, WE ALMOST ALWAYS WILL CALL THEM AT

24  TRIAL.  THEY'RE USUALLY THE BEST PERSON TO TELL THE STORY OF

25  THE CASE.  YOU KNOW, AND WITH, WITH EVERY COOPERATING

1  CODEFENDANT, THEY ARE COMPROMISED.  I MEAN, THEY ARE ALL

2  IMPAIRED IN SOME WAY.

3       MS. MAURYA PRESENTED AN UNUSUAL PROBLEM, BECAUSE

4  EVERY TIME WE MET WITH HER -- AND I WILL, I WILL CONCEDE, EVERY

5  TIME WE ASKED TO MEET WITH HER, SHE CAME, EVERY SINGLE TIME.

6  BUT THE REASON WHY WE HAD TO KEEP MEETING WITH HER IS BECAUSE

7  HER STORY KEPT SHIFTING JUST A LITTLE BIT, AND WE KEPT GETTING

8  NEW INFORMATION.  TWO WEEKS BEFORE TRIAL, WE LEARNED THAT SHE

9  HAD EMBEZZLED FROM LITERALLY EVERY SINGLE EMPLOYER SHE HAD EVER

10  HAD EXCEPT FOR ONE WHERE SHE ONLY WORKED FOR LIKE SIX WEEKS AND

11  I'M GUESSING DID NOT HAVE THE OPPORTUNITY TO EMBEZZLE.  AND IT

12  WAS THE SAME SCHEME.  IT WAS STEALING TO PAY OFF HER AMEX BILLS

13  OR STEALING FOR THE BENEFIT OF JOE DAVENPORT, WHO THE COURT

14  HEARD FROM -- HEARD ABOUT AT TRIAL.

15       AND WE FINALLY REACHED THE POINT WHERE WE REALIZED

16  THAT WE WEREN'T ENTIRELY SURE WHEN SHE WAS BEING STRAIGHT WITH

17  US.  IF I DIDN'T HAVE A DOCUMENT TO SUBSTANTIATE LITERALLY

18  EVERYTHING THAT CAME OUT OF HER MOUTH, I DIDN'T KNOW WHAT TO

19  BELIEVE.  AND WE COULDN'T ASK THE JURY TO BELIEVE HER.  AND SO

20  THAT PUT US IN AN UNUSUAL POSITION AT TRIAL.  WE HAD TO ADJUST

21  OUR TRIAL STRATEGY AND FIGURE OUT HOW TO PUT ON THE CASE

22  WITHOUT HER.

23       AND SO WE FOCUSED ON MR. HARDWICK'S OWN WORDS AND

24  ACTIONS.  AND THE CASE MAY HAVE BEEN STRONGER AS A RESULT.

25       BUT USUALLY WHEN WE OFFER A 5K TO PEOPLE, IT'S

1  BECAUSE THEY HAVE TESTIFIED IN SOME WAY OR THEY GAVE US

2  INFORMATION THAT LED TO AN INDICTMENT.  THAT IS NOT THE CASE

3  HERE.

4         HOWEVER, MS. MAURYA DID DO TWO THINGS THAT WE DO

5  BELIEVE WARRANT SOME RECOGNITION.  THE FIRST CAME BEFORE THE

6  GOVERNMENT INDICTED THE CASE.  AND THAT WAS WHEN FIDELITY --

7  THIS IS IN THE FALL OF 2014.  SHE WORKED WITH A MAN NAMED STEVE

8  HAMLIN, WHO WORKED AT FIDELITY.  AND STEVE HAMLIN'S JOB WAS TO

9  FIGURE OUT WHERE THE MONEY WENT, HOW MUCH OF IT WAS GONE, AND

10  HOW MUCH WAS NEEDED TO MAKE THE FIRM WHOLE.

11         AND MS. MAURYA, FROM WHAT WE UNDERSTAND -- WE TALKED

12  TO MR. HAMLIN TO FIND OUT WHAT SHE DID.  AND SHE WAS CRITICAL

13  IN HIS ABILITY TO GET A HANDLE ON THE FIRM FINANCES.  NO ONE

14  ELSE AT THAT FIRM COULD HAVE DONE WHAT SHE DID.  AND I BELIEVE

15  TO THIS DAY WE MAY NOT FULLY UNDERSTAND THE SCOPE OF THE FRAUD

16  HAD SHE NOT BEEN TRUTHFUL IN THAT WAY.

17         NOW, HOW DOES THAT TRANSLATE INTO SUBSTANTIAL

18  ASSISTANCE FOR THE GOVERNMENT.  THE GOVERNMENT LOOKED TO MR.

19  HAMLIN TO HELP FIGURE OUT WHAT THE LOSS WAS.  WE CONSIDERED

20  CALLING HIM AS A WITNESS AT TRIAL TO ESTABLISH LOSS AND TO

21  ESTABLISH EXACTLY THE SCOPE OF, OF THE FRAUD.

22         I WANT TO NOTE, HOWEVER, THAT THROUGHOUT ALL OF THAT

23  COOPERATION, SHE NEVER DISCLOSED TO FIDELITY OR TO MHS THAT SHE

24  HERSELF HAD EMBEZZLED $900,000.  THE GOVERNMENT, MR. CHAIKEN,

25  DISCOVERED THAT, AND THE FBI AGENTS DISCOVERED THAT.  SO SHE

1    WAS NEVER COMPLETELY TRUTHFUL WITH FIDELITY, EVEN IN THAT

2    SENSE.

3            BUT THE MAIN THING THAT SHE OFFERED TO THIS CASE AND

4    WHY WE ARE WILLING TO OFFER THE ONE-LEVEL VARIANCE IS THAT THE

5    COURT KNOWS THAT WE DISCUSSED AT TRIAL MR. HARDWICK'S

6    CONSOLIDATION OF LEGACY DORMANT ESCROW ACCOUNTS.  AND THESE

7    WERE ESCROW ACCOUNTS FROM HIS OLD FIRM, JACKSON AND HARDWICK,

8    THAT HAD -- THERE WERE OVER A DOZEN ACCOUNTS THAT HAD SOME

9    MONEY.  AND SHORTLY AFTER MS. MAURYA WAS HIRED, MR. HARDWICK

10   DIRECTED HER TO TRANSFER ALL OF THAT MONEY INTO ONE ACCOUNT.

11           AND THEN AT TRIAL, WE CALLED TWO WITNESSES, ONE FROM

12   BRAND BANK, ONE FROM RENASANT BANK, TO TALK ABOUT WHAT MR.

13   HARDWICK THEN DID.  HE TOOK OUT A CD WITH THAT MONEY AND THEN

14   PLEDGED THAT CD AS COLLATERAL ON A PERSONAL LOAN THAT HE TOOK

15   OUT.  AND HE BASICALLY JUST STOLE THAT MONEY.  AND WE WOULD NOT

16   HAVE KNOWN ABOUT THAT HAD MS. MAURYA NOT FULLY TOLD US ABOUT

17   THAT.

18           AND IT DID PLAY A CRITICAL ROLE AT TRIAL, BECAUSE,

19   FROM OUR PERSPECTIVE, IT SHOWED A PATTERN OF BEHAVIOR OF MR.

20   HARDWICK FEELING LIKE HE WAS ENTITLED TO TAKE ESCROW MONEY AND

21   USE IT FOR HIS OWN BENEFIT.  AND SO, FOR THAT REASON, WE, WE DO

22   BELIEVE THAT SHE AIDED THE PROSECUTION.  NOT WORTHY OF A TWO,

23   THREE, FOUR LEVEL, BUT TO RECOGNIZE WHAT SHE DID PROVIDE, WE

24   ARE ASKING THE COURT TO DEPART BY ONE LEVEL.

25           THE COURT:  ALL RIGHT.  THANK YOU.

1          DEFENSE?

2          MR. JOHNSON:  YOUR HONOR, WE ARE ASKING FOR A

3     THREE-LEVEL DEDUCTION BASED ON MS. MAURYA'S COOPERATION.  AND I

4     THINK IT'S IMPORTANT TO TURN TO THE ACTUAL LANGUAGE IN 5K1.1.

5     AND IT TALKS ABOUT THAT THE APPROPRIATE REDUCTION SHALL BE

6     DETERMINED BY THE COURT FOR REASONS STATED THAT MAY INCLUDE BUT

7     NOT ARE LIMITED TO CONSIDERATIONS OF THE FOLLOWING:  THE

8     COURT'S EVALUATION OF THE SIGNIFICANCE AND USEFULNESS OF THE

9     DEFENDANT'S ASSISTANCE; THE TRUTHFULNESS, COMPLETENESS, AND

10    RELIABILITY OF ANY INFORMATION OR TESTIMONY PROVIDED; NATURE

11    AND EXTENT OF THE DEFENDANT'S ASSISTANCE; ANY INJURY SUFFERED

12    OR IN DANGER OR RISK OF INJURY TO THE DEFENDANT OR HIS FAMILY

13    RESULTING FROM HIS ASSISTANCE; AND THE TIMELINESS OF THE

14    DEFENDANT'S ASSISTANCE.

15         THE GOVERNMENT TALKED ABOUT MS. MAURYA COOPERATING

16    WITH FIDELITY.  AND I THINK IT'S IMPORTANT TO TALK ABOUT THE

17    EXTENT OF THAT.  BUT ACTUALLY GOES BACK BEFORE FIDELITY.  WE

18    HAVE TO REMEMBER THAT WHEN MS. MAURYA WAS APPROACHED WITH THE

19    FALSIFIED BANK STATEMENT BACK IN JULY OF 2014, SHE ADMITTED TO

20    IT.  SHE MET WITH THE PARTNERS SHORTLY THEREAFTER.  AND SHE

21    ADMITTED TO IT.  FROM AUGUST 10TH, 2014, TO AUGUST 29TH, 2014,

22    SHE WORKED DAY AND NIGHT WITH FIDELITY'S FINANCIAL

23    INVESTIGATIONS UNIT.

24         THE COURT:  AND THE FALSIFIED BANK STATEMENT, WAS

25    THAT THE ONE WITH TOO MANY DIGITS BETWEEN --

1      MR. JOHNSON:  YES, YOUR HONOR.

2      THE COURT:  OKAY.  ALL RIGHT.

3      MR. JOHNSON:  SHE WORKED WITH FIDELITY.  AND IN TIME

4  OF CRISIS, SHE PROVIDED CLARIFICATION WHEN NOBODY ELSE COULD.

5  SHE KNEW WHAT HAPPENED, AND SHE TOLD THEM.  AND THEY WERE ABLE

6  TO USE THAT INFORMATION.  WHO KNOWS HOW MUCH TIME AND MONEY SHE

7  SAVED FIDELITY BECAUSE OF HER COOPERATION BACK THEN.  AND THAT

8  WAS WITHOUT A LAWYER, BEFORE THE GOVERNMENT WAS INVOLVED.

9      BUT IT WASN'T JUST LIMITED TO AUGUST OF 2014.

10  BETWEEN AUGUST AND NOVEMBER OF 2014, SHE ASSISTED FIDELITY IN

11  RUNNING THAT COMPANY.  SHE TRAINED NEW STAFF.  SHE CONDUCTED

12  BONUS CALCULATIONS, P&L STATEMENTS.  SHE ESSENTIALLY TOLD THEM

13  HOW TO TAKE OVER THIS COMPANY AND RUN IT UNTIL SHE WAS FIRED IN

14  NOVEMBER OF 2014.  AND, AGAIN, THAT WAS ALMOST ON A DAILY

15  BASIS.

16      THE GOVERNMENT BECAME INVOLVED SHORTLY THEREAFTER.

17  AND MS. MAURYA FIRST MET WITH THE GOVERNMENT IN JANUARY OF

18  2015.  THAT WAS THEIR FIRST MEETING, I BELIEVE.  WE WERE NOT

19  COUNSEL AT THE TIME, BUT THAT'S OUR UNDERSTANDING.  BETWEEN

20  JANUARY OF 2015 AND SEPTEMBER OF 2018, RIGHT UP TO THE TIME OF

21  MR. HARDWICK'S TRIAL, SHE MET WITH THE GOVERNMENT, BY MY

22  CALCULATIONS, 11 TIMES.  ELEVEN TIMES.  WE ARE TALKING ABOUT

23  DAY-LONG SESSIONS OR HALF-DAY SESSIONS.  DURING THESE SESSIONS,

24  THE GOVERNMENT WOULD PUT NUMEROUS E-MAILS IN FRONT OF HER,

25  NUMEROUS FINANCIAL DOCUMENTS IN FRONT OF HER, AND SHE WAS ABLE

1   TO PROVIDE CLARITY AND CONTEXT REGARDING THESE E-MAILS,

2   REGARDING THESE DOCUMENTS.

3           AND ALL OF THIS WENT TO THE MOST MAJOR POINT AT

4   TRIAL, WHICH, OF COURSE, WAS MR. HARDWICK'S KNOWLEDGE AND HIS

5   INTENT, DID HE KNOW WHAT WAS GOING ON, WAS THIS HIS INTENT TO

6   STEAL THIS MONEY.

7           SO ASIDE FROM WHAT THE GOVERNMENT MENTIONED, I THINK

8   THAT SHE WAS INSTRUMENTAL IN HELPING THE GOVERNMENT CRAFT THIS

9   CASE AND PROVIDING CONTEXT AND CLARITY AND DETAIL SURROUNDING

10  ALL THESE DOCUMENTS, EVEN THOUGH SHE DIDN'T TESTIFY AT TRIAL.

11          AND THAT BRINGS UP ANOTHER POINT.  ALL ALONG THIS

12  WAY, WE BELIEVED THAT MS. MAURYA WOULD BE TESTIFYING AT TRIAL.

13  THE GOVERNMENT REFERRED TO HER AS THE STAR WITNESS MORE THAN

14  ONCE.  AND IT WASN'T UNTIL, I BELIEVE, SEPTEMBER 30TH DURING

15  MR. HARDWICK'S TRIAL THAT WE RECEIVED AN E-MAIL SAYING THAT SHE

16  WOULD NOT BE TESTIFYING IN THE GOVERNMENT'S CASE IN CHIEF BUT

17  THAT SHE MAY TESTIFY AS A REBUTTAL WITNESS.  SO ALL ALONG THIS

18  TIME, WE THOUGHT THAT SHE WOULD BE TESTIFYING.  AND THEN THE

19  GOVERNMENT LET US KNOW THAT SHE WOULD NOT.

20          SO IT WASN'T AS THOUGH -- I DON'T SEE IT THIS WAY,

21  ANYWAY -- THAT THE GOVERNMENT THOUGHT THAT SHE WAS JUST A LIAR

22  THROUGH AND THROUGH.  I THINK THAT WAS A STRATEGIC CHOICE ON

23  THE PART OF THE GOVERNMENT.  THEIR CASE WAS GOING WELL.  AND

24  THE FACT OF THE MATTER IS, IS THAT MS. MAURYA CAME WITH A LOT

25  OF BAGGAGE.  MOST CODEFENDANT WITNESSES DO.  AND SHE PROBABLY

1   HAD A LITTLE BIT MORE THAN MOST.

2           SO I CERTAINLY UNDERSTAND THE GOVERNMENT'S CALL NOT

3   TO CALL HER.  WE PROBABLY WOULD NOT HAVE CALLED HER IF WE WERE

4   IN THE GOVERNMENT'S SHOES.

5           THE COURT:  SAME HERE.  YEAH.

6           MR. JOHNSON:  BUT THAT DOESN'T UNDO ALL OF THE THINGS

7   THAT SHE DID PRIOR TO THAT, THIS EXTENSIVE COOPERATION OVER

8   FOUR YEARS.

9           THE COURT:  AND SO IS IT YOUR POSITION -- AND I WANT

10  TO MAKE SURE THAT I GET A BETTER UNDERSTANDING OF THE REASON

11  THAT SHE HAD TO MEET WITH THE GOVERNMENT SO MANY TIMES.  YOU

12  SAID 11 TIMES.  WAS THAT JUST BECAUSE OF THE EXTENSIVENESS OF

13  THE DOCUMENTS?  AND I UNDERSTAND THIS WAS A VERY

14  DOCUMENT-INTENSIVE CASE.  DID IT HAVE ANYTHING TO DO WITH THE

15  FACT THAT HER STORY DID KEEP SHIFTING AND SO KIND OF HAD TO

16  BRING HER BACK AND, MAYBE NOT START ALL OVER, BUT KIND OF

17  CLARIFY SOME THINGS THAT SHE WAS FUZZY ON BEFORE BECAUSE SHE

18  WASN'T AS TRUTHFUL?  HOW WOULD YOU CHARACTERIZE THE REASON FOR

19  SO MANY SESSIONS?

20          MR. JOHNSON:  YOUR HONOR, I THINK THAT'S PART OF IT.

21  BUT THE PRIMARY REASON FOR SO MANY SESSIONS IS THAT THIS IS A

22  COMPLICATED CASE, AND THERE ARE A LOT OF DOCUMENTS.  AND IN THE

23  EARLY SESSIONS, AT LEAST WHEN PAGE AND I GOT INVOLVED IN THE

24  CASE, THE GOVERNMENT WAS FOCUSED ON THIS THOUSAND-FOOT VIEW IN

25  THE FIRST FEW SESSIONS.  AND THEN WE GET NARROWER AND NARROWER

1  AND NARROWER.  AND THE LAST FEW SESSIONS WERE ALL TRIAL PREP

2  SESSIONS.  THEY WERE SUPPOSED TO BE RUN-THROUGHS OF HER TRIAL

3  TESTIMONY.

4         SO IT'S NOT MY UNDERSTANDING.  THAT'S NOT WHAT I TOOK

5  AWAY FROM THE SESSIONS IS HER JUST BEING SUCH A LIAR THAT THEY

6  CAN'T CALL HER AS A WITNESS.  IT WAS MY UNDERSTANDING ALL ALONG

7  THAT THEY DID INTEND TO CALL HER AS A WITNESS.  IT WASN'T UNTIL

8  THE MIDDLE OF HIS TRIAL THAT WE WERE INFORMED THAT SHE WOULD

9  NOT BE CALLED.

10        AND I WOULD JUST NOTE THAT THIS LEVEL OF COOPERATION,

11 NOT JUST WITH THE GOVERNMENT, BUT WITH FIDELITY, I THINK A

12 ONE-LEVEL REDUCTION WOULD BE VERY MINIMAL FOR THIS LEVEL OF

13 COOPERATION THAT WAS SO EXTENSIVE, SO TIMELY, AND WE WOULD

14 ARGUE, VERY SIGNIFICANT.

15        MS. BARRON:  YOUR HONOR, MAY I RESPOND BRIEFLY?

16        THE COURT:  NO.  THANK YOU.

17        ALL RIGHT.  I WILL DEPART ONE LEVEL FOR MS. MAURYA'S

18 COOPERATION.

19        THAT TAKES OUR CALCULATIONS TO AN ADJUSTED OFFENSE

20 LEVEL OF 24, STILL A CRIMINAL HISTORY CATEGORY OF I.

21        I BELIEVE THAT PUTS US AT AN ADVISORY CUSTODIAL RANGE

22 OF 51 TO 63 MONTHS.

23        ALL RIGHT.  LET'S MOVE --

24        THE PROBATION OFFICER:  JUDGE?

25        THE COURT:  YES.

1          THE PROBATION OFFICER:  DID YOU INCLUDE ACCEPTANCE IN

2     THAT?

3          THE COURT:  NO.  THANK YOU.

4          ALL RIGHT.  SO ACCEPTANCE OF RESPONSIBILITY IS THREE

5     MORE LEVELS.  IS THAT RIGHT?

6          THE PROBATION OFFICER:  YES, JUDGE.

7          THE COURT:  OKAY.  SO THAT'S 21, WITH A CRIMINAL

8     HISTORY CATEGORY OF I, WHICH IS 37 TO 46 MONTHS.

9          MS. BARRON:  AND THEN, YOUR HONOR, PURSUANT TO THE

10    PLEA AGREEMENT --

11         THE COURT:  LET ME ASK MY NEXT QUESTION.

12         MS. BARRON:  OH, I'M SO SORRY.

13         THE COURT:  THAT'S OKAY.  THAT'S ALL RIGHT.

14         DOES THE GOVERNMENT TAKE ANY POSITION WITH RESPECT TO

15    WHETHER MS. MAURYA HAS EXPEDITIOUSLY OR DID EXPEDITIOUSLY ENTER

16    A GUILTY PLEA?

17         MS. BARRON:  YES, YOUR HONOR.  UNDER 18 U.S.C.

18    3553(A), IN PARAGRAPH 18 OF THE PLEA AGREEMENT, WE ARE ASKING

19    FOR AN ADDITIONAL ONE-LEVEL DEPARTURE.

20         THE COURT:  ALL RIGHT.  THE COURT FINDS THAT THAT IS

21    GRANTED, THAT THAT IS WARRANTED.  SO I WILL FOLLOW THAT

22    RECOMMENDATION, WHICH TAKES US DOWN TO 20.  GIVEN A HISTORY

23    CATEGORY OF I, THAT IS 33 TO 41 MONTHS.

24         ALL RIGHT.  ANYTHING ELSE BEFORE WE MOVE TO

25    REASONABLE SENTENCE, ON BEHALF OF THE GOVERNMENT?

1          MS. BARRON:  NO, YOUR HONOR.

2          THE COURT:  ON BEHALF OF MS. MAURYA.

3          MS. BARRON:  OH, I'M SORRY.  I DO WANT TO OBJECT --

4    WE'LL DO OUR OBJECTIONS LATER.

5          THE COURT:  OKAY.  ON BEHALF OF MS. MAURYA?

6          MR. JOHNSON:  NO, YOUR HONOR.

7          THE COURT:  ALL RIGHT.

8          ALL RIGHT.  SO LET'S GO AHEAD AND MOVE TO REASONABLE

9    SENTENCE PURSUANT TO 18 U.S.C. SECTION 3553(A).  I WILL NOTE

10   THAT, IN ADDITION TO PRESIDING OVER THE HEARINGS AND THE

11   PRETRIAL MOTIONS, AS WELL AS THE JURY TRIAL OF MS. MAURYA'S

12   CODEFENDANT, WHICH DID, OF COURSE, INVOLVE MUCH DISCUSSION

13   ABOUT MS. MAURYA'S CONDUCT RELATED TO THESE CHARGES, I'VE ALSO

14   REVIEWED THE FOLLOWING:  THE GOVERNMENT'S SENTENCING

15   MEMORANDUM; A SENTENCING MEMORANDUM SUBMITTED ON BEHALF OF MS.

16   MAURYA, WITH SEVERAL ATTACHMENTS, INCLUDING LETTERS FROM

17   FAMILY, FRIENDS, A BOYFRIEND, FORMER COWORKERS, HER THERAPIST

18   OR COUNSELOR, ALSO MEDICAL DOCUMENTATION RELATED TO HER

19   SHOULDER INJURY.

20         GOVERNMENT, I'LL START WITH YOU IN ASKING IF THERE

21   ARE ANY WITNESSES YOU'D LIKE THE COURT TO HEAR FROM, ANY

22   STATEMENTS TO BE READ, ANYTHING LIKE THAT.

23         MS. BARRON:  YES, YOUR HONOR.  I DO WANT TO GIVE THE

24   VICTIMS AN OPPORTUNITY TO SPEAK IF THEY WOULD LIKE TO.

25         MR. GERARD, GOES BY ROD, WITTSTADT WOULD LIKE TO

1    SPEAK.

2              THE COURT:  ALL RIGHT.  AND AS HE'S COMING UP, GIVE

3    ME AN IDEA OF HOW MANY OTHER WITNESSES THE GOVERNMENT MAY HAVE.

4              MS. BARRON:  JUST MR. MARK WITTSTADT -- OH, AND ART

5    MORRIS.

6              THE COURT:  ALL RIGHT.  THANK YOU.

7              YES, SIR, IF YOU WOULD STATE YOUR NAME FOR THE

8    RECORD.

9              MR. G. WITTSTADT:  GOOD MORNING, YOUR HONOR.  GERARD

10   WITTSTADT.  W-I-T-T-S-T-A-D-T.

11             MAY IT PLEASE THE COURT.

12             THE COURT:  YES, SIR.

13             MR. G. WITTSTADT:  YOUR HONOR, DEFENSE COUNSEL MADE

14   AN ARGUMENT ABOUT LIFE'S BASIC NECESSITIES.  I'M NOT GOING TO

15   TELL YOU ABOUT MYSELF.  I'M GOING TO TELL YOU ABOUT TWO

16   CHILDREN.  THEIR NAMES ARE STEPHANIE AND MATT.  LAST NAME IS

17   DAVENPORT.  THEY DON'T HAVE A FATHER ANYMORE AS A RESULT OF MS.

18   MAURYA'S CONDUCT.

19             MR. DAVENPORT, I KNEW HIM VERY WELL.  AND I

20   CONSIDERED HIM A FRIEND.  HE WAS A WEAK HUMAN BEING.  WHEN I

21   FIRST MET MR. DAVENPORT, HE WAS A STUTTERER.  AND YOU COULD

22   TELL THAT THAT WAS SOMETHING THAT REALLY AFFECTED HIS LIFE.

23   BUT HE WAS A NICE MAN.  AND I SPOKE WITH HIM ALMOST EVERY DAY.

24   HE RAN THE HR DEPARTMENT.  AND HE AND I REALLY BECAME FRIENDS.

25             AND I JUST WANTED TO REMIND THE COURT, WHEN WE ARE

1  TALKING ABOUT DEPRIVAL OF LIFE'S BASIC NECESSITIES, THERE ARE

2  NO VICTIMS WHO HAVE SUFFERED AS MUCH AS STEPHANIE AND MATT

3  DAVENPORT.  AND WHEN CONSIDERING A SENTENCE, I SEE WHERE WE ARE

4  IN THE ADJUSTED GUIDELINES.  BUT, AGAIN, I DON'T THINK THOSE

5  GUIDELINES ARE SUFFICIENT.  WE HAVE THE LOSS OF A HUMAN LIFE,

6  AND IT IS CLEARLY ATTRIBUTABLE TO MS. MAURYA.

7          THE COURT:  AND IN WHAT WAY?

8          MR. G. WITTSTADT:  SO MS. MAURYA AND MR. DAVENPORT

9  WERE HAVING AN AFFAIR.  AND I READ SOME OF THE E-MAILS BETWEEN

10  THE TWO OF THEM.  AND I DON'T KNOW THIS, BUT I DON'T THINK IT

11  WAS A PURELY CONSENSUAL RELATIONSHIP.  THERE WAS MONEY BEING

12  HELD OVER HIS HEAD BY MS. MAURYA.  THAT'S JUST MY IMPRESSION OF

13  THE E-MAILS.

14          BUT WHEN THE INVESTIGATION WAS BEGUN, I'LL NEVER --

15  I'LL NEVER FORGET, THERE WAS REALLY ONE DAY I EVER REALLY CRIED

16  IN THIS.  AND IT WAS WHEN I HAD HEARD THAT MR. DAVENPORT HAD

17  TAKEN HIS LIFE.  THE FIRM HAD HIRED ATTORNEYS AND ACCOUNTANTS

18  TO COME IN AND DO VARIOUS INVESTIGATIONS.  AND ONE OF THE --

19  ONE OF THE LAWYERS WAS TASKED TO INTERVIEW THE -- BASICALLY THE

20  HIGHER-UP MANAGERS TO SEE WHAT WAS GOING ON.

21          AND I GOT A TELEPHONE CALL IN THE AFTERNOON THAT,

22  SURPRISINGLY, THIS ONE INTERVIEW HAD RESULTED IN MR. DAVENPORT

23  ADMITTING THAT HE HAD HAD A, A SEXUAL AFFAIR WITH MS. MAURYA

24  FOR, FOR YEARS AND THAT HE HAD RECEIVED SOME FINANCIAL GAIN AS

25  A RESULT OF HIS RELATIONSHIP WITH HER.

1          MR. DAVENPORT WROTE A QUICK NOTE TO MY BROTHER THAT

2    SAID WORDS TO THE EFFECT OF, YOU'RE NOT GOING TO HAVE TO FIRE

3    ME.  I QUIT, OR I'M GOING, I'M GOING TO SAVE YOU FIRE ME, QUIT.

4    AND HE WENT HOME AND COMMITTED SUICIDE THAT NIGHT.  I DON'T

5    KNOW HOW HE COMMITTED SUICIDE.  I NEVER CONTACTED HIS WIFE, TO

6    LET IT, YOU KNOW, BE A PRIVATE AFFAIR.

7          BUT I JUST WANTED TO REMIND THE COURT THAT THERE ARE

8    TWO CHILDREN WHO LOST THEIR FATHER AS A RESULT OF THIS, AND

9    SHE'S RESPONSIBLE.

10          THANK YOU.

11          THE COURT:  THANK YOU.  AND I WILL JUST NOTE FOR THE

12    RECORD THAT THE COURT, DURING THE TRIAL, DID NOT GET INTO A LOT

13    OF FACTUAL BACKGROUND REGARDING ANY RELATIONSHIP BETWEEN

14    MR. DAVENPORT AND MS. MAURYA.  IN FACT, I THINK IT WAS THE

15    SUBJECT OF A MOTION IN LIMINE.  THERE WERE SOME NOTES THAT WERE

16    WRITTEN THAT WERE PRESENTED TO ME FOR MY REVIEW TO RULE ON SOME

17    MOTION IN LIMINE.  I DON'T RECALL WHAT THEY SAID.  AND I JUST

18    REMEMBER MAKING SOME RULING THAT ULTIMATELY HAD THE EFFECT OF

19    US NOT GETTING INTO A LOT OF DETAIL ABOUT MR. DAVENPORT.

20          SO I APPRECIATE YOUR STATEMENTS.  I'M NOT SURE THAT I

21    HAVE ENOUGH TO LINK WHATEVER HAPPENED WITH HIM TO MS. MAURYA'S

22    CONDUCT.  AND THAT'S NOT TO SAY THAT IT COULDN'T BE

23    ESTABLISHED, BUT THAT'S NOT BEFORE THE COURT AT THIS TIME.  BUT

24    I DO APPRECIATE YOUR STATEMENTS.

25          THANK YOU.

1           MR. G. WITTSTADT:  THANK YOU, YOUR HONOR.

2           THE COURT:  ALL RIGHT.  MR. WITTSTADT?

3           MR. M. WITTSTADT:  GOOD MORNING AGAIN, YOUR HONOR.

4           THE COURT:  GOOD MORNING.  AND IF YOU WOULD -- WE

5     KNOW WHO YOU ARE.  BUT IF YOU WOULD STATE YOUR NAME.

6           MR. M. WITTSTADT:  FOR THE RECORD, I'M MARK

7     WITTSTADT, W-I-T-T-S-T-A-D-T.

8           THE COURT:  THANK YOU, COUNSELOR.

9           MR. M. WITTSTADT:  YOUR HONOR, THIS CASE IS DIFFERENT

10    AND THE SAME AS MR. HARDWICK.  AND THE SAME PORTION IS IS THAT

11    SHE LIES AND THAT SHE IS A LIAR.

12          I TESTIFIED ON THE STAND.  MR. GARLAND ASKED ME, IS

13    MS. MAURYA A LIAR AND A THIEF.  I SAID, MR. GARLAND, THAT IS

14    ONE THING THAT YOU AND I WILL AGREE UPON, THAT SHE IS A LIAR

15    AND A THIEF.

16          AND LET ME GET -- AND I WANT TO TELL YOU WHAT THE

17    MOST SIGNIFICANT LIE THAT SHE TOLD THAT CAUSED THE MOST AMOUNT

18    OF DAMAGE.  WHEN MS. MAURYA STARTED TO BE ELEVATED UP IN THE

19    CLOSING SIDE OF THE FIRM, I WENT TO HER AND I SAID, LISTEN,

20    ASHA, YOU KNOW THAT RODDY AND I AND NAT ARE PARTNERS IN THIS

21    FIRM.

22          AND I'VE SAID THIS TO ANY ACCOUNTANT THAT WORKED FOR

23    ME.

24          I SAID, YOUR DUTY AND YOUR ALLEGIANCE IS TO THE FIRM,

25    NOT TO ANY INDIVIDUAL.  IF ANYONE, INCLUDING MYSELF, ASKS YOU

1    TO DO SOMETHING THAT YOU DO NOT BELIEVE IS CORRECT, YOU HAVE AN

2    OBLIGATION TO GO TO THE OTHER TWO PARTNERS.  SO IF I DID, YOU

3    HAVE AN OBLIGATION TO GO TO MR. HARDWICK AND TO MY BROTHER AND

4    TELL THEM WHAT IT IS.  LIKEWISE, IF ANYBODY -- IF ONE OF THOSE

5    DID SOMETHING, YOU HAD AN OBLIGATION TO COME TO THE OTHER TWO.

6         SHE TOOK -- SHE MADE A CONSCIOUS DECISION, AT THE

7    TIME THAT MR. HARDWICK MADE HER DO THE FIRST MOVE, SHE MADE A

8    CONSCIOUS DECISION TO NOT COME TO MY BROTHER AND I AND TELL US.

9    SHE TOOK ANOTHER WAY.  SHE TOOK IT AS AN ADVANTAGE TO HER.  SHE

10   FIGURED, IF MR. HARDWICK WAS GOING TO STEAL, WELL, SHE WOULD

11   HAVE THE GOODS ON HIM AND THEN SHE WOULD STEAL.

12        SHE STOLE FROM THIS FIRM.  SHE STOLE, SHE STOLE

13   DIRECTLY FROM PEOPLE'S MONEY IN THE ESCROW ACCOUNT.  I'VE SEEN

14   EXACTLY THE WAY SHE DID IT.  SHE WENT INTO PEOPLE'S FUNDS THAT

15   CHECKS HAD NOT BEEN CASHED, RETURN OF -- LET'S SUPPOSE YOU

16   COLLECTED FROM THE SELLER $5,000 TO -- FOR THE PAYMENT OF REAL

17   PROPERTY TAXES.  AND YOU WENT TO GO RECORD.  THE SELLER THOUGHT

18   THAT THEY HAD TO PAY IT, NEVER KNOWING THAT.  AND THE MONEY WAS

19   NOT NEEDED TO RECORD THE DEED.

20        SO THERE WOULD BE A CHECK CUT TO THAT SELLER FOR --

21   TO REFUND THE $5,000.  AND IT WOULD BE SENT TO THE OLD ADDRESS,

22   AND THE SELLER WOULD NEVER BE -- NEVER FIGURE IT OUT.

23        SO WHAT SHE DID WAS, SHE WENT DOWN TO THE BANK, AND

24   SHE HAD THE CHECK -- INSTEAD OF TO JOHN AND MARY SMITH, SHE

25   SAID, PLEASE GIVE ME A CERTIFIED CHECK MADE PAYABLE TO THE LAW

1   FIRM.  TO THE LAW FIRM.  AND THEY DID.  AND THEY GAVE HER A

2   CERTIFIED CHECK MADE PAYABLE TO THE LAW FIRM FOR $5,000.

3           WELL, SHE WAS BUYING A CONDOMINIUM.  AND SHE NEEDED A

4   CERTAIN AMOUNT OF DOWN PAYMENT.  LO AND BEHOLD, WHERE DID SHE

5   GET HER DOWN PAYMENT FROM.  SHE GOT TO BRING CERTIFIED FUNDS TO

6   THE FIRM, CHECK MADE OUT TO MORRIS HARDWICK SCHNEIDER FOR

7   $5,000.  THAT'S HOW SHE MADE HER DOWN PAYMENT.

8           THAT'S HOW SHE STOLE MONEY.  SHE STOLE MONEY FROM

9   INDIVIDUALS OF THIS STATE, PEOPLE THAT NEEDED THAT $5,000.  AND

10  AS MY BROTHER SAID YESTERDAY, THAT'S REALLY A DOUBLE THEFT,

11  BECAUSE SHE STOLE IT FROM THEM, AND THEN WE HAD TO COVER IT.

12          SHE'S A LIAR AND A THIEF.  WHAT SHE DID -- DEFENSE

13  HAS MADE AN ARGUMENT THAT THE LAWSUITS WERE NOT HER -- SHE

14  DIDN'T CAUSE THOSE.  I BEG TO DIFFER WITH THEM.  I AND

15  MR. MORRIS MET WITH HER.  ABOUT THREE DAYS INTO IT, WE MET AT A

16  BAKERY.  WE CONTACTED HER, AND WE MET.  AND WE SAT DOWN, AND I

17  HAD A CONVERSATION WITH HER.

18          AND I SAID, ASHA, I NEED TO KNOW WHAT HAPPENED.  HOW

19  MUCH MONEY IS MISSING.  HOW MUCH.  DID MR. HARDWICK TAKE IT.

20  AND SHE KEPT HEMMING AND HAWING THAT SHE DIDN'T KNOW; IT COULD

21  BE MAYBE TWO OR $3 MILLION.

22          HAD SHE TOLD ME IN DAY TWO OR THREE THAT THE NUMBER

23  WAS $36 MILLION, AS WE ALL KNOW THE HOLE IN THE ESCROW ACCOUNT

24  TO BE -- AND I UNDERSTAND ALL THE ARGUMENTS AS TO WHAT -- BUT

25  THE HOLE IN THE ESCROW ACCOUNT IS $36 MILLION.  HAD SHE -- SHE

1    KNEW IT.  SHE KNEW THE HOLE WAS 36 MILLION.

2             HAD SHE TOLD ME ON DAY ONE OR TWO THAT THAT WAS THE

3    HOLE, THOSE LOANS WOULD NOT HAVE HAPPENED, BECAUSE I -- WHERE

4    AM I GOING TO GET $36 MILLION FROM?  FOR MR. HARDWICK -- FOR ME

5    TO TELL MR. HARDWICK, YOU BETTER GO OUT AND GET SOME MONEY,

6    WHAT'S $6 MILLION GOING TO DO?  IT'S GOING TO DO ABSOLUTELY NO

7    GOOD.

8             THOSE LOANS WOULD NOT HAVE HAPPENED.  I WOULD HAVE

9    PICKED UP THE PHONE.  I WOULD HAVE CALLED FIDELITY, AS I DID AS

10   SOON AS I FOUND OUT THAT THE NUMBER WAS $36 MILLION.  FIDELITY

11   WOULD HAVE BEEN IN MY OFFICE THAT SAME DAY, EXACTLY THE WAY

12   THEY WERE WHEN I FOUND OUT THE NUMBER WAS.  THOSE $6 MILLION

13   LOANS WOULD NEVER HAVE HAPPENED.  NEVER HAVE HAPPENED.

14            I WOULD NOT HAVE BEEN INVOLVED IN A LAWSUIT WITH

15   MR. PRITCHARD.  I WOULD NOT HAVE BEEN ACCUSED OF BEING A LIAR,

16   A THIEF, AND A CHEAT BY MR. JOHNSON AND HIS ATTORNEYS.  I WOULD

17   NOT HAVE BEEN.  WE WOULD NOT HAVE BEEN IN THIS POSITION.  AND,

18   FRANKLY, MY WIFE WOULD NOT HAVE BEEN THREATENED AFTER MR.

19   HARDWICK WENT TO TRIAL, BECAUSE MR. JOHNSON WOULD NEVER HAVE

20   LENT THAT MONEY, AT LEAST I DON'T THINK HE WOULD HAVE.  MAYBE

21   HE WOULD HAVE.  I DON'T KNOW, BECAUSE HE'S FRIENDS WITH MR.

22   HARDWICK.

23            AND THAT'S MY -- AND THAT'S ANOTHER THING, BUT THE

24   POINT BEING IS, THOSE LOANS WOULD NOT HAVE HAPPENED.

25            PROSECUTION HAS MADE A BUT FOR, YES, BUT FOR MS.

1   MAURYA'S ACTIONS, BUT FOR HER ACTIONS, IN DOING THIS, THIS

2   CATASTROPHE WOULD NOT HAVE HAPPENED.  FOUR YEARS, THREE YEARS,

3   SHE'S PROVEN TO THIS COURT, SHE HAS PROVEN TO THIS COURT THAT

4   SHE IS DISHONEST.  SHE IS CHARGED IN THIS CASE PENDING TRIAL

5   AND GOES AND WORKS FOR AN AMBULANCE COMPANY WHILE SHE IS

6   CHARGED AND STEALS FROM THEM, WHILE SHE'S CHARGED WAITING

7   TRIAL.

8           MS. MAURYA IS A LIAR AND A THIEF.  GIVE HER NO

9   CREDIT.  GIVE HER ZERO CREDIT FOR ANYTHING SHE DID, BECAUSE --

10  I HEAR THIS FROM THE PROSECUTION, BUT I WAS THERE.  SHE HAD

11  EVERY OPPORTUNITY BETWEEN THE TIME I SPOKE TO HER UP UNTIL THE

12  DAY SHE LEFT THAT FIRM WHEN SHE WAS HELPING TO COME 100 PERCENT

13  CLEAN, TELL EVERYBODY EXACTLY WHAT SHE KNEW AND TELL -- AND I

14  TOLD HER THAT.  WHEN WE MET AT THAT BAKERY, I SAID, ASHA, DID

15  YOU TAKE ANY MONEY.

16          NO.

17          I SAID, I'M TELLING YOU, IT WILL COME OUT.  IT WILL

18  BE MUCH BETTER FOR YOU.

19          I UNDERSTAND.  AND IF YOU DID, YOU NEED TO TELL ME

20  EVERYTHING NOW.  BECAUSE IT WILL ALL COME OUT.

21          AND I GAVE HER THE OPPORTUNITY, AND SHE LIED.

22          DO NOT GIVE HER ANY CREDIT.

23          THANK YOU VERY MUCH.

24          THE COURT:  THANK YOU, SIR.

25          MS. BARRON:  AND THEN, FINALLY, I THINK MR. MORRIS

1  WANTS TO SAY SOMETHING.

2            THE COURT:  ALL RIGHT.  THANK YOU.

3            MR. MORRIS:  KNEE SURGERY.

4            THE COURT:  KNEE SURGERY?

5            MR. MORRIS:  YEAH, LAST WEEK.  I WAS OKAY YESTERDAY.

6  BUT WE SAT FOR SO LONG.

7            THE COURT:  OKAY.  I THOUGHT, SURELY YOU DIDN'T HAVE

8  IT SINCE YESTERDAY.  BUT OKAY.

9            MR. MORRIS:  NO, NO, JUST GOT TIRED.  I THINK IT'S

10 THE WEATHER, TOO.

11           THE COURT:  ALL RIGHT.  AND JUST FOR THE RECORD,

12 STATE YOUR NAME.

13           MR. MORRIS:  ART MORRIS.

14           THE COURT:  ALL RIGHT.

15           MR. MORRIS:  AND I WANT TO THANK YOU, YOUR HONOR, FOR

16 -- I'M PLEASED WITH THE DECISION.  I KNOW EVERYBODY HAD

17 DIFFERENT FEELINGS ABOUT IT, AND I THINK YOU DID A GREAT JOB.

18 AND --

19           THE COURT:  CAN'T MAKE EVERYONE HAPPY.  BUT I

20 APPRECIATE THAT.

21           MR. MORRIS:  NO.  THAT'S THE WHOLE POINT OF LIFE.  NO

22 ONE EVER WALKS OUT HAPPY.  THAT'S A GOOD DEAL.

23           I WANT TO THANK THE U.S. ATTORNEYS AND FBI, EVERYBODY

24 ELSE WHO WORKED SO HARD ON THIS CASE.  THIS HAS BEEN FOUR

25 YEARS.  AND I THANK YOU VERY MUCH FOR THAT.

1          THE COURT:  THANK YOU, SIR.

2          MR. MORRIS:  AND I JUST WANT TO CONCUR WITH MARK.  WE

3    TALKED TO ASHA.  IF WE HAD ANY IDEA IT WAS, IT WAS THAT LARGE,

4    WE NEVER WOULD HAVE ENCOURAGED NAT TO GO AHEAD AND GET MONEY

5    FROM DUSTIN AND PRITCHARD.  AND, FRANKLY, UNFORTUNATELY, AS IT

6    TURNED OUT, THAT KILLED US.  THIS WAY FIDELITY WOULD HAVE

7    ASSUMED THE HOLE, AND THAT WOULD HAVE BEEN THE END OF THE DEAL.

8          INSTEAD, WHAT HAPPENED AT THE END, AS YOU'RE

9    FAMILIAR, IS THEY DIDN'T WANT TO PAY DUSTIN AND PRITCHARD.

10   THEY SAID THEY HAD ENOUGH, AND THEY BAILED.  THEY SAID THAT WAS

11   IT, AND THEY BAILED ON IT, AND THE FIRM WENT DOWN, EVEN THOUGH

12   WE WERE PROFITABLE TILL THE LAST MONTH.

13         SO I CONCUR WITH MARK ON THAT.  AND IF ASHA WOULD

14   HAVE TOLD US THE TRUTH, THE FIRM WOULD HAVE BEEN ALIVE TODAY.

15   IT WAS JUST AN EXCUSE, IN A WAY, FIDELITY JUST SAID THEY HAD

16   ENOUGH.  THEY KNEW WHAT THE HOLE AMOUNT WAS.  THEY HAD A CHOICE

17   TO EITHER GO IN AND PARTNER UP IN THE DEAL OR GET OUT.  AND

18   THAT WOULD HAVE BEEN IT.

19         I WANT TO SAY, I WAS SORT OF GONE AT THAT TIME,

20   REALLY, FROM LIKE 2012 TO PROBABLY 2014.  I WAS PRETTY MUCH

21   RETIRED.  AND I DEALT WITH ASHA.  AND I LIKED ASHA.  I THINK A

22   VERY PERSONABLE PERSON.  I THOUGHT SHE WAS VERY, VERY BRIGHT,

23   KNOWS EXACTLY WHAT SHE'S DOING.  AND, BUT AT THE END OF THE

24   DAY, IT WAS KIND OF INTERESTING.

25         YOU SOMETIMES HAVE TO FIND OUT ABOUT A PERSON.  I WAS

1  FOOLED ON THIS.  I WASN'T FOOLED ON NAT, BUT I WAS FOOLED ON

2  ASHA.  AND SOMETIMES YOU HAVE TO ASK THE EMPLOYEES WHO WORK FOR

3  ASHA WHAT THEY THOUGHT OF HER.  AND I THOUGHT EVERYBODY LIKED

4  HER.  THEY DIDN'T.  AND IT'S A GOOD LESSON IN LIFE.  I NEVER

5  THOUGHT ABOUT ASKING THE ACCOUNTING, THE ACCOUNTING PEOPLE

6  BEHIND THE SCENES WHAT THEY THOUGHT.

7           I COULD HAVE A JOKE AND I SAY I SPOKE TO YOUR CLERK

8  THIS MORNING, BUT I'M NOT GOING TO DO THAT.

9           THE COURT:  RESIST.

10           MR. MORRIS:  ANYWAY, I WANT TO THANK YOU VERY MUCH.

11  AND THANK YOU FOR YOUR TIME.

12           THE COURT:  THANK YOU, MR. MORRIS.

13           ALL RIGHT.  GOVERNMENT, ANYONE ELSE YOU WANT THE

14  COURT TO HEAR FROM?

15           MS. BARRON:  NO, YOUR HONOR, JUST ARGUMENT.

16           THE COURT:  ALL RIGHT.  THANK YOU SO MUCH.

17           DEFENSE, IS THERE ANYONE YOU'D LIKE THE COURT TO HEAR

18  FROM ON BEHALF OF MS. MAURYA?

19           MR. JOHNSON:  NO, YOUR HONOR, JUST ARGUMENT.

20           THE COURT:  OKAY.  SO WE WILL PROCEED WITH THE

21  GOVERNMENT'S SENTENCING ARGUMENT, THEN THE DEFENSE'S ARGUMENT

22  FOR SENTENCING.  AND THEN I WILL ASK THE DEFENSE WHETHER MS.

23  MAURYA WISHES TO ADDRESS THE COURT DURING THIS HEARING.

24           GOVERNMENT?

25           MS. BARRON:  THANK YOU, YOUR HONOR.

1          UNDER THE TERMS OF THE PLEA AGREEMENT, THE GOVERNMENT

2     IS BOUND TO RECOMMEND A LOW-END SENTENCE, WHICH, UNDER THE

3     ADJUSTED GUIDELINES, I BELIEVE IS A SENTENCE OF 33 MONTHS.  WE

4     ASK THAT THE COURT IMPOSE A GUIDELINE SENTENCE, THAT SENTENCE,

5     AND NOTHING BELOW THAT.  AND THERE ARE SEVERAL REASONS WHY.

6          THE ISSUE OF PROXIMATE CAUSE IS PROBABLY REASON

7     NUMBER ONE.  MS. MAURYA IS UNQUESTIONABLY THE ONE THING THAT

8     ALLOWED THIS FRAUD TO HAPPEN.  NOW, MR. HARDWICK'S GREED WAS

9     THE MOTIVATION.  BUT HER ABILITIES AND HER UNUSUALLY GOOD

10    ABILITY TO HIDE MONEY, TO KITE WIRE TRANSACTIONS AND TO CREATE

11    THIS SHELL GAME THAT WAS VIRTUALLY UNTRACEABLE BUT FOR THAT

12    EXTRA ZERO IN A BANK STATEMENT, I MEAN, SHE GOT THE

13    SOPHISTICATED MEANS ENHANCEMENT, AND SO I'M NOT ASKING FOR AN

14    ADDITIONAL IMPOSITION ON TOP OF THAT.

15         BUT I JUST WANT TO POINT OUT THAT THIS SCHEME WOULD

16    NOT HAVE BEEN POSSIBLE WITHOUT HER, AND THE CAUSE AND THE

17    EFFECT TO THE FIRM WOULD NOT HAVE HAPPENED BUT FOR HER.

18         AND I WANT TO NOTE THAT THE COURT'S LOSS FINDINGS, BY

19    SUSTAINING THAT OBJECTION, THE COURT IS NOT HOLDING MS. MAURYA

20    ACCOUNTABLE FOR A SINGLE PENNY OF THE CONSPIRACY TO WHICH SHE

21    PLED GUILTY, ONLY THE 900,000 THAT SHE GOT ON THE SIDE.

22         AND WE OBJECT SEPARATELY TO THAT, AND I WILL AT THE

23    APPROPRIATE TIME, BUT, YOU KNOW, THAT SUMMARY EXHIBIT

24    SUMMARIZES THOUSANDS OF PAGES OF BANK RECORDS THAT DOCUMENT --

25    AND E-MAILS THAT DOCUMENT MS. MAURYA RESPONDING TO MR.

1  HARDWICK'S DEMANDS.  AND I DO WANT TO NOTE THAT SHE DIDN'T GET

2  A PENNY FROM THAT CONSPIRACY.  THAT'S NOT WHAT THE GUIDELINES

3  REQUIRE.  WE DON'T LOOK TO HER GAIN IF WE CAN CALCULATE THE

4  LOSS.

5       AND SO SHE DIDN'T GET A PENNY.  AND THAT'S WHY WE'RE

6  NOT OBJECTING TO THE ROLE, THE ROLE ENHANCEMENT AND WHY WE

7  THINK THAT A MINIMAL ROLE DEDUCTION IS APPROPRIATE.  AND WE ASK

8  THAT THE COURT NOT CONSIDER THE FACT THAT SHE DIDN'T GAIN ANY

9  FURTHER.  THE COURT HAS GIVEN HER SIGNIFICANT BENEFIT ALREADY.

10      THE SECOND REASON WHY WE BELIEVE A GUIDELINE SENTENCE

11  IS APPROPRIATE IS BECAUSE MS. MAURYA HAS ACCEPTED

12  RESPONSIBILITY.  BUT, IN A LOT OF WAYS, I QUESTION WHETHER SHE

13  HAS REALLY LEARNED ANYTHING AT ALL.  THROUGHOUT OUR MEETINGS

14  WITH HER UP UNTIL THE VERY END -- AND ONE OF THE REASONS WHY WE

15  HAD TO KEEP MEETING WITH HER IS BECAUSE SHE KEPT TRYING TO

16  BLAME MR. HARDWICK ALL THE TIME.  WELL, HE DID THIS, HE MADE ME

17  FEEL THIS WAY, HE THREATENED ME, HE THREATENED MY JOB.  SHE

18  PAINTED A PICTURE OF HIM THAT WAS INCONSISTENT WITH EVERYTHING

19  ELSE WE HAD HEARD, THAT HE WAS NICE TO HIS EMPLOYEES.

20      AT THE END OF THE DAY, I DON'T KNOW WHAT TO BELIEVE.

21  BUT I DO KNOW THAT IT WAS VERY DIFFICULT FOR MS. MAURYA TO

22  ACCEPT THE FACT THAT SHE HAD MADE CHOICES, TOO.  THERE WAS

23  ALWAYS AN EXCUSE.  IT WAS ALWAYS SOMEONE ELSE'S FAULT.  AND I

24  THINK THAT'S PARTLY JUST WHO SHE IS, THE FACT THAT SHE HAS

25  ALWAYS, WITH EVERY EMPLOYER, SOUGHT A WAY TO PAD HER POCKETS ON

1    THE SIDE, AND WITH SODEXO, U.S. LAND TITLE, AND MHS, TO PAD THE

2    POCKETS OF HER BOYFRIEND, JOE DAVENPORT, SHOWS THAT MS. MAURYA,

3    IN A LOT OF WAYS, DOES NOT HAVE A CONSCIENCE WHEN IT COMES TO

4    STEALING.

5         SHE'S GOING TO FIND A WAY TO JUSTIFY IT IN HER MIND.

6    AND THAT'S FURTHER PROOF FROM THE FACT THAT SHE HAD AGREED WITH

7    HER FORMER ATTORNEYS TO PLEAD GUILTY IN THIS CASE AND

8    COOPERATE.  AND THEN SHE LIED TO MR. PHILLIPS AND AGENT CARUANA

9    ABOUT HER ONGOING CONDUCT.  THEY SAT THERE AND THEY ASKED HER

10   POINT BLANK, BECAUSE THEY ALREADY KNEW THAT SHE HAD STARTED

11   THIS NEW SCHEME IN GWINNETT COUNTY AND ASKED HER IF SHE WAS

12   STEALING AND SHE SAID NO, WHEN SHE HAD ALREADY BEEN CHARGED IN

13   THAT CASE.

14         THE COURT:  THIS IS THE AMBULANCE CASE?

15         MS. BARRON:  THIS IS THE AMBULANCE CASE.  LIED TO THE

16   FBI.  AND SO WHAT HAPPENED AS A RESULT OF THAT.

17         NORMALLY WHEN WE HAVE A COOPERATING CODEFENDANT, A

18   CONSPIRATOR, WE ALLOW THEM TO PLEAD TO 371.  AND THAT MAKES A

19   DIFFERENCE IN TERMS OF GUIDELINES.  THEY START AT A BASE SIX

20   INSTEAD OF A BASE SEVEN, WHICH IS WHAT YOU START OUT FOR WIRE

21   FRAUD.  SO WE PULLED THAT AGREEMENT.  AND SHE SUFFERED THAT

22   ONE-LEVEL BUMP.  SO NOW SHE IS PLEADING TO AN OFFENSE THAT HAS

23   A BASE SEVEN INSTEAD OF A BASE SIX.

24         BUT EVEN THAT DOES NOT FULLY, FULLY ACCOUNT FOR THE

25   FACT THAT THIS WOMAN HAS TROUBLE WITH REMORSE.  HER ENTIRE

1    ADULT LIFE SHE'S BEEN LYING AND STEALING.  AND THIS IS THE

2    STRONGEST CASE FOR SPECIFIC DETERRENCE I HAVE EVER SEEN,

3    BECAUSE I DON'T KNOW THAT ANYTHING SHORT OF A SIGNIFICANT JAIL

4    SENTENCE IS GOING TO CHANGE HER BEHAVIOR.  IF SHE WILL LIE TO

5    THE GOVERNMENT WHEN SHE'S TRYING TO CONVINCE US TO GIVE HER

6    CREDIT, I DON'T KNOW WHAT IS GOING TO CHANGE FOR HER.

7         I WANT TO TALK ABOUT MOTIVE.  I SUSPECT THAT MS.

8    MAURYA WILL TELL YOU WHAT SHE TOLD US, WHICH IS THAT MR.

9    HARDWICK MADE HER FEEL LIKE SHE HAD TO DO IT.  AND MAYBE THERE

10   WAS SOME COERCION THERE.  BUT MY THEORY IS THAT THE REASON WHY

11   MS. MAURYA STAYED AS LONG AS SHE DID IS BECAUSE SHE KNEW THAT

12   IF SHE KEPT MR. HARDWICK HAPPY, HER JOB WOULD BE SECURE.  AND

13   WE KNOW THAT'S TRUE.  HE ULTIMATELY PROMOTED HER, ABOVE THE

14   WITTSTADTS' OBJECTION, TO CFO.

15        AND SO AS LONG AS HE WAS HAPPY, SHE WAS FREE TO

16   EMBEZZLE HER OWN SIDE MONEY, WHICH MR. HARDWICK NEVER KNEW

17   ABOUT.  AND I THINK THAT WAS HER INCENTIVE.  I DON'T THINK SHE

18   WAS FORCED OR COERCED IN ANY WAY BY HIM.

19        AND THEN, FINALLY, I WANT TO TALK ABOUT WHO SHE IS AS

20   A PERSON.  I BELIEVE THERE IS A LOT ABOUT MS. MAURYA THAT IS

21   GOOD.  AND I BELIEVE THAT SHE DID TRY TO BE HELPFUL TO US AND

22   TO FIDELITY.  I THINK THE TROUBLE IS THAT SOMETIMES HER ABILITY

23   TO ACKNOWLEDGE WHAT SHE HAS DONE IN HER ROLE, IN HER DESIRE TO

24   EXPLAIN AND JUSTIFY WHAT SHE DID, CLOUDS HER ABILITY TO

25   COMMUNICATE FACTS IN A WAY THAT IS TRUTHFUL.  AND THAT'S

1    ULTIMATELY WHY WE DECIDED NOT TO CALL HER.  SHE WAS ALWAYS

2    TRYING TO MINIMIZE HER ROLE AND ENHANCE MR. HARDWICK'S ROLE.

3    AND THE JURY DOESN'T NEED TO HEAR THAT.  THEY JUST NEED TO HEAR

4    FACTS.

5          AND SO BECAUSE I TO THIS DAY DO NOT BELIEVE THAT SHE

6    FULLY UNDERSTANDS THAT SHE'S RESPONSIBLE FOR BANKRUPTING THAT

7    FIRM -- SO IS MR. HARDWICK, BUT HE COULDN'T HAVE DONE IT

8    WITHOUT HER.  SHE'S RESPONSIBLE FOR THAT.  SHE'S RESPONSIBLE

9    FOR THE 800 PEOPLE THAT LOST THEIR JOBS.  SHE'S RESPONSIBLE FOR

10   THE FACT THAT SO MANY PEOPLE WHO DON'T EVEN KNOW THAT MORRIS

11   HARDWICK SCHNEIDER IS EVEN A THING, PEOPLE WHO HAD THEIR, THEIR

12   CLOSINGS TIED UP WITH THAT FIRM IN AUGUST 2014 COULD HAVE HAD

13   THEIR LIVES REVERSED IN AN INSTANT BUT FOR FIDELITY.  SHE'S

14   RESPONSIBLE FOR ALL OF THAT.

15          AND FOR THOSE REASONS, YOUR HONOR, WE DO NOT BELIEVE

16   THAT ANY FURTHER VARIANCE IN HER CASE IS WARRANTED.

17          THANK YOU.

18          THE COURT:  THANK YOU.

19          DEFENSE?

20          MR. JOHNSON:  YOUR HONOR, ONE THING I'D LIKE TO

21   ADDRESS RIGHT AWAY IS THE IDEA THAT MS. MAURYA CLAIMS THAT SHE

22   WAS SOMEHOW FORCED OR COERCED BY MR. HARDWICK.  SHE'S NEVER

23   SAID THAT.  SHE'S NEVER MAINTAINED THAT.

24          SHE STOOD BEFORE THE COURT AND ENTERED A PLEA OF

25   GUILTY UNDER OATH.  SHE MAINTAINS THAT SHE IS GUILTY, AND SHE

1  ACCEPTS RESPONSIBILITY FOR WHAT SHE DID.  AND SHE'S ASHAMED OF

2  WHAT SHE DID.

3          WITH REGARD TO 3553, I'D LIKE TO FOCUS ON THE NATURE

4  OF THE OFFENSE AND THE CHARACTERISTICS OF MS. MAURYA, AND I

5  DON'T MEAN TO BELABOR THE POINT AS FAR AS THE NATURE OF THE

6  OFFENSE, BUT, OF COURSE, MS. MAURYA WAS IN A SUBSERVIENT

7  POSITION TO MR. HARDWICK, WHO WAS THE MANAGING PARTNER OF MHS.

8  AND HE DIRECTED HER TO DO THINGS.  SHE KNEW IT WAS WRONG.  SHE

9  DID IT ANYWAY.  BUT SHE WAS IN THAT SUBSERVIENT ROLE.

10         THE COURT:  NOW, THIS WAS THE ONLY PLACE WHERE SHE

11  WORKED WITH HARDWICK.  CORRECT?

12         MR. JOHNSON:  YES, YOUR HONOR.

13         THE COURT:  OKAY.  ALL RIGHT.

14         MR. JOHNSON:  AND I ALSO DON'T MEAN TO BELABOR THE

15  POINT, BUT, AGAIN, WE GO BACK TO THE EXTENSIVE COOPERATION OVER

16  SPANNING FOUR YEARS WHERE FIDELITY MET WITH THE GOVERNMENT.

17  HARDWICK, MR. HARDWICK AND MS. MAURYA TOOK TWO VERY DIFFERENT

18  PATHS.

19         MR. HARDWICK DECIDED TO BLAME MS. MAURYA ENTIRELY FOR

20  FOUR YEARS AND SHIFT BLAME WHERE POSSIBLE.  HE EVEN BLAMED THE

21  WITTSTADTS.  MS. MAURYA DIDN'T DO THAT.  SHE TOOK

22  RESPONSIBILITY ALMOST RIGHT AWAY.

23         I KNOW THAT THERE'S BEEN A LOT OF DISCUSSION ABOUT

24  HER PAST AS WELL, ESPECIALLY WITH PRO CARE EMS.  AND I BELIEVE

25  YESTERDAY, THE DEFENSE STOOD UP AND SAID THAT SHE COMMITTED A

1  NEW OFFENSE WHILE SHE WAS OUT ON BOND IN THIS CASE.  BUT THAT'S

2  NOT ENTIRELY TRUE.

3          I BELIEVE THAT SHE WAS ARRESTED IN THE GWINNETT

4  COUNTY PRO CARE CASE IN AUGUST OF 2015.  SHE WAS NOT ARRESTED

5  IN THIS CASE UNTIL FEBRUARY OF 2016, APPROXIMATELY SIX MONTHS

6  LATER.

7          WHILE SHE'S BEEN ON BOND, THERE HAVE BEEN NO

8  VIOLATIONS AS FAR AS I'M AWARE, AND SHE'S DONE EVERYTHING THAT

9  THE COURT HAS ASKED OF HER WHILE SHE'S BEEN ON BOND.

10          THE COURT:  SO I THINK IT WASN'T DISCOVERED BY THE

11  PROSECUTION THAT SHE HAD THAT UNTIL THIS CASE WAS PENDING.  IS

12  THAT RIGHT?

13          THERE IS SOME DISCREPANCY THAT WAS CLARIFIED, I

14  THINK, IN THE PSR.  BUT I, TOO, THROUGHOUT THE TRIAL WAS UNDER

15  THE IMPRESSION THAT SHE ACTUALLY COMMITTED A NEW OFFENSE WHILE

16  ON BOND.  BUT THAT WASN'T --

17          MR. JOHNSON:  MAYBE THE GOVERNMENT CAN --

18          MS. BARRON:  YES, YOUR HONOR.  AND I WAS NOT THE

19  ATTORNEY ON THE CASE.  MR. PHILLIPS WAS.  BUT MR. CHAIKEN

20  WAS -- AGENT CARUANA TELLS ME, AND I THINK THIS IS TRUE, AND I

21  THINK WE HAD THIS DISCUSSION ABOUT HER PRIOR PLEA AGREEMENT.

22  SHE WAS GOING TO PLEAD GUILTY TO AN INFORMATION, A 371

23  INFORMATION.  THIS WAS BEFORE INDICTMENT.  AND SHE HAD BEEN

24  COOPERATING WITH THE GOVERNMENT.  I THINK IT WAS ON HER THIRD

25  PROFFER, WHICH I BELIEVE WAS IN DECEMBER 2015, WHERE WE

1    DISCOVERED THE PRO CARE.  THIS IS AFTER SHE HAD BEEN PROFFERED

2    IN APRIL 2015.  I DON'T REMEMBER THE SECOND DATE.  BUT IT WAS

3    IN DECEMBER WHERE I BELIEVE THAT -- AND AGENT CARUANA CAN SAY

4    -- I DON'T KNOW IF YOU KNOW THE DATES.

5          ALL I KNOW IS IT WAS BEFORE INDICTMENT BECAUSE THE

6    PLAN WAS TO HAVE HER PLEAD TO AN INFORMATION.

7          THE COURT:  OKAY.  ALL RIGHT.

8          MR. JOHNSON:  AND TO THAT EXTENT, WHERE THE

9    GOVERNMENT IS SAYING THAT SHE LIED ABOUT WHAT HAPPENED AT PRO

10   CARE, YOU KNOW, THERE'S A BIG DIFFERENCE BETWEEN COOPERATING

11   WITH THE CHARGED CONSPIRACY AND THEN COOPERATING ON CONDUCT

12   THAT YOU'RE NOT CHARGED WITH THAT IS SEPARATE FROM THAT.

13         AND I UNDERSTAND THE NEED TO BE TRUTHFUL, BUT AT THE

14   SAME TIME, THERE IS A DIFFERENCE BETWEEN THOSE TWO.

15         ONE THING THAT WE TRIED TO DO IN OUR SENTENCING

16   MEMORANDUM IS HUMANIZE MS. MAURYA A LITTLE BIT.  AND TODAY WE

17   ARE JOINED BY FOUR CLOSE FRIENDS OF HERS, ONE OF WHOM IS HER

18   CURRENT PARTNER, WHO SHE INTENDS TO MOVE IN WITH AND BE MARRIED

19   TO.  THIS IS JAMES WILSON.

20         WE ALSO HAVE CARRIE MAURYA, WHO IS MS. MAURYA'S

21   SISTER-IN-LAW.  WE HAVE MARY KATHRYN MITCHELL, WHO WAS MS.

22   MAURYA'S SUPERVISOR AT HER CURRENT EMPLOYER, SHIFTGIG; AS WELL

23   AS ANOTHER CO-WORKER, DAVITA SHIN.  AND THEY HAVE PROVIDED

24   LETTERS TO THE COURT, AND SO DID A NUMBER OF OTHER PEOPLE.

25         AND I WANT TO FOCUS FOR A MOMENT ON CARRIE MAURYA'S

1    LETTER, THE SISTER-IN-LAW.  AND SHE TALKS ABOUT THE ABUSE THAT

2    MS. MAURYA AND HER SIBLINGS AND HER MOTHER SUFFERED AT THE

3    HANDS OF HER FATHER GROWING UP.  THIS WAS EXTENSIVE ABUSE,

4    PHYSICAL, VERBAL.  AND WHEN HER FATHER PASSED AWAY, HER BROTHER

5    TOOK OVER THAT ROLE OF ABUSE.  AND FOR A LONG TIME, THIS IS

6    WHAT MS. MAURYA THOUGHT WAS NORMAL.  AND THIS IS SOMETHING THAT

7    SHE SOUGHT OUT, DYSFUNCTIONAL RELATIONSHIPS, BE IT IN HER

8    PERSONAL LIFE, PROFESSIONAL LIFE.  AND THAT'S SOMETHING THAT

9    JEFF ENGBERG, HER THERAPIST, TALKS ABOUT AS WELL, WHO MS.

10   MAURYA HAS BEEN GOING TO FOR QUITE SOME TIME.  AND HE TALKS

11   ABOUT HOW THIS ABUSE HAS INFILTRATED EVERY ASPECT OF HER LIFE.

12           AND I THINK WHAT'S TELLING ABOUT THESE TWO LETTERS

13   IS, IT'S NOT A JUSTIFICATION FOR HER ACTIONS IN ANY WAY, MAYBE

14   SOME SORT OF EXPLANATION OF SORTS.  BUT REALLY WHAT TOOK ME BY

15   THESE LETTERS IS THE FACT THAT SHE WAS REMORSEFUL EARLY ON.

16   SHE FELT ASHAMED EARLY ON.  THAT'S WHAT SHE SHARED WITH HER

17   THERAPIST.  THAT'S WHAT SHE SHARED WITH HER CLOSE FRIENDS, THAT

18   SHE WAS ASHAMED OF HER CONDUCT AND HER ACTIONS.

19           THERE ARE ALSO A COUPLE OF LETTERS FROM COWORKERS.  I

20   KNOW THAT MINDY GULLEDGE PROVIDED A LETTER, WHO MS. MAURYA

21   WORKED WITH AT SHIFTGIG, TALKING ABOUT WHAT A VALUABLE EMPLOYEE

22   SHE WAS AND WELL LIKED THERE.

23           THERE'S ALSO MARY KATHRYN MITCHELL, WHO IS IN COURT

24   TODAY.  AND SHE WAS MS. MAURYA'S SUPERVISOR AT SHIFTGIG.  AND I

25   JUST WANT TO NOTE, ONE THING THAT SHE SAID IN HER LETTER IS

1   THAT, OF THE NUMBERS COMPRISING OUR LEADERSHIP TEAM, MS. MAURYA

2   WAS THE MEMBER WITH THE MOST INTEGRITY AND THE MEMBER WHO IS

3   MOST RELIABLE, HUMBLE, AND MOTIVATING.

4          AND I BRING ALL THIS UP TO SUBMIT TO THE COURT THAT

5   MS. MAURYA IS NOT BEYOND REDEMPTION.  THIS IS SOMEONE WHO, FOR

6   THE PAST THREE YEARS, HAS BEEN PERFECT ON BOND.  SHE GOT A JOB,

7   EMPLOYER WHO SHE DID NOT STEAL FROM, WHO SHE STILL MAINTAINED

8   FROM -- STILL EMPLOYED WITH.  AND SHE'S IN A COMMITTED

9   RELATIONSHIP.

10          SHE'S BEEN DOING EVERYTHING THAT SHE CAN FOR THE PAST

11  THREE YEARS TO BREAK THAT CYCLE OF ABUSE WHERE SHE SEEKS OUT

12  DESTRUCTIVE BEHAVIOR.

13          BASED ON ALL THESE FACTORS, THIS ENTIRE CASE, HER

14  EXTENSIVE COOPERATION, WHO SHE IS, WHERE SHE'S COME IN LIFE, WE

15  WOULD ASK THAT THE COURT SENTENCE HER TO THE LOW END OF THE

16  GUIDELINES AND SENTENCE HER AT 33 MONTHS.

17          THE COURT:  ALL RIGHT.  THANK YOU.

18          BEFORE I INQUIRE AS TO WHETHER MS. MAURYA WISHES TO

19  ADDRESS THE COURT, I NEGLECTED TO ASK ABOUT RESTITUTION, IF THE

20  PARTIES HAVE HAD ANY DISCUSSION IN TERMS OF WHETHER YOU ARE

21  READY TO PROCEED TODAY WITH A RESTITUTION AMOUNT OR, IF SUCH IS

22  THE CASE WAS YESTERDAY WITH MR. HARDWICK, YOU ARE REQUESTING A

23  FUTURE DATE FOR A RESTITUTION HEARING.

24          GOVERNMENT, I'LL START WITH YOU SINCE YOU'RE SEEKING

25  RESTITUTION AS PART OF THE SENTENCE.

1      MS. BARRON:  YES, YOUR HONOR.  WE TALKED ABOUT IT

2  VERY, VERY BRIEFLY.  BUT I BELIEVE THAT, BECAUSE OF THE MVRA,

3  RESTITUTION WOULD NEED TO BE JOINT AND SEVERAL, THAT SETTING

4  THEM AT THE SAME TIME MAKES MORE SENSE.

5      THE COURT:  ALL RIGHT.  GREAT.

6      ALL RIGHT.  MR. JOHNSON, DOES YOUR CLIENT, MS.

7  MAURYA, WISH TO ADDRESS THE COURT DURING THIS HEARING?

8      MR. JOHNSON:  SHE DOES, YOUR HONOR.

9      THE COURT:  ALL RIGHT.  MS. MAURYA, YOU MAY PROCEED

10  TO THE PODIUM WITH WHICHEVER ATTORNEY OR BOTH ATTORNEYS WILL

11  STAND WITH YOU FOR YOUR STATEMENT.

12      THE DEFENDANT:  GOOD MORNING, JUDGE ROSS.

13      THE COURT:  GOOD MORNING.

14      THE DEFENDANT:  THANK YOU, YOUR HONOR.

15      I STAND HERE WITH THE UTMOST HUMILITY.  I'M PAINFULLY

16  AWARE THAT WE ARE GATHERED HERE FOR THE SOLE REASON OF MY

17  ACTIONS.  I TAKE FULL RESPONSIBILITY FOR THE CRIMES I'VE

18  COMMITTED, CONSPIRACY TO WIRE FRAUD AND THE RELEVANT CONDUCT

19  THAT I PLED GUILTY TO IN 2017.

20      YOUR HONOR, MY ACCEPTANCE AND ANY RESPECTIVE

21  PUNISHMENT I RECEIVE FROM THIS COURT WILL ONLY BE A SMALL PART

22  OF MY SENTENCE.  I KNOW THAT I OWE SO MUCH MORE.  THIS IS A

23  SHAME I WILL CARRY FOREVER.  BUT BE ASSURED THAT I WILL STRIVE

24  TO CONTINUE TO BE A GOOD AND PRODUCTIVE MEMBER OF SOCIETY.

25      ACCEPTANCE AND APOLOGIZING FOR MY MISTAKES WAS NOT

1    TAKEN LIGHTLY.  YET THIS IS -- THIS IS DONE -- WILL BE DONE --

2    I'M SO SORRY.

3              THE COURT:  IT'S OKAY.  GO AHEAD, TAKE YOUR TIME.

4              THE DEFENDANT:  YET THIS DOES LITTLE TO FIX THOSE

5    THINGS I'VE DONE.  APOLOGIES DO NOT SUFFICE, EVEN WHEN MOST

6    SINCERE.  THERE ARE NO WORDS THAT DIMINISH THE HARM AND PAIN I

7    HAVE CAUSED TO MORE THAN THE 800 PARTNERS, ATTORNEYS, AND

8    STAFF; MARK WITTSTADT, GERARD WITTSTADT, ART MORRIS, AND

9    FIDELITY NATIONAL FINANCIAL, WHO PLACED THEIR FAITH IN MY

10   LEADERSHIP TO BE MORALLY AND ETHICALLY GUIDING.  AND FOR THAT

11   I'M DEEPLY SORRY.

12             COUNTLESS MAN-HOURS, FUNDS, AND EMOTION HAVE BEEN

13   SPENT ON ADJUSTING MY MISDEEDS.  I MADE TERRIBLE DECISIONS.  I

14   COST PEOPLE DEARLY.  I DAMAGED PUBLIC TRUST.  I WISH I COULD GO

15   BACK, DO EVERYTHING DIFFERENTLY.  BUT THE MATTER OF FACT IS I

16   CANNOT.  THEY COUNTED ON ME TO DO MY JOB SO THEY COULD DO

17   THEIRS, AND I FAILED MISERABLY.

18             I BETRAYED EVERYONE AND EVERYTHING I ASPIRED TO

19   BECOME, EVEN THE CODE OF ETHICS WHEN MY -- REQUIRED BY MY

20   PROFESSION.

21             I'M ASHAMED TO ACKNOWLEDGE AND CHARACTERIZE MYSELF AS

22   THE ONE WHO LACKED THE STRENGTH AND THE FORTITUDE TO MAKE THE

23   ONLY CHOICE ONE SHOULD EVER MAKE, THE MORALLY AND ETHICALLY

24   SOUND ONE.  I OUTRIGHT BROKE THE LAW INTENTIONALLY AND DID SO

25   DECEITFULLY.  I FIND MY OWN BASIC FAILURES JUST AS STARTLING AS

1    OTHERS DO.

2         I AM SPEAKING TODAY TO PROVIDE SOME CONTEXT FOR WHAT

3    I DID, CERTAINLY NOT TO MINIMIZE THE CRIMES OR TO TRY TO

4    EXPLAIN HOW A PERSON WITH MY BACKGROUND AND ADVANTAGES IS

5    STANDING HERE TODAY.  I WAS LOST.  I HAVE -- I DID NOT HAVE

6    LESSER GOALS OR PLANS.  I WILLINGLY DISGRACED THE PRIVILEGE AND

7    SAFETY OF OUR COUNTRY, BUT I IGNORED THE PAIN AND DEVASTATION

8    MY MOTHER ENDURED HER ENTIRE LIFE.

9         ALTHOUGH I DESERVE EVERY MOMENT OF REGRET AND SORROW

10   AND FEAR -- AND LEVEL OF FEAR I EVER IMAGINED, THOSE WHO CARE

11   FOR ME SHOULD NOT.  I WORRY FOR MY MOTHER'S WELFARE SHOULD I BE

12   INCARCERATED.  I OWN THIS.  I MUST CHANGE.  STARTING WITH THE

13   MINDSET.

14        THIS HAS BEEN MOST DIFFICULT DUE TO MY EMOTIONAL

15   CULMINATION OF BELIEFS, BEHAVIORS AND PATTERNS.  I NEED TO TAKE

16   TIME TO EVALUATE AND RESET.  WITH THE CONTINUED ASSISTANCE OF

17   MY THERAPIST AND A SMALL GROUP OF FRIENDS AND FAMILY AND

18   LIMITED STRESS-INDUCING INTERACTIONS, I AM MAKING INCREMENTAL

19   CHANGES AND UNDERSTANDING OF MY HISTORY.  I LEARN TO MAKE

20   BETTER CHOICES, SET BOUNDARIES, AND BUILD SELF-CONFIDENCE AND

21   FEEL EMOTIONALLY STRONGER.  I HAVE BEEN MOTIVATED.  I AM -- I

22   HAVE BEEN MOTIVATED MORE THAN EVER TO PROVE MYSELF TO MYSELF.

23   I HAVE FORCED MYSELF TO LEARN TO TRUST MY MORAL COMPASS OVER

24   ANYTHING ELSE AND TO FIND THE LOST PIECES OF MYSELF.

25        IT HAS BEEN DIFFICULT TO NAVIGATE THROUGH THE LEGAL

1 SYSTEM AS WELL AS AN UNBELIEVABLE SET OF CIRCUMSTANCES WHICH

2 HAVE PRESENTED THEMSELVES OVER THE LAST FEW YEARS.  I CONTINUE

3 TO WORK HARDER THAN EVER WHILE EMOTIONALLY AND FINANCIALLY

4 ASSISTING MY MOTHER.

5 　　　　I AM A SUCCESSFUL TEAM MEMBER AND LEADER AT SHIFTGIG.

6 I AM GRATEFUL FOR THE MENTORSHIP AND THE CLIENT INTERACTION.

7 I AM MORE THAN WILLING TO START OVER AND CREATE A NEW FUTURE

8 FOR MYSELF.  I'VE DONE EVERYTHING I CAN START TO MAKE AMENDS

9 FOR MY CRIMES.

10 　　　　I WOULD NEVER CONSIDER PUTTING MY VICTIMS THROUGH A

11 BURDEN OF A TRIAL.  I HAVE COOPERATED WITH THE GOVERNMENT.  AND

12 I DO HOPE FOR THE GOVERNMENT'S ADVOCACY FOR THAT COOPERATION.

13 AND I DO SEEK THE COURT'S LENIENCY.

14 　　　　ON THE DAY OF MY INDICTMENT, INTERESTED OFFICER ASKED

15 WHETHER THAT MOMENT WAS THE WORST IN MY LIFE.  I RESPONDED, NO,

16 THOSE MOMENTS HAVE ALREADY OCCURRED.

17 　　　　TODAY IS A DAY OF CLOSURE, YOUR HONOR.  I UNDERSTAND

18 INCARCERATION.  I'VE BEEN LIVING IN A PRISON SINCE CHILDHOOD.

19 I SEEK CLOSURE FROM THIS.  I WOULD LIKE TO ATONE.

20 　　　　THANK YOU, YOUR HONOR, FOR YOUR TIME.  MOST

21 IMPORTANTLY, I WOULD LIKE TO ONCE AGAIN APOLOGIZE TO THE

22 VICTIMS.

23 　　　　THE COURT:  THANK YOU, MA'AM.

24 　　　　YEAH, I WILL TELL YOU, AND I UNDERSTAND THAT --

25 SOUNDS LIKE THAT STATEMENT DEALT A LOT WITH WHAT HAPPENED WITH

1   RESPECT TO MHS.  I HEARD YOU REFERENCING THE 800 PEOPLE WHO

2   LOST JOBS AND ALL.  BUT, AS YOU KNOW, AND IT'S BEEN DISCUSSED

3   HERE TODAY, AT TRIAL, WE DIDN'T JUST DISCUSS YOUR CONDUCT AT

4   MHS.  THE GOVERNMENT FILED A MOTION TO PUT BEFORE THE JURY IN

5   MR. HARDWICK'S TRIAL -- WAS IT THE GOVERNMENT?  OR THE DEFENSE.

6   IT WAS THE DEFENSE.  YEAH.  THAT MAKES SENSE.  THE DEFENSE.

7   THAT'S RIGHT.

8           MR. GARLAND WANTED TO PRESENT TO THE JURY ALL OF THE

9   DIFFERENT EMPLOYERS FROM WHOM YOU STOLE.  AND I SAID, WELL,

10  THIS SEEMS TO BE A BIT MUCH, BECAUSE I WANT THE TRIAL TO STAY

11  ABOUT MR. HARDWICK AND NOT RE-SHIFT TO MS. MAURYA.  BUT THERE

12  WERE A LOT OF THEM.  AND I THINK I ALLOWED MAYBE TWO, MAYBE

13  THREE, BUT DEFINITELY TWO IN.

14          YOU HAVE AT THIS POINT -- AND I'M NOT GOING TO ASK

15  YOU POINT BLANK HOW MANY EMPLOYERS YOU'VE STOLEN FROM -- BUT

16  YOU HAVE BEEN ACCUSED OF STEALING FROM HOW MANY AT THIS POINT?

17          THE DEFENDANT:  I THINK FOUR.  I BELIEVE IT'S FOUR,

18  YOUR HONOR.

19          THE COURT:  ALL RIGHT.  I THOUGHT IT WAS HIGHER THAN

20  THAT.  I THOUGHT IT WAS CLOSER TO SIX, BUT YOU MAY BE CORRECT.

21          AND THAT'S WHAT, I GUESS THAT'S WHAT STANDS OUT TO ME

22  IS THIS PATTERN.  AND EVEN IF IT WERE ACCEPTED THAT MR.

23  HARDWICK SOMEHOW FORCED YOU, MADE YOU DO CERTAIN THINGS WITH

24  RESPECT TO THIS CASE, IT REALLY DOESN'T, IT REALLY DOESN'T

25  EXPLAIN ALL THE OTHER EMPLOYERS AND ALL THE OTHER CONDUCT,

1     WHICH IS WHY I ASKED YOUR ATTORNEY EARLIER WHETHER MHS WAS THE

2     ONLY PLACE WHERE YOU WORKED WITH MR. HARDWICK.

3          I JUST NEVER HAVE HEARD ANYTHING LIKE THIS.  AND YOU

4     JUST KEPT GETTING HIRED.  SO I DON'T KNOW IF THESE PEOPLE

5     WEREN'T DOING FULL BACKGROUND CHECKS, OR I DON'T KNOW HOW IT

6     WENT UNDETECTED.  SOMETIMES MAYBE EMPLOYERS ARE TOO EMBARRASSED

7     TO MAKE KNOWN THAT THEY HAVE BEEN STOLEN FROM SO THEN FUTURE

8     PROSPECTIVE EMPLOYERS DON'T FIND OUT ABOUT IT.  BUT I JUST

9     NEVER HAVE SEEN ANYTHING LIKE IT.

10         IT WAS LIKE YOU JUST COULDN'T STOP YOURSELF.  AND I'M

11     NOT SURE HOW THAT RELATES TO THE ABUSE THAT YOU UNFORTUNATELY

12     SUFFERED AS A YOUNGER PERSON.  I'M NOT SURE HOW THAT CONNECTION

13     IS MADE.  BUT I CERTAINLY DO TAKE NOTE OF THAT ABUSE THAT YOU

14     HAVE BEEN SO CANDID ABOUT.

15         BUT I WILL TELL YOU SIMPLY, I HAVE RULED ON THE

16     GUIDELINES AS I SEE FIT.  I HAVE JUST DONE THE BEST THAT I CAN

17     AS A JUDGE.  BUT I DON'T FIND THAT WHERE THEY END UP WARRANTS

18     THE MOST APPROPRIATE PUNISHMENT FOR YOU.  I JUST REALLY DON'T.

19         THE DEFENDANT:  MAY I ADDRESS --

20         THE COURT:  YOU MAY.  THIS IS YOUR DAY IN COURT.

21     YES, MA'AM.

22         THE DEFENDANT:  I UNDERSTAND YOUR CONCERN AS WELL AS

23     THE GOVERNMENT'S CONCERN.  IT'S NOT EVEN A CONCERN.  I HAVE

24     ABSOLUTELY --

25         THE COURT:  TAKE YOUR TIME.

1          THE DEFENDANT:  I LIVED ABOVE MY MEANS.  I WAS UNABLE

2    TO SET BOUNDARIES WITH PEOPLE IN MY LIFE.  AND THAT IS WHY

3    THERE WAS AN ISSUE WITH MY PREVIOUS EMPLOYERS AND MY INABILITY

4    TO ETHICALLY DRAW LINES WITH AND BREAK THE LAW.

5          I OUTRIGHT BROKE THE LAW.  AND IF IT WAS SIX

6    EMPLOYERS, I DO NOT -- I'M TRYING TO THINK HOW MANY EMPLOYERS

7    IT WAS.  IF IT WAS SIX, IT WAS SIX.  I'M NOT GOING TO DISAGREE

8    AT THIS POINT.  IF I BROKE THE LAW -- I BROKE THE LAW.  AND IT

9    WILL NEVER HAPPEN AGAIN.

10          I UNDERSTAND HOW TO DRAW THE BOUNDARIES AT THIS

11    POINT.  I UNDERSTAND WHERE MY WEAKNESSES ARE.  I UNDERSTAND HOW

12    MY PAST BLED INTO MY INABILITY TO STOP SOMEONE FROM

13    MANIPULATING MY THOUGHT PROCESS, FROM RIGHT AND WRONG.

14          THE COURT:  SO --

15          THE DEFENDANT:  IT WILL NEVER HAPPEN AGAIN.

16          THE COURT:  SOMEONE ELSE MANIPULATED YOUR THOUGHT

17    PROCESS IN THESE CASES?

18          THE DEFENDANT:  RIGHT, FROM LIVING ABOVE MY MEANS.

19          THE COURT:  ALL RIGHT.  ALL RIGHT.

20          ANYTHING ELSE?  I'M SORRY.

21          THE DEFENDANT:  NO, ABSOLUTELY.

22          THE COURT:  BEFORE I IMPOSE SENTENCE, MR. JOHNSON, I

23    -- THE SENTENCE WILL, OF COURSE, INVOLVE CUSTODIAL TIME.  ARE

24    YOU GOING TO MAKE SOME REQUEST WITH RESPECT TO SURRENDER?

25          MR. JOHNSON:  YOUR HONOR, WE WOULD REQUEST THAT SHE

1    SURRENDER AFTER THE RESTITUTION HEARING.

2            THE COURT:  ALL RIGHT.  GOVERNMENT, WHAT IS YOUR

3    POSITION GOING TO BE IN RESPONSE TO THE REQUEST?

4            MS. BARRON:  WE ARE NOT ASKING THAT SHE BE REMANDED.

5    SHE'S BEEN GOOD ON BOND.  AND WE ASK THE COURT TO KEEP HER ON

6    BOND.

7            THE COURT:  THANK YOU.

8            OFFICER MOODY, DO YOU HAVE ANY INFORMATION THAT

9    CONTRADICTS WHAT THE GOVERNMENT HAS JUST REPRESENTED?

10           THE PROBATION OFFICER:  NO, JUDGE.  SHE'S BEEN

11   COMPLIANT ON PRETRIAL SUPERVISION.  WE DON'T SEE HER AS A

12   FLIGHT RISK.

13           THE COURT:  ALL RIGHT.  THANK YOU.

14           THE DEFENDANT:  JUDGE ROSS?

15           THE COURT:  YES, MA'AM.

16           THE DEFENDANT:  MAY I JUST SAY ONE LAST THING?

17           THE COURT:  YES.  THIS IS YOUR DAY IN COURT.  I WANT

18   YOU TO GET OUT WHATEVER YOU WANT ME TO CONSIDER.

19           THE DEFENDANT:  IN NO WAY, SHAPE, OR FORM AM I

20   BLAMING ANYBODY ELSE.  I WANT TO MAKE SURE THAT I'M CLEAR THAT

21   IT WAS MY DECISION TO ACT UPON EVERY SINGLE ONE OF THESE

22   DECISIONS.

23           THE COURT:  THANK YOU.

24           THE DEFENDANT:  I WANT TO BE VERY CLEAR OF THAT.

25           THANK YOU.

1          THE COURT:  THAT WASN'T CLEAR.  SO THANK YOU FOR

2    THAT.

3          MR. JOHNSON:  YOUR HONOR?

4          THE COURT:  YES.

5          MR. JOHNSON:  I APOLOGIZE.  WE WOULD LIKE TO MAKE A

6    REQUEST FOR A DESIGNATION, IF YOU WOULD LIKE TO HEAR THAT NOW

7    OR AFTER.

8          THE COURT:  THAT'S FINE.  SINCE WE'VE GONE THERE, GO

9    AHEAD.

10         MR. JOHNSON:  MS. MAURYA, IT'S HER INTENTION WHEN SHE

11   IS RELEASED TO MOVE IN WITH HER MOTHER IN NEW JERSEY.  AND I

12   HAVE AN ADDRESS.  I DON'T KNOW IF THE COURT WOULD BE

13   COMFORTABLE WITH PUTTING THAT INTO THE J&C, BUT THAT IS HER

14   INTENTION.

15         THE COURT:  ALL RIGHT.  I WILL ALLOW YOU TO FURNISH

16   THAT AT A LATER POINT SO THAT IT'S NOT ON THIS RECORD.  SO YOU

17   ARE REQUESTING WHAT TYPE OF DESIGNATION?

18         MR. JOHNSON:  I BELIEVE DANBURY WOULD BE ONE OF THE

19   CLOSER FACILITIES.

20         THE COURT:  ALL RIGHT.

21         ALL RIGHT.  TAKING INTO ACCOUNT EVERYTHING THAT HAS

22   BEEN PRESENTED TO ME AND PURSUANT TO THE SENTENCING REFORM ACT

23   OF 1984, IT IS THE JUDGMENT OF THIS COURT THAT YOU, ASHA R.

24   MAURYA, BE HEREBY COMMITTED TO THE CUSTODY OF THE BUREAU OF

25   PRISONS TO BE IMPRISONED FOR A TERM OF 84 MONTHS ON COUNT ONE

1    OF THE INDICTMENT.

2              IT IS FURTHER ORDERED THAT YOU SHALL PAY TO THE

3    UNITED STATES A SPECIAL ASSESSMENT OF $100, WHICH SHALL BE DUE

4    IMMEDIATELY.

5              RESTITUTION SHALL BE DETERMINED AT A LATER POINT.

6              THE INDICTMENT DOES CONTAIN A FORFEITURE PROVISION.

7    MS. CONNORS, IS THERE ANYTHING OUTSTANDING WITH RESPECT TO

8    FORFEITURE?

9              MS. CONNORS:  YES, YOUR HONOR.  I DID PROVIDE A

10   CONSENT PRELIMINARY ORDER OF FORFEITURE TO THE COURT FOR

11   SIGNATURE.  THIS WAS PREVIOUSLY FILED ON THE DOCKET BUT DIDN'T

12   SEE THAT IT WAS SIGNED.  AND THE CONSENT PRELIMINARY ORDER JUST

13   NEEDS TO BE INCORPORATED INTO THE J&C.

14             THE COURT:  IT WILL BE.  AND I HAVE SIGNED THAT

15   FORFEITURE IN CORRESPONDENCE WITH THE CORRESPONDING FORFEITURE

16   ORDER AS PART OF THIS ORDER AS WELL.

17             UPON YOUR RELEASE FROM IMPRISONMENT, YOU SHALL BE

18   PLACED ON SUPERVISED RELEASE FOR THREE YEARS.

19             YOU SHALL REPORT IN PERSON TO THE NEAREST PROBATION

20   OFFICE WITHIN 72 HOURS OF YOUR RELEASE.

21             AS PART OF YOUR SUPERVISION, YOU MUST COMPLY WITH THE

22   STANDARD AND MANDATORY CONDITIONS ADOPTED BY THIS COURT, AS

23   WELL AS THE FOLLOWING ADDITIONAL STANDARD OR SPECIAL CONDITIONS

24   OF SUPERVISION:

25             YOU MUST SUBMIT TO THE MANDATORY DNA TESTING.

1          YOU MUST REFRAIN FROM ANY UNLAWFUL USE OF CONTROLLED

2     SUBSTANCE.

3          YOU MUST SUBMIT TO ONE DRUG TEST WITHIN 15 DAYS OF

4     YOUR RELEASE FROM CUSTODY AND AT LEAST TWO PERIODIC ONES

5     THEREAFTER.

6          YOU MUST NOT OWN, POSSESS, OR HAVE ACCESS TO A

7     FIREARM, AMMUNITION, DESTRUCTIVE DEVICE, OR DANGEROUS WEAPON.

8          YOU MUST SUBMIT YOUR PERSON, PROPERTY, HOME,

9     RESIDENCE, VEHICLE, PAPERS, COMPUTERS, OTHER ELECTRONIC

10    COMMUNICATIONS OR DATA STORAGE DEVICES OR MEDIA TO A SEARCH BY

11    UNITED STATES PROBATION UPON REASONABLE REQUEST AND PURSUANT TO

12    REASONABLE CIRCUMSTANCES.

13         YOU MUST MAKE A FULL AND COMPLETE DISCLOSURE OF YOUR

14    FINANCES AND SUBMIT TO AN AUDIT OF YOUR FINANCIAL DOCUMENTS

15    UPON PROBATION'S REQUEST AND NOT INCUR ANY NEW CREDIT CHARGES

16    OR OPEN ADDITIONAL LINES OF CREDIT WITHOUT PROBATION'S

17    APPROVAL.

18         AND, AGAIN, YOU WILL BE DIRECTED AND ORDERED TO PAY

19    RESTITUTION, BUT THAT WILL BE ORDERED PURSUANT TO THE

20    RESTITUTION ORDER THAT WILL COME OUT AFTER THE RESTITUTION

21    HEARING, WHICH THIS COURT HAS SET FOR -- IS IT MAY 9TH, MS.

22    BECK?

23         THE COURTROOM DEPUTY:  YES.

24         THE COURT:  MAY 9TH.  AN ORDER WILL GO OUT TO THAT

25    EFFECT.

1    DO YOU UNDERSTAND THE SENTENCE THAT I'VE JUST NOW

2  IMPOSED, MS. MAURYA?

3    THE DEFENDANT:  I DO.

4    THE COURT:  I DO FIND JUSTIFICATION IN THIS SENTENCE

5  FOR YOU, MS. MAURYA, AFTER CONSIDERING ALL OF THE APPLICABLE

6  SENTENCING FACTORS PURSUANT TO 18 U.S.C. SECTION 3553(A).

7    I FIND THIS SENTENCE SHOULD PROVIDE SUFFICIENT

8  PUNISHMENT AND ADEQUATE DETERRENCE.

9    THIS IS A VARIANCE UPWARD, WHICH IS UNCOMMON FOR ME.

10  AND IT'S UNCOMMON THAT I IMPOSE A SENTENCE THAT IS LOWER THAN

11  ONE THAT HAS BEEN REQUESTED BY THE GOVERNMENT.  BUT UNDER THESE

12  CIRCUMSTANCES, YOUR EGREGIOUS CONDUCT, THE NUMBER OF PEOPLE TO

13  WHOM YOU CAUSED HARM, YOUR REPEATED CONDUCT, I FIND THAT THIS

14  SENTENCE IS JUSTIFIED AND, AGAIN, THAT IT SHOULD PROVIDE

15  SUFFICIENT PUNISHMENT AND ADEQUATE DETERRENCE, ESPECIALLY

16  SPECIFIC DETERRENCE.

17    ARE THERE ANY OBJECTIONS ON BEHALF OF MS. MAURYA?

18  YOU MAY RESTATE OBJECTIONS ALREADY MADE TO MAKE SURE THAT THEY

19  ARE PRESERVED AND STATE ANY ADDITIONAL ONES AT THIS TIME.

20    MR. PATE:  YOUR HONOR, IF WE MAY HAVE A MOMENT.

21    THE COURT:  YES, SIR.

22    MR. JOHNSON:  YOUR HONOR, WE WOULD RELY ON THE

23  OBJECTIONS THAT WE'VE ALREADY MADE, INCLUDING THE OBJECTION TO

24  THE FINANCIAL HARDSHIP ENHANCEMENT.

25    WE WOULD ALSO OBJECT TO THE COURT'S VARIANCE UPWARDS

1    UNDER 3553.

2              THE COURT:  SO NOTED.  THANK YOU.

3              ANY OBJECTIONS ON BEHALF OF THE GOVERNMENT?

4              MS. BARRON:  YOUR HONOR, WE OBJECT TO THE LOSS

5    CALCULATION AND PROCEDURAL REASONABLENESS.

6              THE COURT:  SO NOTED.

7              MS. MAURYA, MA'AM, I DO REMIND YOU THAT YOU DID WAIVE

8    YOUR RIGHT TO APPEAL THE CONVICTION AND SENTENCE AND THE RIGHT

9    TO COLLATERALLY ATTACK YOUR SENTENCE AND CONVICTION IN ANY

10   POST-CONVICTION PROCEEDING.  THERE IS AN EXCEPTION FOR CLAIM OF

11   CONSTITUTIONALLY INEFFECTIVE ASSISTANCE OF COUNSEL.

12             IF YOU DID HAVE SOME REASON OR DESIRE TO FILE SUCH A

13   CLAIM, YOU'D HAVE 14 DAYS FROM JUDGMENT BEING ENTERED TO DO SO.

14             AND I REMIND EVERYONE THAT WE STILL DO, OF COURSE,

15   HAVE THE RESTITUTION HEARING THAT WILL BE HELD AT A LATER

16   POINT, MAY 9TH.

17             IF UNABLE TO PAY THE COST OF SUCH AN APPEAL, YOU DO

18   HAVE THE RIGHT TO ASK THE COURT TO ALLOW YOU TO APPEAL IN FORMA

19   PAUPERIS, MEANING AS SOMEONE WHO DOES NOT HAVE THE FINANCIAL

20   RESOURCES TO PAY THE COST OF SUCH AN APPEAL.

21             DO YOU HAVE ANY QUESTIONS ABOUT YOUR APPELLATE RIGHTS

22   AND/OR ANYTHING THAT HAS OCCURRED DURING THIS HEARING?

23             THE DEFENDANT:  I DON'T.

24             THE COURT:  AS PART OF THE JUDGMENT, WE WILL ADD IN

25   THAT -- A RECOMMENDATION THAT YOU BE DESIGNATED TO DANBURY OR

1  AS CLOSE TO NEW JERSEY AS POSSIBLE.

2         DO YOU UNDERSTAND THAT'S SIMPLY A RECOMMENDATION AND

3  NOT A GUARANTEE ON MY PART OF WHERE YOU WILL BE DESIGNATED?

4         THE DEFENDANT:  I DO.

5         MS. BARRON:  YOUR HONOR, MAY I SAY, I NEED TO CORRECT

6  SOMETHING THE COURT SAID ABOUT THE APPELLATE RIGHTS.  PARAGRAPH

7  32, WHICH DISCUSSES THE LIMITED WAIVER OF APPEAL, DOES GIVE MS.

8  MAURYA THE RIGHT TO FILE A DIRECT APPEAL OF AN UPWARD DEPARTURE

9  OR VARIANCE, SO --

10        THE COURT:  OH.

11        MS. BARRON:  -- SHE HAS FULL APPELLATE RIGHTS.

12        THE COURT:  I -- YOU ARE ABSOLUTELY RIGHT.  I

13 NORMALLY, AS I SAID, DO NOT VARY UPWARDS.  SO I NEED TO SAY

14 THAT.  HMM.

15        YOU DO HAVE THE RIGHT TO FILE AN APPEAL WITH RESPECT

16 TO MY UPWARD VARIANCE.  THAT IS INCLUDED IN YOUR LIMITED WAIVER

17 OF APPEAL.  AS I TOLD YOU DURING YOUR PLEA COLLOQUY, YOU DON'T

18 HAVE THE RIGHT TO WITHDRAW YOUR GUILTY PLEA ON THAT BASIS, BUT

19 YOU DO HAVE THE RIGHT TO FILE AN APPEAL ON THAT BASIS.

20        I WAS THINKING IN MY MIND ABOUT YESTERDAY.  BUT MR.

21 HARDWICK WAS IN A TOTALLY DIFFERENT SITUATION BECAUSE HE DID

22 NOT RETAIN A RIGHT TO APPEAL.  SO --

23        MR. PATE:  AND THAT'S FINE, YOUR HONOR.  WE'RE GOING

24 TO EXPLAIN HER APPEAL RIGHTS TO HER.

25        THE COURT:  OKAY.  GOOD.  LOST MY BREATH FOR A SECOND

1    THINKING I HAD OVERLOOKED SOMETHING YESTERDAY.  BUT WE'RE OKAY.

2          ALL RIGHT.  IS THERE ANYTHING ELSE ON BEHALF OF MS.

3    MAURYA AT THIS TIME?

4          MR. JOHNSON:  NO, YOUR HONOR.

5          THE COURT:  ANYTHING ELSE ON BEHALF OF THE GOVERNMENT

6    AT THIS TIME?

7          MS. BARRON:  NO, YOUR HONOR.

8          THE COURT:  ALL RIGHT.  THANK YOU SO MUCH.  WE'RE

9    ADJOURNED.

10          THE COURT SECURITY OFFICER:  ALL RISE.  COURT STANDS

11    IN RECESS.

12          THE COURT:  YES, VOLUNTARY SURRENDER.

13          MS. MAURYA, AS PART OF THE VOLUNTARY SURRENDER, YOU

14    WILL RECEIVE A NOTE IN THE FUTURE FROM THE BUREAU OF PRISONS

15    FOR A DATE CERTAIN TO TURN YOURSELF IN.  WHATEVER DATE IS

16    REFLECTED IN THAT NOTICE, YOU ARE TO TURN YOURSELF IN BY NOON

17    ON THAT DATE.

18          THANK YOU.  WE ARE ADJOURNED.

19                    (PROCEEDINGS CONCLUDED AT 12:33 P.M.)

20                         -  -  -

21

22

23

24

25

1   UNITED STATES DISTRICT COURT

2   NORTHERN DISTRICT OF GEORGIA

3   <u>CERTIFICATE OF REPORTER</u>

4

5

6           I DO HEREBY CERTIFY THAT THE FOREGOING PAGES ARE A

7   TRUE AND CORRECT TRANSCRIPT OF THE PROCEEDINGS TAKEN DOWN BY

8   ME IN THE CASE AFORESAID.

9           THIS, THE 19TH DAY OF FEBRUARY, 2019.

10

11

12

                            /S/ *ELIZABETH G. COHN*
13                          _____
                            ELIZABETH G. COHN, RMR, CRR
14                          OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25