# EXHIBIT D

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

_____

## APPEAL NOS. 19-11040-CC & 19-12140-CC
_____

## NATHAN E. HARDWICK, IV

**Appellant,**

v.

## UNITED STATES OF AMERICA,

**Appellee.**

_____

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

_____

## AMENDED BRIEF OF APPELLANT HARDWICK
_____

## THIS IS A DIRECT APPEAL FROM A FINAL JUDGMENT IN A
## CRIMINAL CASE PERSUANT TO 28 U.S.C. §1291

_____

| | |
|---|---|
| **EDWARD T.M. GARLAND** | **KRISTEN W. NOVAY** |
| **GEORGIA BAR NO. 284900** | **GEORGIA BAR NO. 742762** |
| **GARLAND, SAMUEL & LOEB** | **GARLAND, SAMUEL & LOEB** |
| **3151 MAPLE DRIVE N.E.** | **3151 MAPLE DRIVE N.E.** |
| **ATLANTA, GEORGIA 30305** | **ATLANTA, GEORGIA 30305** |
| **(404) 262-2225** | **(404) 262-2225** |

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

| | |
|---|---|
| NATHAN HARDWICK, IV, | ) |
| | ) |
| Appellant, | ) |
| | ) |
| v. | ) APPEAL NOS. 19-11040-CC |
| | ) & 19-12140-CC |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Appellee. | ) |

## AMENDED CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Local Rule 28-2(b), counsel for appellant, Nathan Hardwick, certifies

that the following persons may have an interest in the outcome of this case:

1. Alston and Bird, LLP, law firm for Fidelity National Financial, Inc. (FNF)

2. Anand, Joseph, United States Magistrate Judge, Northern District of Georgia

3. Burch, Edward D., counsel for Fidelity National Financial, Inc.

4. Chandler, Douglas V., movant

5. Chen, Jeffrey, appellate counsel for Co-Defendant Asha Maurya

6. Connors, Kelly Kathleen, Assistant United States Attorney and trial counsel for Appellee

7. Fidelity National Financial, Inc., victim

8. Fulks, Mia Patrice, counsel for Appellant

9.   Garland, Edward T. M., counsel for Appellant

10.  Hardwick IV, Nathan E., Defendant/Appellant

11.  Komarek, Laura Ann, counsel for Fidelity National Financial, Inc.

12.  Loeb, Robin N., counsel for Appellant

13.  Maurya, Asha, Co-Defendant

14.  McBath, Jane Elizabeth, Assistant United States Attorney and
     appellate counsel for Appellee

15.  McEvoy, Brian Fenton, counsel for Morris

16.  MHSLAW, Inc., owner of Morris Hardwick Schneider, LLC

17.  Moody, Alexander R., U.S. Probation Officer who prepared PSR

18.  Monnin, Paul, counsel for movant Fidelity National Financial, Inc.

19.  Moore, Bret, counsel for movant Douglas V. Chandler

20.  Morris, Arthur, victim

21.  Morris Hardwick Schneider, LLC, victim

22.  Novay, Kristen W., counsel for Appellant

23.  Parker, Hudson, Rainer & Dobbs LLP, movant

24.  Phillips, John Russell, Assistant United States Attorney and trial
     counsel for Appellee

25.  Rainer, J. Marbury, counsel for Parker, Hudson, Rainer & Dobbs
     LLP

26.  Ramachandrappa, Naveen, appointed appellate counsel for

     Co-Defendant Asha Maurya

27. Ross, Eleanor Louise, United States District Court Judge

28. Salinas, Catherine, United States Magistrate Judge

29. Schneider, Randy, victim

30. Sharp, Joseph C., counsel for Arthur Morris

31. Smith, Gambrell & Russell, LLP, law firm for Fidelity National

Financial, Inc.

32. Wittstadt, Gerard, victim

33. Wittstadt, Mark, victim

This 7th day of October 2019.

RESPECTFULLY SUBMITTED,

**GARLAND, SAMUEL & LOEB, P.C.**

*/s/ Edward T.M. Garland*
EDWARD T.M. GARLAND
Georgia Bar No. 284900
Attorney for Appellant

*/s/ Kristen W. Novay*
KRISTEN W. NOVAY
Georgia Bar No. 742762
Attorney for Appellant

3151 Maple Drive, N.E.
Atlanta, GA  30305
Phone: 404-262-2225
Email: kwn@gsllaw.com

C-3

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Counsel for Appellant, Nathan E. Hardwick IV, respectfully requests oral argument in this case to enable further elaboration of the issues presented by this appeal.

## STATEMENT OF ADOPTION

Pursuant to 11th Cir. R. 28-1(f), the Hardwick requests that  (1) the facts regarding the sentencing and restitution proceedings (p. 9 section 2.3 through p. 27 section 2.4.10) and (2) the arguments regarding the District Court's Restitution Order (p. 27–53), put forth by Co-Defendant-Appellant Asha Maurya in her initial Appellant brief, filed with this Court on September 17, 2019, in Case :19-12108, be adopted by reference and incorporated by reference on behalf of the Appellant. Since Hardwick and Maurya, as co-conspirators, were found jointly and severally liable, in the amount of $40,307,431.00 (Doc. 367), the same arguments apply to Appellant Hardwick as those that Maurya asserts regarding the fact that this Court should vacate the District Court's Restitution order because (1) the District Court failed to provide Hardwick with a proper opportunity to object to its findings of fact and legal conclusions; (2) the District Court lacked a proper evidentiary basis for its $6 million restitution award to Mark Wittstadt; (3) the District Court lacked a proper evidentiary basis for its $6 million restitution award to Gerard Wittstadt; (4) the District Court lacked a proper evidentiary basis for finding that all of Fidelity's claimed losses were caused by Defendants' scheme; and, (5) the District Court lacked a proper evidentiary basis for its $5 million restitution award to Art Morris.

.

## TABLE OF CONTENTS

| | |
|---|---|
| AMENDED CERTIFICATE OF INTERESTED PARTIES | C-1 |
| STATEMENT REGARDING ORAL ARGUMENT | i |
| STATEMENT OF ADOPTION | ii |
| TABLE OF CONTENTS | iii |
| TABLE OF CITATIONS | vi |
| STATEMENT OF JURISDICTION | xi |
| STATEMENT OF THE ISSUES | 1 |
| STATEMENT OF THE CASE | 2 |
| STATEMENT OF THE FACTS | 4 |
| STANDARDS OF REVIEW | 18 |
| SUMMARY OF THE ARGUMENT | 20 |
| ARGUMENT AND CITATIONS OF AUTHORITY | 22 |
| I.   THE DENIAL OF HARDWICK'S MOTION FOR BILL OF PARTICULARS DENIED HIM THE ABILITY TO PRESENT A DEFENSE AND THE ABILITY TO CHALLENGE THE GOVERNMENT'S THEORY OF INTENT. | |
| II.   THE ADMISSION OF THE GOVERNMENT'S TRIAL EXHIBIT 1001 PRESENTED FLAWED AND MISLEADING INFORMATION TO THE JURY AND FURTHER COMPOUNDED THE PREJUDICE SUFFERED IN THE DENIAL OF HARDWICK'S MOTION FOR BILL OF PARTICULARS. | |

III.  THE DISTRICT COURT ERRED IN DENYING
HARDWICK'S MOTION FOR JUDGMENT OF
ACQUITTAL AS TO HIS CONVICTION OF
CONSPIRACY TO COMMIT FRAUD, WIRE FRAUD,
AND A FALSE STATEMENT TO INFLUENCE A
FEDERALLY INSURED FINANCIAL INSTITUTION.

A. The Government Offered Insufficient Evidence that
Hardwick Knowingly Joined A Conspiracy with
Maurya.

B. Hardwick's Conviction for Taking More Than "He
Was Entitled to Receive from MHS" Cannot Stand
When the Government Never Proved That Hardwick
Was Not Entitled to Receive the Distributions in
Counts 2–22 of The Indictment and Did Not Prove His
Intent to Defraud.

C. The Government Failed to Prove that Hardwick
Knowingly Made a False Statement for the Purpose of
Influencing a Bank.

IV.  THE DISTRICT COURT ERRED WHEN IT
EXCLUDED HARDWICK'S 404(b) EVIDENCE
PROVING THAT CO-DEFENDANT MAURYA'S
REPEATED FRAUD SCHEME WAS ALWAYS
ACCOMPLISHED APART FROM AND WITHOUT
THE KNOWLEDGE OF HER EMPLOYERS, EVEN
THOUGH THEY RECEIVED MONETARY BENEFITS.

V.  THE DISTRICT COURT ERRED WHEN IT ALLOWED
INADMISSIBLE HEARSAY AND PREVENTED
HARDWICK FROM CONFRONTING MAURYA AS A
WITNESS.

| | | |
|---|---|---|
| VI. | THE DISTRICT COURT IMPROPERLY CHARGED THE JURY ON DELIBERATE IGNORANCE WHEN THERE WAS NO EVIDENCE IN THE RECORD TO SUPPORT SUCH A CHARGE. | |
| VII. | THE CUMULATIVE ERRORS RENDERED HARDWICK'S TRIAL FUNDAMENTALLY UNFAIR. | |
| VIII. | THE DISTRICT COURT'S SENTENCE WAS SUBSTANTIVELY UNREASONABLE. | |
| IX. | THE GOVERNMENT DID NOT PROVE A LOSS AMOUNT FOR RESTITUTION AND THE DISTRICT COURT ERRED BY FAILING TO MAKE ANY FACTUAL FINDINGS AND FAILING TO OFFSET THE RESTITUTION AMOUNT. | |
| CONCLUSION | | 49 |
| CERTIFICATE OF COMPLIANCE | | 51 |
| CERTIFICATE OF SERVICE | | 52 |

v

# TABLE OF CITATIONS

| **CASES** | |
|---|---:|
| *Bearint ex rel. Bearint v. Dorell Juvenile Group, Inc.,*<br>389 F.3d 1339 (11th Cir. 2004) | 42 |
| *Chambers v. State of Mississippi,*<br>410 U.S. 284 (1973) | 38, 39 |
| *Chapman v. California,*<br>386 U.S. 18 (1967) | 44 |
| *Crawford v. Washington,*<br>541 U.S. 36 (2004) | 41 |
| *Fagiola v. Nat'l Gypsum Co. AC & S., Inc.,*<br>906 F.2d 53 (2nd Cir. 1990) | 28 |
| *Holmes v. South Carolina,*<br>547 U.S. 319 (2006) | 40 |
| *Lamonica v. Safe Hurricane Shutters Inc.,*<br>711 F.3d 1299 (11th Cir. 2013) | 19 |
| *Rock v. Arkansas,*<br>483 U.S. 44 (1987) | 40 |
| *Steele v. United States,*<br>222 F.2d 628 (5th Cir. 1955) | 28 |
| *Strickland v. Washington,*<br>466 U.S. 668 (1984) | 44 |
| *United States v. Adkinson,*<br>158 F.3d 1147 (11th Cir. 1998) | 31 |

| | |
|---|---|
| *United States v. Anderson,*<br>799 F.2d 1438 (11th Cir. 1986) | 26 |
| *United States v. Baker,*<br>432 F.3d 1189 (11th Cir. 2005) | 19, 43, 44 |
| *United States v. Broughton,*<br>689 F.3d 1260 (11th Cir. 2012) | 19 |
| *United States v. Brown,*<br>665 F.3d 1239 (11th Cir. 2011) | 19 |
| *United States v. Chandler,*<br>388 F.3d 796 (11th Cir. 2004) | 30 |
| *United States v. Citron,*<br>783 F.2d 307 (2d Cir. 1986) | 28 |
| *United States v. Cole,*<br>755 F.2d 748 (11th Cir. 1985) | 26 |
| *United States v. Colson,*<br>662 F.2d 1389 (11th Cir. 1981) | 18 |
| *United States v. Conlin,*<br>551 F.2d 534 (2d Cir. 1977) | 28 |
| *United States v. Dohan,*<br>508 F.3d 989 (11th Cir. 2007) | 19 |
| *United States v. Garber,*<br>607 F.2d 92 (5th Cir. 1979) | 41 |
| *United States v. Hands,*<br>184 F.3d 1322 (11th Cir. 1999) | 43 |
| *United States v. Huff,*<br>609 F.3d 1240 (11th Cir. 2010) | 48, 49 |

| | |
|---|---|
| *United States v. Hurn*,<br>368 F.3d 1359 (11th Cir. 2004) | 40 |
| *United States v. Ignasiak*,<br>667 F.3d 1217 (11th Cir. 2012) | 44 |
| *United States v. Irey*,<br>612 F.3d 1160 (11th Cir. 2010) | 46, 48 |
| *United States v. Lankford*,<br>955 F.2d 1545 (11th Cir. 1992) | 41 |
| *United States v. Lindor*,<br>613 Fed. Appx. 777 (11th Cir. 2015) | 19 |
| *United States v. Marshall*,<br>173 F.3d 1312 (11th Cir. 1999). | 43 |
| *United States v. McClure*,<br>546 F.2d. 670 (5th Cir. 1977) | 39 |
| *United States v. Panice*,<br>598 F.3d 426 (7th Cir. 2010) | 48 |
| *United States v. Richardson*,<br>233 F.3d 1285 (11th Cir. 2000) | 18 |
| *United States v. Rivera*,<br>944 F.2d 1563 (11th Cir. 1991) | 42 |
| *United States v. Sardinas*,<br>386 Fed.Appx. 927 (11th Cir. 2010) | 31 |
| *United States v. Seals*,<br>419 F.3d 600 (7th Cir. 2005) | 39 |
| *United States v. Steed*,<br>548 F.3d 961 (11th Cir. 2008) | 43 |

| | |
|---|---|
| *United States v. Stone,*<br>9 F.3d 934 (11th Cir. 1993) | 21, 42 |
| *United States v. Terzado-Madruga*,<br>897 F.2d 1099 (11th Cir. 1990) | 40 |
| *United States v. Thevis*<br> 474 F.Supp. 117 (N.D. Ga. 1979) | 26 |
| *United States v. Vanegas,*<br>294 Fed.Appx. 537 (11th Cir. 2008) | 31 |
| *United States v. Veltmann*,<br>6 F.3d 1483 (11th Cir. 1993) | 40 |
| *United States v. Vernon,*<br>723 F.3d 1234 (11th Cir. 2013) | 29 |
| *United States v. Villegas,*<br>911 F.2d 623 (11th Cir. 1990) | 32 |
| *United States v. Wells,*<br>519 U.S. 482 (1997) | 34 |
| *United States v. Williams,*<br>527 F.3d 1235 (11th Cir. 2008) | 32 |
| *United States v. Williams,*<br>553 F.3d 1073 (7th Cir. 2009) | 48 |
| *United States v. Willner,*<br>795 F.3d 1297 (11th Cir. 2015) | 31 |
| *United States v. Word*,<br>129 F.3d 1209 (11th Cir. 1997) | 40 |
| *Washington v. Texas,*<br>388 U.S. 14 (1967) | 23 |

| | |
|---|---|
| *Williams v. United States,*<br>458 U.S. 279 (1982) | 34 |

| **FEDERAL STATUTES** | |
|---|---|
| 18 U.S.C. § 1014 | 34 |
| 18 U.S.C. § 1343 | 3, 32 |
| 18 U.S.C. § 3742 | xi |
| 28 U.S.C. § 1291 | xi |
| Fed. R. Evid. 403 | 46 |
| Fed. R. Evid. 404(b) | 14, 21, 37, 45 |

## <u>JURISDICTIONAL STATEMENT</u>

The United States District Court for the Northern District of Georgia, Atlanta Division, had jurisdiction over this case pursuant to 18 U.S.C. § 3231. This Court has jurisdiction over this appeal because the district court entered its final decision and sentence on February 20, 2019 (Doc. 329) and its restitution order on May 9, 2019 (Doc. 368). Hardwick timely filed notices of appeal on March 1, 2019 (Doc. 337) and May 21, 2019 (Doc. 373). *See* 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## STATEMENT OF THE ISSUES ON APPEAL

1. The Indictment specifically charged Hardwick with taking more money than "he was entitled to receive" from MHS. Hardwick should have been furnished with the necessary information to determine (1) to what Hardwick was entitled, (2) what money did Hardwick receive to which he was *not* entitled, and (3) how did the Government make this determination. Hardwick filed Motions for Bill of Particulars and they were denied. The issue is whether this filing caused Hardwick to be denied Due Process in violation of the Fifth and Sixth Amendments to the U.S. Constitution by denying Hardwick his right to present a defense and the ability to prepare for trial.

2. Whether the District Court erred in admitting Government's Trial Exhibit 1001, which was misleading, deceptive, and overly-prejudicial in its comparison of net income to distributions?

3. Did the court err in failing to grant Hardwick's Motion for a Judgment of Acquittal on Counts 1-23 of the Indictment because the evidence presented was insufficient to authorize a jury to find Hardwick guilty on each count beyond a reasonable doubt?

4. The court ruled, over the objection of the Government, that the Defense's 404(b) evidence was relevant. Did the court abuse its discretion and violate Hardwick's Fifth Amendment right to Due Process and Sixth Amendment

right to compulsory process when it limited relevant 404(b) evidence that was

critical to presenting Hardwick's defense?

5.  Whether Hardwick's right of confrontation under the Sixth Amendment to the

U.S. Constitution was violated by the introduction of inadmissible hearsay

testimony of a third party of the fact that Maurya had pled guilty and was a

participant of the crimes alleged in the Indictment?

6.  Whether the court erred in charging the jury on the principal of deliberate

ignorance?

7.  Whether the cumulative prejudicial effect of the District Court's trial errors

deprived Hardwick of a fair trial?

8.  Whether the District Court erred in sentencing Hardwick when it misapplied

the § 3553(a) factors to reach an unreasonably lengthy sentence?

9.  Whether the District Court erred in calculating Hardwick's restitution

liability?

## **STATEMENT OF THE CASE**

Appellant Nathan E. Hardwick IV was indicted on February 9, 2016, by a

grand jury in the Northern District of Georgia, along with Co-Defendant Asha

Maurya. (Doc. 1). Hardwick and Maurya were initially charged with conspiring to

defraud MHSLAW, Inc. and its subsidiaries, Morris Hardwick Schneider, LLC and

LandCastle Title, LLC, (collectively referred to as "MHS"), and to obtain money

and property from MHS under false pretenses, in violation of the wire fraud statute, 18 U.S.C. § 1343. *Id.* On May 11, 2017, Maurya pled guilty to conspiring with Hardwick to commit wire fraud. (Doc. 112; Doc. 113). The Grand Jury returned a Superseding Indictment against Hardwick only on December 5, 2017, which charged him with one count of conspiracy to commit wire fraud (Count 1, 18 U.S.C. § 1343), twenty-one counts of wire fraud (Counts 2 through 22, 18 U.S. C. §1349), and three counts of making a false statement to a federally-insured financial institution (Counts 23-25, 18 U.S.C. §1014). (Doc 126).

Hardwick's jury trial began on September 17, 2018. (Doc. 215, p. 1). At the start of trial, the Government made an oral motion to dismiss Count 25, which was granted. (Doc. 291, p. 14). At the close of the Government's case-in-chief, the Defense moved for a judgement of acquittal, which the court denied, as to Counts 1-23. (Doc. 305, p. 1981-2020). As to Count 24, after taking it under advisement, the Court granted the Defense's oral motion for a directed verdict. (Doc. 305, p. 2020; Doc. 307, pp. 2272-73). After the Defense rested its case, the Defense renewed its Motion for Judgment of Acquittal on Counts 1-23 of the Indictment, and the motion was denied. (Doc. 310, pp. 3319-24). On October 12, 2018, Hardwick was found guilty on Counts 1-23. (Doc. 271).

At sentencing, Hardwick received 180 months on Counts 1-23 to run concurrently. (Doc. 329, p. 3). Hardwick filed his Notice of Appeal as to the

Judgment and Commitment on March 1, 2019. (Doc. 337). On May 9, 2019, the

court ordered that Hardwick and Maurya pay restitution, jointly and severally, in the

amount of $40,307,431.00. (Doc. 367). Hardwick filed his objection with the District

Court to the Restitution Order on May 9, 2019. (Doc. 369). Hardwick subsequently

filed a Notice of Appeal of the Restitution Order on May 21, 2019. (Doc. 376).

Hardwick timely appealed his conviction and sentence, as well as the restitution

amount imposed by the District Court. Hardwick is currently incarcerated.

## STATEMENT OF FACTS

### A. Background and Events Leading Up to Discovery of Escrow Accounts Shortages

MHS owned and operated a residential real estate law firm specializing in

closings and foreclosures, and it sold title insurance. (Doc. 126, p. 2). The firm

operated in sixteen states with fifty lawyers, 800-900 employees, and over fifty

offices. (Doc. 291, p. 62) Hardwick was the majority owner of MHS, the managing

partner of the law firm, and the CEO of the title insurance business. (*Id.*; Govt's Trial

Exh. 1002). Hardwick ran the law firm's closing division, based in Atlanta, Georgia,

and he was primarily responsible for marketing the firm's real estate closing

division. (Doc. 126, p. 2). During the relevant time period, 2011-14, Co-Defendant

Maurya was intricately involved in MHS's accounting operations, first as controller,

responsible for managing the firm's escrow accounts, and then ultimately as CFO.

(Doc. 298, p. 1404).

Maurya, who began with MHS in 2009, initially reported to the CFO at the time, Robert Driskell, until January 2014. (Doc. 341, p. 4, ¶ 3(f)). After January 2014, Maurya reported directly to Alyce Ritchie, a non-equity partner in charge of oversight of many of the firm's support services departments, including accounting. (Doc. 298, pp. 1384-85, 1389, 1406, 1423). Although Maurya had personality conflicts with many people at MHS, by all accounts Hardwick and his partners felt that Maurya was doing a good job as far as her actual accounting duties were concerned. (Doc. 298, pp. 1423-29; Doc. 309, pp. 3026-27; Doc. 302, pp. 1537-38). Despite Maurya's conflicts, Hardwick trusted her because Schneider and Driskell "raved" about her. (Doc. 309, p. 2906).  Hardwick believed that as the firm's CFO and Controller, Driskell and Maurya, respectively, provided checks and balances on one another. (*Id.* at 3027-28). In 2011, Maurya became *de facto* CFO when she took over most of Driskell's duties and officially became CFO January 2014. (Doc. 341, p. 13, ¶ 20).

As a result of (1) Driskell's reduced role at the firm; (2) the lack of a controller; and (3) Maurya's hoarding of information related to the accounting department, Maurya became indispensable. (Doc. 302, 1478-79; Doc. 293, p. 732).

MHS maintained three different types of bank accounts: (1) operating accounts, which held funds belonging to MHS; (2) trust accounts (sometimes called "IOLTA" or "escrow accounts"), which held MHS client funds; and (3) an account

that was hybrid in nature, containing both firm funds and client funds.  (Doc. 292, pp. 522-23). This third type account, commonly referred to as the "wire account" or "Sun Trust Account 7328," was not on the firm's books, and its existence and hybrid function was largely unknown by those outside of the accounting department, including Hardwick.[1] (Doc. 309, pp. 2892-93, 2933; Doc. 298, pp. 1421-23; Doc. 292, p. 523; Doc. 302, p. 1525; Doc. 293, pp. 725-26, 730, 832, 838-39). This account was used to (1) accept incoming wires; (4) make transfers of the firm's payroll to the outside payroll vendor; and (3) make payroll and distributions payments to the firm's partners, as well as payments to third parties. (Doc. 302, pp. 1523-24, 1527-28; Doc. 292, p. 44l; Doc. 293, pp. 727-29; Doc. 293, pp. 830-31, 838-39).

Hardwick's chief source of knowledge of the firm's "available cash" was provided to him by Maurya, via email and in person. (Doc. 309, pp. 2905-08). Specifically, Hardwick's impression regarding MHS's strong cash position was largely fueled by the daily and weekly closing reports and financials he received, including the automatically-generated dashboard report, as well as cash flow and crystal reports. (Doc. 298, pp.1376-78, 1398-99; Doc. 309, pp. 2907-11, 2957; Doc. 293, pp. 610, 653-54; Doc. 307, p. 2451; Govt's Trial Exhs. 1031 & 1032). These

---

[1]  Hardwick, along with others, did sign the signature card associated with opening this account. (Doc. 309, p. 2892).

reports cumulatively reflected that both the law firm's closing and foreclosure divisions were profitable and "flush with cash" that was available from various sources, not including the firm's traditional IOLTA accounts or "the wire account." (Doc. 309, pp. 2922-26, 2943-44, 2960, 2969; Doc. 298, p. 1399). These available sources included the firm's (1) 30 or so operating accounts; (2) factoring line – commonly referred to as the Action Capital account; (3) reserve balance; (4) dividend accounts; (5) closing fees that had not yet been drawn down out of the IOLTA accounts; (6) multiple joint venture accounts; and (7) foreclosure fees or profits that were due to be sent to Atlanta from the foreclosure division in Baltimore. (Doc. 309, pp. 2923-25, 2928-30, 2941-42).

When requesting a distribution, Hardwick would ask Maurya if all the bills were being paid and whether the available cash also could sustain the Wittstadts contemporaneously getting their *pro rata* share. (Doc. 309, pp. 2930, 2932-33, 2945, 2952). Based on Maurya's representations, Hardwick believed that she was having the same conversations with all the partners regarding the availability of distributable cash, especially since Mark Wittstadt had made it clear to Maurya that, although the Wittstadts were minority partners, she was equally as accountable to them as she was to Hardwick. (*Id.* at 2931). If Hardwick received too much in distributions, or if a personal bill of his was paid out of the firm's funds, Hardwick

believed that Maurya and the accounting department would do an even-up among the partners to account for such a payment. (*Id.* at 2933).

In July of 2018, Hardwick and Ritchie became aware that, during a routine audit and an ensuing internal investigation by Chicago Title Insurance Company[2] (MHS's title insurer) it had been discovered that someone at MHS had submitted an altered bank statement. (Doc. 309, pp. 3039-40, Doc. 298, p.143l). After some initial confusion regarding the source of the error, it was discovered that Maurya had forged the bank statement, claiming that she did not want to fail the audit because "Ritchie did not tolerate mistakes." (Doc. 309, pp. 3040-43, 3057-58; Doc. 298, 1431-38). Maurya also indicated that she had inadvertently moved approximately $680,000 from an escrow account to an operating account. (Doc. 309, pp. 3043-44). Hardwick placed Maurya on administrative leave and instructed her to move the money back to the escrow account. (*Id.* at 3043-44; Doc. 298, p. 1436-37).

It was later learned that existing shortages in the escrow accounts had been masked by two employees in the accounting department who, at Maurya's direction, had been moving around money from account to account in order to cover pending shortages. (Doc. 309, p. 3054; Doc. 292, pp. 379-81). When the kiting was stopped, even more shortages began to appear. (Doc. 309, p. 3054). The firm's management

---

[2] Chicago Title is a subsidiary of Fidelity National Financial Corporation. (Doc. 303, p. 1852). During the relevant time period, Ericka Meinhardt was president of national agency operations at Fidelity. (*Id.* at 1838).

could not reconcile the accounts or even pinpoint a starting point at which to begin and they retained outside accountants to help them unravel the accounting mess. (Doc. 309, pp. 3055-57).

On July 29, 2014, Hardwick, in an emergency call, advised his minority partners, Mark and Gerard Wittstadt, of the facts that (1) Maurya had been suspended due to the forged bank statement; (2) shortages in the escrow accounts had been discovered; and (3) such shortages were likely due to equity partner over disbursements. (Doc. 293, pp. 709-10). In an email dated August 1, 2014, Hardwick indicated to Gerard Wittstadt that he was going to contribute $1.5 million of his own money and that he had confirmed a $2 million-dollar loan and was still in talks to secure an additional $3 million-dollar loan. (*Id.* at 715-16).

On August 15, 2014, Fidelity arrived at MHS headquarters, after being contacted by Art Morris, and immediately took over the investigation. (Doc. 303, pp. 1874-84). Fidelity, along with Hardwick's partners, the Wittstadts, forced Hardwick to resign and relinquish his ownership rights to the Wittstadts.[3] (Doc. 303, p. 1892; Doc. 292, pp. 456-60; Doc. 293, pp. 740-41, 840-42; Doc. 309, pp. 3074-76). In exchange for LandCastle Title and an assignment of MHS's claims relating

---

[3] During a telephone call with Hardwick on August 17, 2014, Meinhardt of Fidelity notified Hardwick that he must resign and surrender his interest in the firm within 12 hours, or Fidelity would revoke its agency relationship with the firm. (Revoking the agency relationship would have immediately put LandCastle Title out of business). Hardwick submitted his resignation and surrendered his interest in the firm by handwritten letter the next day. (Doc. 341, p. 24, ¶ 59).

to the fraud, Fidelity agreed to fund all shortages in MHS's escrow accounts. (Doc. 341, p. 26, ¶ 60).

### 2. Motions for Bill of Particulars

In response to the initial indictment, on May 21, 2016, Hardwick filed a Motion for Bill of Particulars. (Doc. 62). On May 24, 2016, Magistrate Judge Catherine Salinas took Hardwick's Motion under advisement and ordered the Government to respond to the Motion and to provide Hardwick with a detailed discovery index no later than August 1, 2016. (Doc. 69, p. 1). On August 18, 2016, during a pre-trial hearing, Hardwick's Motion was withdrawn per Defense Counsel's belief that "[t]he Government [had] been most cooperative" and they would affirmatively assisting the Defense in navigating the discovery. (Doc. 83, p. 1; Doc. 363, p. 2).

After the Superseding Indictment was issued, Hardwick filed a second Motion for Bill of Particulars with Brief in Support on December 20, 2017, to ascertain exactly what transactions he had to defend against, and what fraudulent statements or actions were being attributed to him. (Doc. 131). In his Motion, Hardwick noted the inadequacy of the indictment, and contended that because he was specifically charged with taking money that he was not entitled to, from a law firm that he was the majority owner of, the Defense should at least be furnished with the necessary information to determine (1) what he was entitled to and on what basis; (2) what

money he received that he was not entitled to; and (3) how the Government arrived

at its determinations and calculations. (*Id.* at 5). Hardwick asked the Government to

provide, in relevant part, the following:

> (1) With regard to Counts 2-22 what amount of money had been
> distributed to the other shareholders as of the date of that wire transfer,
> and what was Hardwick "entitled to" as of the date of the wire transfer?;
> (4) Does the Government claim that the "fraud" was the improper
> receipt of money from a trust account or the receipt of money that
> exceeded Hardwick's "entitlement" on the day the distribution
> occurred?;
> (5) For each year of the alleged conspiracy, what amount of money: (d)
> was paid to each shareholder (or to a third party on their behalf) as a
> distribution?
> (6) With regard to each of the substantive counts and the allegations
> contained in ¶ 4(i) [of the Indictment], what were the "false statements,"
> "half-truths" and "material facts"?;
> (12) regarding ¶ 4(e) [of the Indictment], what was the amount to which
> Hardwick was "entitled," and what is the method by which this
> calculation was determined?

(*Id.* at 5-9). On January 10, 2018, Judge Salinas took the Motion under advisement.

(Doc. 136, p. 1). On February 27, 2018, the Parties advised the Court that the Parties

were working together, and they requested that the Court defer the Motion. (Doc.

148). The request was granted, and the Motion was deferred to the assigned trial

judge. (*Id.*)

The Government provided discovery of more than 4.7 million pages,

including "e-mails and business records obtained from MHS; bank records of

accounts maintained by MHS; bank records of accounts maintained by Hardwick

and other individuals; and business records obtained from numerous sources,

including private jet companies, casinos, and bookies." (Doc. 177, p. 4-5). The Defense's ability to prepare for trial was still substantially hindered due to the sheer volume of material that was produced and the impracticability of reviewing it all. (Doc. 305, pp. 2248-49).

On August 31, 2018, the Court denied Appellant's Motion, finding that "the First Superseding Criminal Indictment sufficiently inform[ed] Defendant of the charges against him to adequately prepare his defense and minimize surprise at trial." (Doc. 215, p. 2).

### 3. Government's Rule 1006 Summary Charts

The Government first provided the Defense copies of the Government's draft Rule 1006 summary charts on or about July 26, 2018. (Doc. 239, p. 2) and the supporting documentation was provided to the Defense on August 3, 2018. (Doc. 213, p. 12). The Defense did not receive Government's Exhibit 1001, entitled "MHS Net Income vs. Payments to & for Nat Hardwick's Benefit," until September 11, 2019. (Doc. 307, pp. 2295, 2582). The Exhibit 1001 chart compared distributions to Hardwick with the firm's net profits for 2011-2013. (Gov't Trial Exh. 1001). On September 17, 2018, Hardwick filed his Objection to, and Motion In Limine to Exclude Government's Summary Chart, in which the Defense objected to the Government's proposed Exhibits 1001 and 1003, and the Government's proposed

"Hamlin Chart," on the basis that they were "flawed, misleading and inadmissible for a number of reasons, and should be excluded." (Doc. 241, p. 2).

On September 17, 2018, the Court declared Hardwick's Objection to the charts moot since the Government revised its charts to address the Defense's concerns regarding the chart's characterization of the monies that went to Hardwick, as "distributions" rather than "payments." (Doc. 239; Doc. 242).

At trial the Government called a summary witness, FBI forensic accountant Kim Johnson. (Doc 298, p. 1224-25). Regarding Government's Trial Exhibit 1001, Johnson testified that she got the numbers reflecting MHS's net income for 2011-2013 from the audited financial statements prepared by Warren Averitt. (Doc. 298, p. 1235).

On cross, Johnson admitted that she did not (1) use income tax returns as a source for the data contained in the 1006 charts; (2) analyze transfers from MHS to the other partners or their company credit cards; (3) analyze the accounts of the MHS subsidiaries; (4) analyze the SunTrust account 7328 or "the wire account;" or (5) analyze MHS's escrow or operating accounts. (*Id.* at 1359-64).

At trial, the Defense presented evidence through expert J.P. Gingras that in order to find out what the distributions were for all partners one must first get all the bank records and other relevant financials, and then determine all payments that went from MHS to each partner. (Doc. 308, p. 2743-44). Second, calculate the total

13

amount of payments to each partner, offsetting personal expense reimbursements, leaving the distributions received by each owner. (*Id.*) Third, apply the partner's ownership percentage and compare that to the actual amount of distributions received to establish whether each partner was correctly disbursed. (*Id.* at 2745). Fourth, compare each partner's actual distributions to the others to determine if each got their appropriate pro-rata share. (*Id.*) Finally, in order to determine the shortfalls in the escrow accounts a three-way reconciliation must be done. (*Id.* at 2745-47). Mark Wittstadt testified that a three-way reconciliation was never done. (Doc. 310, p. 3374).

## 4.  Motion for Judgment of Acquittal

At the close of the Government's case, the Defense moved for a Judgment of Acquittal on Counts 1-24. (Doc. 305, p. 1993). The court denied the Defense's Rule 29 Motion as to Counts 1-23. (*Id.* at 2019-20). As to Count 24, after taking it under advisement, the Court directed a verdict. (Doc. 305, p. 2020; Doc. 307, pp. 2272-73). Defense subsequently renewed its Motion for Judgment of Acquittal on Counts 1-23, and the motion was denied. (Doc. 310, pp. 3319-24).

## 5.  Defense's 404(b) Evidence

On August 31, 2018, Hardwick sent the Prosecution notice that pursuant to Fed. R. Evid. 404(b) it planned to introduce evidence of Mauyra's signature scheme to defraud her employers using "lies, falsified documents, check kiting to cover her

tracks." (Doc. 219-1, p. 3). These actions showed Maurya's intent, preparation, knowledge and plan, they were admissible under Rule 404(b). (*Id.*).

The Court took the issue under advisement. (Doc. 224; Doc. 237). After the Government rested without calling Maurya, the Defense noted on the record that the Defense's intention was to call Maurya as a hostile witness, but that it could not do so after being told by her counsel that she would "take the Fifth." (Doc. 303, pp. 1935-36, 1974). The court found that the evidence regarding Maurya's prior fraud was sufficiently similar and such evidence should be allowed. (Doc. 307, pp. 2275-76). However, the court limited the Defense's witnesses and only allowed two to testify. (*Id.* at 2274-77). The court also excluded a video of Maurya lying to a prior employer, as an example of how she manipulated her bosses (Doc. 307, pp. 2342-43) and a note from Maurya's lover and fellow co-worker, the late Joe Davenport stating that although he received money from Maurya's scheme, he had not realized she was stealing. (Doc. 176, p. 14).

The Defense attempted to make an oral proffer of how excluded witness Tara Bridge, a witness from ProCare, would have testified had she been allowed but the court cut it off. (Doc. 307, p. 2366) The Defense subsequently submitted a written proffer outlining the testimony of the second excluded witness, Vern Johnson of Sodexo, which was marked as Defendant's Trial Exhibit 1200. (Doc. 309, p. 2844-45; Doc. 310, p. 3422-23).

## 6. Deliberate Ignorance Jury Charge

On September 12, 2018, the Government requested that the jury be charged on Deliberate Ignorance as Proof of Knowledge. (Doc. 232, p. 2). The next day, the Government filed an Amended Proposed Jury Instruction on Deliberate Ignorance which stated in relevant part as follows:

> The Government may prove that Defendant Nathan Hardwick acted knowingly by proving beyond a reasonable doubt that Defendant deliberately closed his eyes to what otherwise would have been obvious to him. . . . Ignorance is deliberate if the Defendant was presented with facts that put him on notice that criminal activity was particularly likely, and yet he intentionally failed to investigate those facts.

(Doc. 233). The Defense objected to the Government's charge request, arguing that "the jury instruction proposed by the Government alter[ed] the language of deliberate ignorance charges approved by the United States Supreme Court and the Eleventh Circuit, and varie[d] significantly from the Eleventh Circuit Pattern Charge," and that the proposed "language point[ed] to reckless or negligent behavior and not to the higher standard required for finding of deliberate ignorance." (Doc. 238, p. 1-2). Additionally, the Defense objected to the proposed charge claiming that the relevant evidence pointed only to actual knowledge, rather than deliberate ignorance. (*Id.* at 3). On October 10, 2018, Hardwick filed his Objection, in which he proposed his own version of the charge. (Doc. 265, p. 2).

During the charge conference, the Defense reiterated its previously raised objections and again advocated for its proposed charge language. (Doc. 310, pp.

3382-84). The Court overruled the Defense's objections and charged the jury accordingly. (*Id.* at 3386-89; Doc. 311, p. 3445).

### 7. Sentencing

In preparation for Sentencing, Hardwick filed a Sentencing Memorandum (Doc. 296) and urged the Court to consider (1) the nature and circumstances of the offense, in that it occurred mainly due to bad business decisions and his failure to impose proper oversight over his and his firm's finances, and (2) his favorable personal back ground and attributes, such as his lengthy and esteemed legal background, close community ties and support, and his lack of a previous criminal past. (*Id.* 15-17). Hardwick contended that in light of these factors, a sentence of 96 was reasonable. (*Id.* at 19).

At Sentencing, the court found that the appropriate Guideline level was 31, with a criminal history category I, giving Hardwick an advisory guideline range of 108 to 135 months. (Doc. 364, p. 227). The court then varied upward substantially, by nearly 5 levels, and sentenced Hardwick to 180 months. (*Id.* at 292).

### 8. Restitution Hearing

Pursuant to 11th Cir. R. 28-1(f), Hardwick requests that (1) the facts regarding the restitution hearing and (2) the arguments regarding the court's Restitution Order put forth by Co-Defendant-Appellant Asha Maurya in her initial Appellant brief

filed with this Court on September 17, 2019, Case No. 19-12108, be adopted by reference and incorporated by reference on behalf of Hardwick.

Hardwick includes the following facts in addition to the facts adopted from Maurya's brief. First, Hardwick infused $1.4 million of his own money back into MHS when the escrow account shortages were discovered. (Doc. 293, pp. 709-10). The court refused to give Hardwick credit for that amount. (Doc. 364, pp. 112–13).

Second, Maurya and her staff, at her direction, combined multiple law firm and escrow accounts and subsequently made payments, such as payroll, distributions, and expenses, out of these accounts in order to conceal her crimes. (Doc. 302, pp. 1523-24, 1527-28; Doc. 292, pp. 379-81, 441; Doc. 293, pp. 727-29; Doc. 293, pp. 830-31, 838-39; Doc. 309, p. 3054).

## <u>STANDARDS OF REVIEW</u>

The District Court's denial of a Motion for Bill of Particulars is reviewed for abuse of discretion. *United States v. Colson*, 662 F.2d 1389, 1391 (11th Cir. 1981).

A district court's admission of summary charts, pursuant to Federal Rule of Evidence 1006, is reviewed for an abuse of discretion. *United States v. Richardson*, 233 F.3d 1285, 1293 (11th Cir. 2000).

The District Court's denial of a Motion for Judgment of Acquittal is reviewed *de novo*, and the sufficiency of evidence underlying a conviction is considered "in the light most favorable to the government, with all inferences and credibility

choices drawn in the government's favor." *United States v. Broughton*, 689 F.3d 1260, 1276 (11th Cir. 2012).

The District Court's evidentiary rulings are reviewed for abuse of discretion. *United States v. Baker*, 432 F.3d 1189, 1202 (11th Cir. 2005) (internal citation omitted).

*De novo* review applies to the legal correctness of jury instructions and whether they misstate the law or mislead the jury, but the phrasing and style is reviewed for abuse of discretion. *Lamonica v. Safe Hurricane Shutters Inc.*, 711 F.3d 1299, 1309 (11th Cir. 2013) (citation omitted).

In reviewing cumulative error, the total prejudicial effect of the trial errors must be weighed *de novo*. *United States v. Dohan*, 508 F.3d 989, 993 (11th Cir 2007); *United States v. Baker*, 432 F.3d 1189, 1203 (11th Cir. 2005) (reviewing cumulative error for showing of aggregate prejudice to the defendant, rather than parsing each claim separately for harmlessness).

The reasonableness of a district court's sentence is reviewed under a deferential standard for abuse of discretion. *United States v. Lindor*, 613 Fed. Appx. 777, 780 (11th Cir. 2015).

The legality of a district court's restitution order is reviewed *de novo*, but the factual findings underpinning a restitution order are reviewed for clear error. 18 U.S.C.A. § 3664; *United States v. Brown*, 665 F.3d 1249, 1252 (11th Cir. 2011).

## SUMMARY OF THE ARGUMENT

1. The Indictment specifically charged Hardwick with taking more money than "he was entitled to receive" from MHS. Hardwick should have been furnished with the necessary information to determine (1) to what Hardwick was entitled, (2) what money did Hardwick receive to which he was *not* entitled, and (3) how did the Government make this determination.

2. The District Court abused its discretion when it allowed Government's Trial Exhibit 1001 in evidence, when it was based on flawed and misleading information, in that did not compare the monies Hardwick received to the monies that the other partners received, and inappropriately compared net income to distributions, and thus was misleading and unduly prejudicial, and, therefore, should have been excluded.

3. There was a lack of sufficient evidence for a reasonable fact-finder to conclude that Hardwick was guilty beyond a reasonable doubt (1) of a conspiracy when there was no evidence a conspiracy existed, (2) of taking "more than he was entitled to" when the government never proved what amount Hardwick was entitled to take, and (3) of making a statement to influence a financial institution when he knew that his statements had no impact on the bank's decision.

20

4. The District Court abused its discretion and violated Hardwick's right to a fair trial by not allowing him to present a defense of producing relevant evidence and witnesses under Fed. R. Evid. 404(b) that showed Hardwick's lack of knowledge.

5. The District Court erred when it allowed the Government to introduce inadmissible hearsay testimony of Maurya's plea of guilty and the existence of a conspiracy and denied Hardwick the right to confront Maurya.

6. The District Court erred in giving a deliberate ignorance instruction to the jury when there was insufficient evidence to support such an instruction, since the relevant evidence only pointed to actual knowledge and, as such, the charge was both misleading and prejudicial. Even if such an error is found be harmless pursuant to this Court's holding in *United States v. Stone*, 9 F.3d 934 (11th Cir. 2017), such an error should still be considered with respect to Hardwick's claim of cumulative error.

7. The District Court made numerous errors which pervaded every stage of the proceedings and went to the central issue of Hardwick's intent, and, as a result, his right to a fair trial was substantially compromised. The cumulative prejudicial effect of those errors is likely to have affected the verdict.

8. The District Court erred in sentencing Hardwick when it failed to apply the appropriate 18 U.S.C. § 3553 factors, and balance them reasonably with

Hardwick's positive history and characteristics, which included (1) his positive community impact and strong family and community support; (2) his long and esteemed legal career; (3) his lack of a prior criminal record; (4) the non-violent nature of his offenses; (5) his primary role in caring for his aging and ailing parents; and (6) the young age of his only child, whom he would likely lose his parental rights to, if an over lengthy sentence were imposed.

9. The District Court erred by failing to (1) make any factual findings regarding how restitution was calculated; (2) consider in its calculation the $1.4 million already paid by Hardwick and the market value of Appellant's ownership interest that he signed over to his partners when he was forced out of the firm, thus providing a windfall to the victims; and (3) prove by any standard of proof that the claimed losses by the firm's partners and Fidelity was directly attributable to Appellant's actions, rather than the separate scheme perpetrated by Maurya, or a myriad of MHS accounting practices and errors.

## ARGUMENT AND CITATIONS OF AUTHORITY

Appellant Hardwick was denied a fair trial and the opportunity to present a defense. The Government presented the jury with a flawed theory for determining Hardwick's intent (Government's Exhibit 1001). The District Court prevented the Defense from attacking the flawed basis of the Government's theory of intent (by denying Hardwick's Motion for Bill of Particulars). The court also prevented the

defense from presenting proof that Hardwick's Co-Defendant Asha Maurya was the
cause of the accounting mismanagement of the firm's operating and escrow accounts
and that she had concealed that conduct from Hardwick. The proffered 404(b)
evidence was relevant proof to show the lack of Hardwick's knowledge of Maurya's
crimes and proof of the absence of knowing participation in the alleged conspiracy
and scheme to defraud. The Government's witnesses repeatedly violated the Court's
orders precluding irrelevant and prejudicial evidence. Without a basis in the
evidence, the court improperly charged on deliberate ignorance. Finally, the District
Court erred in sentencing Hardwick by misapplying the Section 3553 factors, and
erred by entering a restitution order that was nearly *$34 million more* than the
determined loss amount.

## I.   THE DENIAL OF HARDWICK'S MOTION FOR BILL OF PARTICULARS DENIED HIM THE ABILITY TO PRESENT A DEFENSE AND THE ABILITY TO CHALLENGE THE GOVERNMENT'S THEORY OF INTENT.

A defendant has a well-established right to present a defense. He has the right
to call witnesses, "to present the defendant's version of the facts," . . . . This right is
a fundamental element of due process of law." *Washington v. Texas*, 388 U.S. 14,
19 (1967). To show that Hardwick had the intent to commit the crimes as indicted,
the Government presented a deceptive chart (Gov't Trial Exh. 1001) showing the
difference between the net profits of MHS and the amount of money received by
Hardwick. The Government supported its theory of intent through the MHS

shareholder agreements[4] (Gov't Trial Exhs. 976, 977, 978, 979, 980) and MHS's tax returns. (Gov't Trial Exhs. 1400, 1401, 1402, 1410-12). Simply, the Government attempted to show that the money given to Hardwick was beyond his 55% share of the net profits, thus, he intended to steal from MHS. (Doc. 307, pp. 2293-94).

The Government's case rested entirely on that comparison depicted in Chart Exhibit 1001. The Defense's theory was that (1) the Government's numbers supporting the calculation of net profits were wrong and (2) that Hardwick did not intend to steal from MHS where all the partners frequently departed from the shareholders agreements and disbursements were not based on net profits. (Doc. 305, pp. 1998, 2247-52; Doc. 307, pp. 2503-09). In order to mount this defense, the Defense had to know what Hardwick received in comparison to the other partners— not net profits. Hardwick requested the partnership comparison information from the Government in his Motion for Bill of Particulars (Doc. 130; Doc. 131), and it was nowhere to be found in the *4.7 million documents* turned over by the Government in discovery.

The Government refused to answer the Defense's simple request: What did all of the partners receive and what was Hardwick actually entitled to receive? (Doc.

---

[4] Undisputed evidence existed that MHS's partners did not always follow the letter of the shareholders' agreements and often departed when it came to allocating distributions based on MHS net income, or deciding the interval (i.e., monthly, quarterly etc.) in which distributions would be issued. Further, other partners had received distributions in a given year that far exceeded that partner's pro-rata share of net income. (Doc. 292, p. 427, 506).

24

131). Despite the Government's promises that the information would be given to the Defense (Doc. 83, p. 1; Doc. 363, p. 2) the request went unanswered and ultimately the court denied the Defendant's Motion on the eve of trial. (Doc. 215, p. 2). Indeed, it was not until the Government surprised the Defense with a copy of its Exhibit 1001 chart on September 11, 2018 (Doc. 239, p. 2) that the Government revealed that it would use "net profits" as the standard by which it would calculate that Hardwick took more than "he was entitled to receive" (Doc. 126).[5] Had the Government responded to Hardwick's inquiries, the Defense would not have been surprised and handcuffed at trial.[6]

Thus, at trial the Government presented numbers—*that were calculated by Co-Defendant Maurya prior to anyone discovering her separate and ongoing theft*[7]—and the Defense was prevented from disputing the basis of that calculation and denied the ability to show that a comparison of the partners' distributions proved Hardwick had no intent to steal was entirely wrong.[8]

---

[5] The Government conceded, and the Court agreed, that the Government's theory of the case and the Defense's theory of the case were "like two ships passing in the night." (*Id.* at 2005).

[6] As noted by Defense counsel:

> All we have are some vague e-mails. I am floored. We all are. We've actually been thinking, except for the fact of the fine reputation of these lawyers, maybe we're being bamboozled, maybe there is something that we are just missing.

Doc. 307, p. 2367.

[7] See Doc. 303, p. 1914 ("I don't know whether Asha Maurya was hired or what the circumstances were. I do know that she was retained in some capacity in order to help sort through the huge mess that those escrow accounts were.")

[8] It became clear that the Government simply did not ever do the calculation or a reconciliation of the numbers. (Doc. 298, pp. 1360-61).

"Where an indictment fails to set forth specific facts in support of requisite elements of the charged offense, and the information is essential to the defense, failure to grant a request for a bill of particulars may constitute reversible error." *United States v. Cole*, 755 F.2d 748, 760 (11th Cir. 1985). "A bill of particulars, properly viewed, supplements an indictment by providing the defendant with *information necessary for trial preparation*." *United States v. Anderson*, 799 F.2d 1438, 1441 (11th Cir. 1986) (emphasis added). It is proper for a defendant to be furnished with additional information about the charge when it is necessary for preparation of his defense . . ." *Id.* at 1441. "In essence, the defendant must show that without the requested particular his own investigation could not glean the facts or theory which would preclude prejudicial surprise or allow meaningful opportunities for defense preparation to meet the government's evidence and theories." *United States v. Thevis*, 474 F. Supp. 117, 124 (N.D. Ga. 1979).

The information requested by Hardwick pre-trial was central and vital to both his theory of defense and to his evidence that was necessary to allow him to make his own investigation of the facts out of which the charges arose. *See id.* Hardwick was prevented from effectively meeting the Government's case when he was denied information to combat the Government's final numbers and to demonstrate why the Government's proof was insufficient to prove intent. Such a denial was an abuse of discretion, prejudiced the Defense's case, and made the trial fundamentally unfair.

26

## II.   THE ADMISSION OF THE GOVERNMENT'S TRIAL EXHIBIT 1001 PRESENTED FLAWED AND MISLEADING INFORMATION TO THE JURY AND FURTHER COMPOUNDED THE PREJUDICE SUFFERED IN THE DENIAL OF HARDWICK'S MOTION FOR BILL OF PARTICULARS.

The prejudice created by the District Court's denial of Hardwick's Motion for Bill of Particulars (Doc. 131) was further compounded when the court allowed the Government to summarize its misleading premise in chart form and present it to the jury in Government's Exhibit 1001. The chart should not have been admitted for two reasons. First, the representations of MHS income were wrong. The chart had one column with MHS's net income for 2011 through 2013 and the income numbers were based on the firm's audited financial statements. (Gov't Trial Ex. 1001) But the audited financial statements were at odds with the income tax returns. The difference between the two in 2011 alone was $1 million. Further, the financial statements that formed the basis of the audit were inaccurate because the figures in the underlying bank accounts and supporting banking documents were manipulated by the Maurya. The inaccuracies were so extreme that they formed the basis of an accounting malpractice lawsuit. (Doc. 241, p. 2).

Second, there was another column on the chart depicting money Hardwick received—clearly comparing those to net income. However, highlighting only one owner's distributions made the chart especially misleading. A company can distribute funds that have as their genesis something other than "net income" which bears no semblance to money actually on hand. By way of example, the chart showed

that MHS had net income for 2011 of $549,608, however, Morris received a distribution of $593,556 that year, clearly exceeding of MHS's net income.

A summary must be "*based upon and fairly represent competent evidenc*e already before the jury." *Fagiola v. Nat'l Gypsum Co. AC & S., Inc.*, 906 F.2d 53, 57 (2d Cir. 1990). "A chart submitted by the prosecution is a very persuasive and powerful tool and must be fairly used, since, by its arrangement and use, it is an argument to the jury during the course of the trial . . . A chart which for any reason presents an unfair picture can be a potent weapon for harm and permitting the jury to consider it is error." *United States v. Conlin,* 551 F.2d 534, 538–39 (2d Cir. 1977) (citing *Steele v. United States*, 222 F.2d 628, 630 (5th Cir. 1955), cert. denied, 355 U.S. 828 (1957)). Where the summary chart is not based on competent evidence, the chart is more likely to confuse or mislead the jury than it is to assist it. *See* Fed. R. Evid. 403; *United States v. Citron,* 783 F.2d 307, 316 (2d Cir. 1986).

Essentially, the Government asked the jury to compare distributions with net profits—a calculation that no one in the law firm ever did before determining a distribution amount. This chart was used throughout the trial, including in opening and closing. (*See* Doc. 291, pp. 18-19, 42, 185; Doc. 298, pp. 1235-36; Doc. 305, p. 2005; Doc. 311, pp. 3449-50, 3479). The chart misled the jury to infer Hardwick's intent by asking them to do a calculation that the partners never did and based the calculation on numbers proven to be wrong (Doc. 298, pp.1360-61). It should never

have been admitted. Further, to defend against the misleading chart, Hardwick needed to show, first, that his distributions should be compared to other partners' distributions—not net profits. He could not do this because his Motion for Bill of Particulars was denied. Second, he needed to prove that the basis for the calculation of net profits was entirely wrong because it was based on Maurya's calculations while she was still concealing her theft, however the court gutted Hardwick's attack on Maurya (*see* Section IV) compounding the prejudice against Hardwick.

## III.   THE DISTRICT COURT ERRED IN DENYING HARDWICK'S MOTION FOR JUDGMENT OF ACQUITTAL AS TO HIS CONVICTION OF CONSPIRACY TO COMMIT FRAUD, WIRE FRAUD, AND A FALSE STATEMENT TO INFLUENCE A FEDERALLY INSURED FINANCIAL INSTITUTION.

### A. The Government Offered Insufficient Evidence that Hardwick Knowingly Joined A Conspiracy with Maurya.

There is a lack of substantial evidence, viewed in the light most favorable to the Government, from which a reasonable fact-finder could find beyond a reasonable doubt, that a conspiracy ever existed, much less that Hardwick willfully joined a conspiracy with Maurya. "For a defendant to be found guilty of conspiracy, the government "must prove beyond a reasonable doubt (1) that a conspiracy existed; (2) that the defendant knew of it; and (3) that the defendant, with knowledge, voluntarily joined it. *United States v. Vernon*, 723 F.3d 1234, 1273 (11th Cir. 2013).

The Government admitted that—apart from any wrong-doing with Hardwick—Maurya had been stealing from the firm and lying about it. (Doc. 305,

p. 2237). Maurya was involved in her own scheme apart from Hardwick and without Hardwick's knowledge shows that Maurya had her own reason for moving funds, comingling accounts, and lying about the prosperity of the business. (Doc. 292, pp. 442-43). Maurya's crimes for her own benefit do not prove a conspiracy with Hardwick.

Theoretically, the only evidence that could link Hardwick to a conspiracy with Maurya was Maurya's testimony, which the Government chose not to rely upon due to Maurya's extreme credibility issues. (Doc. 291, pp. 28-29; Doc. 303, p. 1974). Instead, in order to prove the conspiracy, the Government entered numerous emails between Maurya and Hardwick. (Gov't Trial Exhs. 205, 221). Every email entered into evidence consisted of Hardwick asking Maurya to pay a bill or issue a distribution with monies, some of which Hardwick was entitled to receive. Essentially, every email offered requested that Maurya do her job and were no different than the emails also sent to Maurya by other partners. (Doc. 292. pp. 447-448, 451-452; Def. Trial Exh. 586).

The Government must prove not only "the existence of an *agreement* to achieve an unlawful objective," but also the defendant's *knowing* participation in that agreement." *United States v. Chandler*, 388 F. 3d 796, 805–06 (11th Cir. 2004) (emphasis in original). "The government, therefore, must prove beyond a reasonable doubt that the conspiracy existed, that the defendant *knew* about it and

that he voluntarily agreed to join it." *Id.* (emphasis in original). Indeed, "[a]lthough each defendant does not have to know every act taken in furtherance of the conspiracy, each defendant convicted must know that there *is* a conspiracy and demonstrate a specific intent to join it." *United States v. Adkinson*, 158 F.3d 1147, 1153-55 (11th Cir. 1998); (*see also United States v. Willner*, 795 F.3d 1297 (11th Cir. 2015) (in a conspiracy case based entirely on circumstantial evidence, this Court found that at most, the government proved that the defendant might have been aware—or should have been aware—of a conspiracy to commit health care fraud but there was no evidence that she willfully joined and participated in it); *United States v. Vanegas*, 294 Fed.Appx. 537, 539-40 (11th Cir. 2008); *United States v. Sardinas*, 386 Fed.Appx. 927, 935-36 (11th Cir. 2010)).

The documents that the Government argued established the conspiracy reflected no more than a tradition employee/employer communication. (*See* Gov't Trial Exhs. 205, 221). Not a single witness at trial testified that Hardwick was aware of Maurya's current or past schemes against her employers. No witness testified that Hardwick was told about Maurya's co-mingling of funds—in fact every witness testified that they were entirely unaware, even when they were the direct beneficiaries of those co-mingled funds from the wire account. (Doc. 292, p. 523 (Mark Wittstadt); Doc. 302, p. 1524-25; Doc. 293, pp. 725-728, 730, 832-833, 838-39).

To the contrary, the evidence showed that when Hardwick became aware of the fact that his money had come from a trust account, he asked Maurya to correct the error and make sure that such an error never occurred previously. (Doc. 298, p.1347). The absence of any proof that Hardwick had knowledge of Maurya's actions, much less that he affirmatively joined a conspiracy, is a critical, fatal flaw in the Government's case. The Government's evidence does not "amount to a reasonable inference of the ultimate fact of [Hardwick's] guilt." *United States v. Villegas*, 911 F.2d 623, 628 (11th Cir. 1990) (reversing conspiracy conviction).

**B. Hardwick's Conviction for Taking More Than "He Was Entitled to Receive from MHS" Cannot Stand When the Government Never Proved That Hardwick Was Not Entitled to Receive the Distributions in Counts 2–22 of The Indictment and Did Not Prove His Intent to Defraud.**

Under 18 U.S.C. § 1343, to gain a conviction, the Government must prove beyond a reasonable doubt that "(1) the defendant participated in a scheme or artifice *to defraud*; (2) *with the intent to defraud*; and (3) used, or caused the use of, interstate wire transmissions for the purpose of executing the scheme or artifice to defraud." *United States v. Williams*, 527 F.3d 1235, 1240 (11th Cir. 2008) (emphasis added).

The Indictment alleged that Hardwick took more than "he was entitled to receive from MHS." (Doc. 126, ¶ 4(e)). However, the Government's proof was insufficient to prove (1) what Hardwick was actually entitled to receive and (2) that

32

he had any intent to deceive. The Government maintained that it only needed to prove that Hardwick was "taking more money out of the firm than he was allowed to." (Doc. 305, p. 2004). To which Hardwick consistently responded with: What was he entitled to take? (*Id.* at 1997). Simply put: How can the government prove fraud if the Defendant merely took what he *believed* to be rightfully his?

To show Hardwick's intent to deceive, the Government used the amount of money that Hardwick received when compared to the actual income of the law firm. The Government argued that, although it did not have any clear numbers of what Hardwick was owed, such striking disproportionality proves Hardwick's intent to defraud his partners. (Doc. 307, p. 2293). Specifically, the Government relied heavily on a misleading chart (Gov't Trial Exh. 1001) that compares distributions to Hardwick with net income of the law firm. Government's Trial Exhibit 1001 shows nothing of Hardwick's intent, but only that the partners at MHS were not at all taking distribution based off their pro-rata share of net-income.[9] In addition, the Government's contention that Hardwick was trying to hide the transfers in question, is debunked by the fact that the transfer at issue were open and obvious, and available for review. (Doc. 309, pp. 2936, 2947). Thus, the Government did not prove that Hardwick intended to defraud his partners.

---

[9] By way of example, MHS had net income for 2011 of $549,608, however, it was also established at trial that in the same year, another partner, Art Morris, received a distribution of $593,556. (Doc. 308, pp. 2768-2769).

33

## C. The Government Failed to Prove that Hardwick Knowingly Made a False Statement for the Purpose of Influencing a Bank.

The elements of 18 U.S.C. § 1014 make it a crime to knowingly make any false statement or report . . . *for the purpose of influencing in any way* the action of . . . any institution the accounts of which are [federally] insured . . . upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, or loan, or any change or extension of any of the same, by renewal, deferment of action or otherwise. (emphasis added). To establish a violation of this provision, the government "must demonstrate (1) that the defendant made a 'false statement or report,' and (2) that he did so 'for the purpose of influencing in any way the action of [a described financial institution] upon any application, advance, ... commitment, or loan.'" *Williams v. United States,* 458 U.S. 279, 284 (1982).

Although materiality is not an element of the offense, *United States v. Wells*, 519 U.S. 482 (1997), the very crux of the offense is that a defendant must have intentionally acted in such a way as to influence the banking institution. In the instant case, Hardwick was extended a $25,000 "line of credit" (not a bank loan as incorrectly stated in the superseding indictment (Doc. 126, ¶ 9) from First Landmark Bank. The indictment alleged that when asked if there were any law suits or judgments pending against him, Hardwick responded "No" when there were two suits pending: one with Bellagio, LLC and one with The National Bank of Georgia.

34

The evidence at trial showed that the $25,000 line of credit was considered "standard" with most clients as an accommodation and used as, essentially, overdraft protection. (Doc. 303, p. 1787) and Hardwick was told as much; meaning, the paperwork filled out by Hardwick and the bank officer was a mere formality and was never sent for approval from the board of the bank. *Id*.

Hardwick did not intentionally make a false statement. At the time Hardwick filled out the paperwork for the banking officer, the Bellagio, LLC lawsuit had been settled and it was reasonable for Hardwick to believe that it was no longer pending. (Doc. 302, p. 1607). Further, the information on the suit involving the National Bank of Georgia was provided to First Landmark Bank a few months after the line of credit was given. (Doc. 303, p. 1787). Hardwick discussed the suit with the banking officer, and she subsequently updated the paperwork of the file to reflect the change and continued to make loans to Hardwick. Essentially, the evidence, even in the light most favorable to the Government, showed that Hardwick knew, and the banking officer knew that Hardwick's statement on the line of credit application would not influence the decision to provide Hardwick credit that was "standard." *Id.*

## IV.   THE DISTRICT COURT ERRED WHEN IT EXCLUDED HARDWICK'S 404(b) EVIDENCE PROVING THAT CO-DEFENDANT MAURYA'S REPEATED FRAUD SCHEME WAS ALWAYS ACCOMPLISHED APART FROM AND WITHOUT THE KNOWLEDGE OF HER EMPLOYERS, EVEN THOUGH THEY RECEIVED MONETARY BENEFITS.

Maurya was responsible for committing her own entirely separate fraud from any allegations against Hardwick (Doc. 292, pp. 442-43).[10] Further, Maurya committed strikingly similar frauds with four employers prior to her employment with MHS and one employer after her employment at MHS. (Doc. 224). Each time, the signature of her fraud was clear: she (1) scrambled the accounting to make money virtually untraceable; (2) lied about profits and gave bosses the illusion of prosperity through the creation of false reports to keep them from asking questions; (3) gained trust with bosses and provided benefits to them; (4) made herself indispensable by hoarding information, limiting others' access, working 7 days a week, taking no vacations, and alienating subordinates by disagreeable behavior; and (5) shifted blame on the bosses when her misdeeds were uncovered, asserting stating that she

---

[10] This included siphoning money to pay off her mortgage (Doc. 292, pp. 418-19, 469), paying her own credit card bills (Doc. 292 pp. 418, 469; Doc. 302, p. 1526), and distributing money to her lover, Joe Davenport, who subsequently committed suicide and left a note saying:

> I am relying on Asha to be honest about the fact that I knew nothing and was getting [money] from her and not the firm. I can't prove that and I don't and can't trust her to be honest. Don't let her lie about this . . . I had no idea she was stealing money from her places of employment . . ."

(Doc. 176, p. 14).

had "inferred" that the bosses wanted her to break the rules to meet stated business objectives. (Doc. 224, pp. 2-3).

Maurya's distinct *modus operandi* was a critical piece of Hardwick's defense. Maurya's fraudulent patterns proved that (1) she had her own motivation to scramble the law firm and trust accounts that were entirely separate from any alleged conspiracy with Hardwick and (2) she consistently lied to her employers about the actual profits of the company—negating the Government's theory that Hardwick and others were fully aware of the actual financial status of MHS. The signature of Maurya's fraud negated the element of intent and proved *why* Maurya would never say "no" to any partner that asked for a distribution.

In order to present this critical piece of evidence, pursuant to Fed. R. Evid. 404(b), the Defense intended to (1) call four of Maurya's prior employers[11] to explain how they got richer off her lies but had nothing to do with her scheme and were thoroughly duped (Doc. 219), (2) introduce a video of Maurya lying to a former employer, Tony Thrash, about her conduct and further demonstrating the mastery of her skills of deception with her employers (Doc. 307, pp. 2342-43), (3) through cross-examination of Maurya herself regarding her frauds at Sodexo (1997-2005), PowerBrands (2005-2006), MGS (2006), US Land Title (2006-2009), MHS (2009-

---

[11] Vern Johnson (Doc. 307, p. 2341) and Todd Schram from Sodexo, and Tara Bridge (Doc. 307, p. 2366) and Tony Thrash from ProCare EMS.

2014), and ProCare EMS (2015), and (4) through a note from her lover and prior MHS employee, Joe Davenport, stating that he also was unaware that she was stealing. (Doc. 176, p. 14).

Although the court initially ruled that the Davenport note was admissible, it then reversed its ruling stating, among the reasons, that Hardwick had "other evidence of [Maurya's] previous untruthfulness that does not involve the suicide note . . ." (Doc. 227, p. 3). The court, without providing a basis for its ruling, excluded the video tape of Maurya lying to her employer. (Doc. 307, pp. 2342-43). The Government chose not to call Maurya and the Defense attempted to call her as a witness but was informed that she would take the fifth, thus the Defense could not question her regarding her lies to the Government or to her prior employers. (Doc. 303, pp. 1935-36, 1974). After finding that the evidence of Maurya's scheme was relevant and admissible,[12] the court only allowed testimony from two of Maurya's prior employers. (Doc. 307, pp. 2274-77). Compounding the prejudice, the court then limited which defense attorney would be allowed to present evidence regarding Maurya. (Doc. 307, p. 2277).

"The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers v.*

---

[12] Doc. 307, p. 2276. (the court noted: "I do find, though, that the bottom line in terms of [Maurya] being shown to be someone who steals from her employers is similar enough to what has come out in this case.")

*State of Mississippi*, 410 U.S. 284, 294 (1973). Hardwick's right to present a defense was fundamental to his receiving a fair trial. *See id.*

While Rule 404(b) is typically used by the Government . . . a defendant may also seek to admit evidence of a witness's other crimes or schemes pursuant to the rule if it tends to disprove the defendant's guilt of the crime charged against him. *United States v. McClure*, 546 F.2d. 670, 673 (5th Cir. 1977); *see also United States v. Seals*, 419 F.3d 600, 606 (7th Cir. 2005). When the prosecution offers 404(b) evidence, stringent standards for admissibility protect the defendant from prejudice, *McClure,* 546 F.2d. at 673; however, when the evidence is being offered by the defense, prejudice to the defendant is not a concern and a lower standard for admissibility governs. *Id*.

The evidence of a clear *modus operandi* interwoven in Maurya's fraud schemes and the effects on her employers was vital to Hardwick's defense of Counts 1-22 of the Indictment—her plan to intentionally keep her employers in the dark disproved that Hardwick had the knowledge and intent to take more than "he was entitled to receive." (Doc. 126 ¶ 4). However, the court gutted the Hardwick's defense by limiting the Defense's evidence to only two witnesses.

The testimony of the excluded witnesses, both individually and cumulatively, was crucial to establishing Hardwick's defense. The excluded witnesses, Vern Johnson (Doc. 307, p. 2341) and Tara Bridge would have provided further examples

of how Maurya, using a signature fraud also implemented at MHS, kept them completely in the dark.

Ultimately, Hardwick was deprived of his constitutional right to present a defense. *Rock v. Arkansas*, 483 U.S. 44, 52 (1987); *United States v. Word*, 129 F.3d 1209, 1212-13 (11th Cir. 1997) (reversing conspiracy conviction where defendant was not afforded opportunity to present evidence to counter the Government's argument); *United States v. Veltmann*, 6 F.3d 1483, 1495 (11th Cir. 1993) (reversing convictions where defendants were precluded from fully presenting their defense). The right to present a defense is undermined where the defendant is precluded from presenting evidence *disproving the government's theory of the case*. *United States v. Hurn*, 368 F.3d 1359 (11th Cir. 2004) (providing that a defendant must be permitted to introduce evidence that "tends to place the story presented by the prosecution in a significantly different light, such that a reasonable jury might receive it differently"); *Veltmann*, 6 F.3d at 1495; *United States v. Terzado-Madruga*, 897 F.2d 1099, 1108 (11th Cir. 1990). "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006). Finally, "where the element of willfulness is critical to the defense, the defendant is entitled to wide

latitude in the introduction of evidence tending to show lack of intent." *United States v. Lankford*, 955 F.2d 1545, 1550 (11th Cir. 1992); *United States v. Garber*, 607 F.2d 92, 99 (5th Cir. 1979) (*en banc*).

## V.   THE DISTRICT COURT ERRED WHEN IT ALLOWED INADMISSIBLE HEARSAY AND PREVENTED HARDWICK FROM CONFRONTING MAURYA AS A WITNESS.

The Confrontation Clause gives a defendant the right to confront and cross-examine witnesses against him. U.S. Const. Amend. 6; *Crawford v. Washington*, 541 U.S. 36, 43 (2004). The court, over Defense objection,[13] erred by allowing the Government to introduce through Thrash—a witness who was aware of Maurya's MHS fraud only through his discussions with the FBI—that he had heard Maurya pled guilty to conspiracy in connection with her conduct at MHS. (Doc. 307, p. 2375.) The Government could not establish a proper foundation to ask this question and it was inadmissible hearsay. Further, Hardwick was substantially prejudiced because the Government was allowed to introduce evidence that Maurya admitted to joining a conspiracy *without ever calling her to testify and allowing the Defense to cross-examine her.*

---

[13] Doc. 307, pp. 2367-71.

## VI.   THE DISTRICT COURT IMPROPERLY CHARGED THE JURY ON DELIBERATE IGNORANCE WHEN THERE WAS NO EVIDENCE IN THE RECORD TO SUPPORT SUCH A CHARGE.

Over the Defense's objection, the District Court gave the deliberate ignorance charge requested by the Government. (Doc. 310, pp. 3386-89; Doc. 311, p. 3445). "If the instructions accurately reflect the law, the trial judge is given wide discretion as to the style and wording employed in the instruction. *Bearint ex rel. Bearint v. Dorell Juvenile Group, Inc.*, 389 F.3d 1339, 1351 (11th Cir. 2004) (citation omitted). Under this standard, the Court of Appeals examines "whether the jury charges, considered as a whole, sufficiently instructed the jury so that the jurors understood the issues and were not misled." *Id.* It is a fundamental presumption of our jury trial system that juries follow the instructions of the trial judge. *Id.*

A deliberate ignorance instruction is only proper where "the facts support the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution." *United States v. Rivera*, 944 F.2d 1563, 1571 (11th Cir. 1991). This Court has cautioned district courts against charging the jury on deliberate ignorance when "the evidence only points to either actual knowledge or no knowledge on the part of the defendant." *United States v. Stone*, 9 F.3d at 937 (*citing Rivera*, 944 F.2d at 1570-71)).

42

The District Court erroneously charged the jury on deliberate ignorance when there was no evidence to support such a charge, and when the Government had throughout the trial indicated that Hardwick was fully aware of the fraud and participated in the alleged conspiracy. Although this Court has held that "instructing the jury on deliberate ignorance is harmless error where the jury was also instructed and could have convicted on an alternative, sufficiently supported theory of actual knowledge," *United States v. Steed*, 548 F.3d 961, 977 (11th Cir. 2008); however, this error was not harmless. The evidence against Hardwick was insufficient to support a theory of actual knowledge for the reasons stated above, and, thus, compels reversal.

## VII.  THE CUMULATIVE ERRORS RENDERED HARDWICK'S TRIAL FUNDAMENTALLY UNFAIR.

The district court made numerous evidentiary errors which individually and cumulatively compel a reversal of Hardwick's convictions. Even if "the prejudice caused by each individual error was harmless," the "cumulative prejudicial effect of many errors may be greater than the sum of the prejudice caused by each individual error." *United States v. Baker*, 432 F.3d 1189, 1223 (11th Cir. 2005). Cumulative prejudicial error requires reversal even if the evidence is sufficient to establish the defendant's guilt. *United States v. Hands*, 184 F.3d 1322, 1329 (11th Cir. 1999); *United States v. Marshall*, 173 F.3d 1312, 1314-15 (11th Cir. 1999). "In

reviewing for cumulative error, the Court must review all errors preserved for appeal and all plain errors." *Baker*, 432 F.3d at 1223 (internal quotation omitted).

In cases, as here, in which the sufficiency of the evidence is in question, this Court "must be less tolerant of the idea that errors committed during the trial of th[e] case are acceptable because they are harmless." *United States v. Ignasiak*, 667 F.3d 1217 (11th Cir. 2012). This is because "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland v. Washington*, 466 U.S. 668, 696 (1984). Where errors deprive a defendant of his constitutional right to present a defense, the Court reviews those errors under the "harmless beyond a reasonable doubt" standard of *Chapman v. California*, 386 U.S. 18, 24 (1967).

For Hardwick, the errors enumerated above pervaded every stage of the proceedings, occurring pre-trial and during trial, such that when considering the trial as a whole, it is clear that the impact of such errors cannot easily be blunted. Hardwick made it clear to the Government and the District Court that the Defense's focus of rebutting that Hardwick took "too much" would be through the percentage comparison of the partners. (*See* Doc. 130 & 131). Yet, it was not until less than eight weeks before the start of trial that the Government indicated to the Defense that it would determine "too much" based on a comparison of Hardwick's transfers to net profits. (Gov't Trial Exh. 1001). Further, the net profits number was derived

44

from a tax return that was retroactively created *after* Hardwick left the firm and that Hardwick never agreed to or saw. (Doc. 294, p. 945-46).

Hardwick thus arrived at trial, surprised by the Government's method of calculating how Hardwick knew he received "too much," and unarmed with the ability to mount a defense by showing the jury the correct comparison of partnership shares when the court excluded vital defense evidence under Fed. R. Evid. 404(b) and then limited which attorney would be allowed to present what little evidence was allowed. The court then allowed the Government to parade its chart (Gov't Trial Exh. 1001) before nearly every witness, in opening and in closing, and the Defense had no answer from its Motion Bill of Particulars (Doc. 131). Clearly, the central and most contested issue was Hardwick's alleged intent to defraud and whether he knowingly entered into a conspiracy to defraud with Maurya. Most of the errors in question went directly to this issue, and, as such, they were inextricably tied to one another, making their cumulative impact even greater.

Prejudice to Hardwick was further compounded by Government's sometimes willful violations of the court's prior rulings excluding the age of a witness,[14] the details of Hardwick's divorce,[15] an allegation that Hardwick did not properly pay

---

[14] Doc. 294, pp. 1162–64. (specifically, where the court asked the Government "what part of my ruling did you not understand, sir, that caused you to go around it in a way that still established the very evidence you knew I had ruled was irrelevant?" (*Id.* at 1164)).
[15] Doc. 292, pp. 350-51.

taxes in 2007,[16] and an inference that Hardwick sexually harassed an employee.[17] This was all evidence that the court excluded on the basis of Fed. R. Evid. 403 (Doc. 215) and that Hardwick objected to when the evidence was offered. Finally, the court instructed the jury on deliberate ignorance when there was no evidence in the record to support such a charge. (Doc. 310, p. 3387; Doc. 311, pp. 3443-44). Consequently, these errors, in their aggregate, resulted in a trial that, as a whole, was fundamentally unfair.

## VIII. THE DISTRICT COURT'S SENTENCE WAS SUBSTANTIVELY UNREASONABLE.

The District Court's sentence was substantively unreasonable and an abuse of discretion. A district court abuses its discretion "when it (1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors." *United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (*en banc*). In addition, a district court commits "a clear error of judgment" when it considers the proper factors but balances them unreasonably." *Id.* As this Court has stated, "substantive review exists, in substantial part, to correct sentences that are based on unreasonable weighing decisions." *Id.* at

---

[16] Doc. 310, pp. 3240–44 (where the court states that "this is the third motion *in limine* on which I've ruled that has been violated" (*Id.* at 3243)).

[17] Doc. 307, p. 2458; Doc. 310, p. 3245.

1194. The District Court ignored the important precept that "the sentencing court shall impose a sentence sufficient, but not greater than necessary" to comply with the purposes of § 3553(a).

At sentencing, the District Court found that Hardwick's appropriate Guideline level was 31 in a criminal history category of I, giving Hardwick an advisory guideline range of 108 to 135 months. (Doc. 364, p. 227). After considering the arguments and evidence addressing the § 3553 factors, the District Court varied upward by nearly 5 levels and sentenced Hardwick to 180 months. (*Id.* at 292). In explaining its rationale for departing upward, the District Court focused primarily on the amount of money that was taken (Doc. 364, pp. 291-92), despite the Court's findings as to the loss amount, and the Court made no mention of ever considering Hardwick's positive characteristics or history.

The reviewing court must consider the "totality of the facts and circumstances," and as this Court has noted *en banc*, "[l]ooking at sentencing decisions through the prism of discretion is not the same thing as turning a blind eye to unreasonable ones." *Id.* at 1191. Here, the District Court failed to give adequate weight to significant mitigating factors, which the Court acknowledged when referring to the letters submitted in support of Hardwick, stating "I've never had a

case where I've had this many letters[18] (*Id.* at 290-93), which include, inter alia, (1)
his lack of criminal history; the non-violent nature of his offenses; (3) his lengthy
and esteemed legal career; (4) the young age of his only child; and (5) his role as
primary caretaker for his aging and ailing parents. *See United States v. Panice*, 598
F.3d 426, 443 (7th Cir. 2010); *United States v. Williams*, 553 F.3d 1073, 1084-85
(7th Cir. 2009). Rather than properly weighing Hardwick's overwhelming positive
characteristics, the District Court failed to reasonably balance those factors to
Hardwick's benefit, *see Irey*, 612 F.3d at 1189, as is obvious from the extreme
sentence imposed (Doc. 364, p. 292), which was greater than necessary to comply
with the purposes of § 3553.

## IX.   THE GOVERNMENT DID NOT PROVE A LOSS AMOUNT FOR RESTITUTION AND THE DISTRICT COURT ERRED BY FAILING TO MAKE ANY FACTUAL FINDINGS AND FAILING TO OFFSET THE RESTITUTION AMOUNT.

At the restitution hearing, the District Court made no factual findings, and
instead, entered an Order of Restitution against Hardwick in the amount of
$40,307,431.00 (Doc. 368). The District Court's exorbitant order of restitution is
problematic in three ways. First, the District Court failed to make any specific factual
findings regarding how restitution was calculated as mandated by *United States v.*

---

[18] For sentencing purposes, the Defense submitted to the Court 47 letters from Appellants family, friends, and associates, in which they attested to Hardwick's good character, charitable heart, strong support network, and capacity to be a productive, contributing member of society in the future. (Doc. 364, pp. 275-77).

*Huff*, 609 F.3d 1240, 1249 (11th Cir. 2010). Hardwick filed his objection to that order. (Doc. 369).

Second, the District Court failed to consider in its calculation the $1.4 million already paid by Hardwick or the market value of Appellant's shares that he signed over to his partners when he departed from the firm. *Huff*, 609 F.3d at 1240.

Third, the Government failed to prove that the claimed losses by the firm's partners and Fidelity was directly attributable to Hardwick and not to the separate scheme run by Maurya that was entirely separate from the conspiracy count as found by the jury.[19] As demonstrated at trial, Maurya and her staff, at her direction, combined multiple law firm and escrow accounts and subsequently made payments, such as payroll, distributions, and expenses, out of these accounts in order to conceal her crimes. (Doc. 302, pp. 1523-24, 1527-28; Doc. 292, pp. 379-81, 441; Doc. 293, pp. 727-29, 830-31, 838-39; Doc. 309, p. 3054). The Government failed to prove what conduct of Maurya, and Maurya alone, accounted for the financial implosion and what was attributable to Appellant.  Based on the foregoing, this Court should vacate the District Court's Restitution Order and remand for recalculation.

## X.     CONCLUSION

---

[19] The Government outright acknowledged that Maurya had her own scheme for which Hardwick was not responsible and of which he was not aware, stating that "Ms. Maurya, in this case at Morris Hardwick Schneider, really engaged in two separate, two separate schemes. One was herself, where she did this thing with Alyce Ritchie, where she got Alyce Ritchie to pay AmEx bills and it was really Asha Maurya's AmEx bill. And she got some other things paid as well. So, she did that. Mr. Hardwick was not involved in that." (Doc. 305, p. 2237).

For the foregoing reasons, Hardwick requests that the Court vacate the convictions and remand the case for the entry of judgment of acquittal as to Counts 1-23, or, in the alternative, remand the case with an order for a new trial on any remaining counts. Alternatively, Hardwick requests that the Court vacate the sentence and restitution amounts, and remand for re-sentencing and recalculation of the restitution amount.

This the 7th day October, 2019.

Respectfully submitted,

**GARLAND, SAMUEL & LOEB, P.C.**

*/s/ Edward T.M Garland*
Edward T. M. Garland
Georgia Bar No. 284900
Attorney for Appellant

*/s/ Kristen W. Novay*
Kristen W. Novay
Georgia Bar No. 742762
Attorney for Appellant

3151 Maple Drive, N.E.
Atlanta, Georgia 30305
(404) 262-2225

## <u>CERTIFICATE OF COMPLIANCE</u>

1. I certify this brief complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7)(B)(i) because this brief contains 12,981 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. I certify that this brief was uploaded in electronic format to the Court's website pursuant to 11th Cir. R. 25-3 on the 7th day of October, 2019.

3. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared I proportionally spaced typeface using Microsoft Word in fourteen (14) font size and times New Roman type style.

This the 7th day of October, 2019.

Respectfully submitted,

**GARLAND, SAMUEL & LOEB, P.C.**

*/s/ Edward T.M Garland*
Edward T. M. Garland
Georgia Bar No. 284900
Attorney for Appellant

*/s/ Kristen W. Novay*
Kristen W. Novay
Georgia Bar No. 742762
Attorney for Appellant

3151 Maple Drive, N.E.
Atlanta, Georgia 30305
(404) 262-2225

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this day I electronically filed **AMENDED BRIEF OF APPELLANT HARDWICK** with the Clerk of Court using the CM/ECF system which will automatically send email notifications of such filing to all counsel of record in this matter:

> Office of the United States Attorney
> J. Russell Phillips, Assistant United States Attorney
> J. Elizabeth McBath, Assistant United States Attorney
> 600 U.S. Courthouse
> 75 Ted Turner Drive, S.W.
> Atlanta, Georgia 30303

This is to also certify that Appellant Hardwick has been served with a copy of the brief by depositing a copy of same in the U.S. Mail to:

> Nathan E. Hardwick IV, # 69849-019
> FCI Ashland
> ST. Route 716
> Ashland, KY 41105

This the 7th day of October, 2019.

> */s/ Edward T.M Garland*
> Edward T. M. Garland
> Georgia Bar No. 284900
>
> */s/ Kristen W. Novay*
> Kristen W. Novay
> Georgia Bar No. 742762

3151 Maple Drive, N.E.
Atlanta, Georgia 30305
(404) 262-2225