[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 19-10746

————————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

ASHA R. MAURYA,

Defendant-Appellant.

————————————————

Appeals from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:16-cr-00065-ELR-CMS-2

————————————————

2                    Opinion of the Court                    19-10746

_____

No. 19-11040

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

NATHAN E. HARDWICK, IV,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:16-cr-00065-ELR-CMS-1

_____

_____

No. 19-12108

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

19-10746              Opinion of the Court                    3

*versus*

ASHA R. MAURYA,

                                        Defendant-Appellant.

————————————

Appeals from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:16-cr-00065-ELR-CMS-2

————————————

————————————

No. 19-12140

————————————

UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

*versus*

NATHAN E. HARDWICK, IV,

                                        Defendant-Appellant.

_____

Appeals from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:16-cr-00065-ELR-CMS-1

_____

Before WILLIAM PRYOR, Chief Judge, GRANT, and ANDERSON, Circuit Judges.

GRANT, Circuit Judge:

This case concerns two defendants found guilty of orchestrating large-scale corporate fraud. Nathan Hardwick was convicted at trial on counts of conspiracy, making a false statement to a financial institution, and wire fraud. The district court sentenced him to 15 years in prison and required him, along with his alleged co-conspirator Asha Maurya, to pay over $40 million in restitution. Hardwick argues on appeal that the district court failed to support its restitution order with the reasoning required by law. He also attacks his convictions on a number of grounds and contends that his sentence is substantively unreasonable. We agree with Hardwick that the district court must vacate and reissue its restitution order, but we otherwise affirm Hardwick's convictions and sentence.

Hardwick's case has been consolidated with Maurya's on appeal. Maurya pleaded guilty to conspiracy to commit wire fraud. She joins Hardwick's challenge of the restitution order, and further

argues that the district court violated the Ex Post Facto Clause of the U.S. Constitution by applying a sentencing enhancement issued after she committed the offense.  The government concedes that the district court made these errors, and we agree: Maurya must be resentenced.

## I.

In 2005, Nathan Hardwick helped found a real estate law firm called Morris Hardwick Schneider (MHS).  Hardwick managed MHS's "closing side," including its client trust and operating accounts.  After two years, MHS sold part of its foreclosure operation to a private equity group, and Hardwick received $14 or $15 million in compensation.  Even so, Hardwick soon found himself mired in both public and private misfortune: the 2008 financial crisis and an acrimonious divorce.  His assets were hit hard.  Within three years, the $15 million was gone—and Hardwick owed millions in loans he couldn't repay, many of them gambling debts.

Hardwick eventually turned to unscrupulous methods to satisfy his creditors.  When a bank and a casino sued him to recover unpaid debts, Hardwick lied to a different bank in a line-of-credit application, claiming that there were no suits pending against him.  But a single line of credit wasn't enough to solve Hardwick's money problems, so he turned to a more fertile source of income: his law firm.  From 2011 to 2014, Hardwick siphoned off about $26.5 million from MHS while carefully hiding the withdrawals

from other shareholders.  Around $19 million of this money came from MHS's trust accounts.

Hardwick relied heavily on the help of Asha Maurya, who initially worked at MHS as a controller.  Maurya had no accounting experience when MHS hired her.  But unbeknownst to her new supervisor, she did have a history of embezzling from her previous employers.  Maurya's duties included managing, setting up, and monitoring client trust accounts.  She oversaw the staggering cash flow—millions, sometimes billions, of dollars—that went in and out of those trust accounts.  Although her position in the firm hierarchy meant she did not directly report to Hardwick, Maurya often went straight to him to discuss issues and concerns.  Soon enough, Hardwick promoted Maurya to CFO, giving her even broader authority over the trust accounts.

When Maurya received her promotion, she also got something else—a vital role in Hardwick's embezzlement scheme.  At Hardwick's request, she repeatedly sent money from MHS to Hardwick or his creditors and significantly underreported distributions to Hardwick.  In return, Hardwick assured Maurya that she had "earned [his] trust and respect" and was "now part of [his] small inner circle."

With so much money draining out of MHS accounts, someone was bound to notice.  The scheme began to unravel in summer 2014, when an internal audit by one of MHS's business partners revealed an altered bank statement.  When confronted, Hardwick was quick to distance himself from Maurya—in spite of

his private accolades to her. He claimed that she had "duped" him by stealing money from MHS, altering the firm's records to cover her tracks, and sending him payouts to hide the firm's real financial situation. After further investigation revealed large payments from MHS to Hardwick and his casino creditors, however, it became clear that "the jig was up."

A grand jury indicted Hardwick and Maurya. After Maurya pleaded guilty, the grand jury issued a superseding indictment against Hardwick. He went to trial, where he was convicted of wire fraud, conspiracy to commit wire fraud, and making false statements to a federally insured financial institution. The district court sentenced him to 180 months in prison—an upward variance from the Guidelines range of 108 to 135 months. Maurya received a sentence of 84 months. The court also issued a restitution order requiring Maurya and Hardwick to "pay restitution, jointly and severally, in the amount of $40,307,431.00."

Both defendants now appeal. Maurya asks the court to vacate both the restitution order and her sentence. Hardwick requests the same relief, but he also directly challenges his convictions.

## II.

We begin with Maurya's appeal. Maurya first argues that her sentence must be vacated because the district court applied a sentencing enhancement that did not exist when her offense was committed. The sentence, she says, thus violated the

Constitution's prohibition against ex post facto laws.  *See* U.S. Const. art. I, § 9.  The government agrees.

Maurya did not raise this argument below, so we review it for plain error.  *United States v. Abraham*, 386 F.3d 1033, 1037 (11th Cir. 2004).  Under that standard, Maurya must establish (1) an error, (2) that is plain, (3) that affects her substantial rights, and (4) that, "if left uncorrected, would seriously affect the fairness, integrity, or public reputation of a judicial proceeding."  *Id.* at 1036 n.1 (quotation omitted).

Each prong is satisfied here.  Though courts typically apply the Guidelines in effect at the time of sentencing, the Ex Post Facto Clause prohibits the use of Guidelines issued after the offense that create a higher applicable sentencing range.  *See United States v. Elbeblawy*, 899 F.3d 925, 939 (11th Cir. 2018); *Peugh v. United States*, 569 U.S. 530, 533 (2013).  Here, the district court used the 2018 Guidelines, which included a two-level substantial financial hardship enhancement added in 2015—that is, after Maurya's offense, which ended "in or about August 2014."  *See* U.S.S.G. § 2B1.1(b)(2)(A)(iii) (2018).  Applying the 2018 Guidelines was thus error.  And that error was unmistakably plain:  it was "obvious" and "clear under current law" that the district court could not apply an enhancement issued after Maurya committed the offense.  *United States v. Madden*, 733 F.3d 1314, 1322 (11th Cir. 2013) (quotation omitted).

Using the wrong Guidelines meant that the district court calculated the wrong Guidelines range.  And the application of an

incorrect Guidelines range is almost always enough "to show a reasonable probability of a different outcome absent the error." *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1907 (2018) (quotation omitted).   With no extenuating circumstances to suggest otherwise, we hold that the error here affected Maurya's substantial rights.   And while defendants usually face an uphill climb in showing that an error seriously affects the fairness, integrity, or reputation of a judicial proceeding, "proof of a plain Guidelines error that affects the defendant's substantial rights is sufficient to meet that burden."   *Id.* at 1909 n.4; *see also id.* at 1908. The district court's error thus requires Maurya to be resentenced.[1]

Maurya (joined by Hardwick) also challenges the district court's restitution order.   "To enable meaningful appellate review," though, "a district court's calculation of restitution must be supported by specific factual findings."   *United States v. Singletary*, 649 F.3d 1212, 1222 (11th Cir. 2011).   And the district court—as the government concedes—gave us no factual findings to consider.   The only course open to us, then, is to vacate the order and remand the case for the district court to correct its oversight. *Id.*

---

[1] Maurya further requests that we remand with instructions that the district court issue a new sentence under a specific offense level and within a specific range.   But we decline this invitation, mindful that the district court is "in a superior position to find facts and judge their import under § 3553(a) in the individual case."   *Gall v. United States*, 552 U.S. 38, 51 (2007).

## III.

### A.

We now turn to Hardwick's lengthy series of challenges to his convictions. To begin, Hardwick argues that he was "prevented from effectively meeting the Government's case" because the district court denied his request for a bill of particulars before trial.

We review a denial of a motion for a bill of particulars for abuse of discretion. *United States v. Davis*, 854 F.3d 1276, 1293 (11th Cir. 2017). "To show an abuse of discretion, a defendant must establish that he actually was surprised at trial and that the denial of the request for a bill of particulars prejudiced his substantial rights." *Id.*

In his brief on appeal, Hardwick summarizes the information he requested as "(1) to what Hardwick was entitled, (2) what money did Hardwick receive to which he was *not* entitled, and (3) how did the Government make this determination." This simple characterization belies the level of detail requested by Hardwick's proposed bill of particulars, which included a battery of specific questions.[2] The district court rejected the motion

---

[2] For instance, Hardwick asked:

> 1. With regard to Counts 2 – 22 (the substantive wire fraud counts):

because it found that Hardwick's indictment "sufficiently inform[ed] Defendant of the charges against him to adequately prepare his defense and minimize surprise at trial."

The district court's reasoning was correct. The purpose of a bill of particulars is threefold: "to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense." *United States v. Warren*, 772 F.2d 827, 837 (11th Cir. 1985). But a bill of particulars cannot be used as a weapon to force the government into divulging its prosecution strategy; we do not allow defendants to "compel the government to detailed exposition of its evidence or to explain the legal theories upon which it intends to rely at trial" in that manner. *United States v. Burgin*, 621 F.2d 1352, 1359 (5th Cir. 1980).[3]

----

a. What amount of money had been distributed to the other shareholders as of the date of that wire transfer, and from what accounts were those distributions made?

b. What was Hardwick "entitled to" as of the date of that wire transfer?

c. What amount of money obtained from the trust account (#7328) was "client" money, as opposed to law firm money (*i.e.*, money that was destined to be transferred to the operating account of the law firm)?

[3] This Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981, in *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

The first superseding indictment put Hardwick on adequate notice of the charges against him.  He was fully aware of the crimes he was being charged with and had adequate time and information to plan his defense.  Indeed, Hardwick's proposed bill of particulars even references the specific transactions that the government contended were fraud, showing that he understood the specific charges against him in detail.  At bottom, Hardwick simply wanted the government to explain ahead of time which transactions, amounts, accounts, and other details would be most significant at trial; essentially, he asked about the government's specific legal "theory."  And he also tried to use a bill of particulars to "compel the government to provide the essential facts regarding the existence and formation of a conspiracy"—a practice we have explicitly forbidden.  *United States v. Rosenthal*, 793 F.2d 1214, 1227 (11th Cir. 1986), *modified*, 801 F.2d 378 (11th Cir. 1986).

Hardwick's request for a bill of particulars seeking that kind of information is inappropriate.  The district court did not abuse its discretion by denying his motion.

## B.

Hardwick next appeals the district court's decision to exclude certain evidence of Maurya's bad acts offered under Rule 404(b).  At trial, Hardwick argued that Maurya was the mastermind (and sole knowing participant) behind the scheme to defraud MHS.  He asserted that Maurya went from one employer to another, siphoning off company money for herself and altering the companies' records to hide her tracks.  According to Hardwick, she

would then lie to her supervisors, luring them into complacency with financial distributions designed to convince them the company was prospering. So, Hardwick explained, Maurya had orchestrated the massive cash distributions to his personal accounts and creditors to keep him blissfully ignorant of her fraud.

To prove this theory, Hardwick attempted to introduce a stack of evidence: a suicide note from a former romantic partner and MHS coworker; a video of Maurya lying to a former employer; and testimony from Maurya and four of her employers, who Hardwick says were in a "unique position to testify as to how a hallmark of Maurya's *modus operandi* was to create an 'aura of prosperity'" at each company where she had worked. The district court limited Hardwick's 404(b) evidence to testimony from two of Maurya's former employers. He now argues that this decision "gutted" his defense.

We review evidentiary rulings for abuse of discretion, and we see no such abuse here. *United States v. LaFond*, 783 F.3d 1216, 1221 (11th Cir. 2015). The court provided a well-reasoned basis for excluding each piece of 404(b) evidence offered by Hardwick.

*First*, the suicide note. The court initially allowed the note into evidence under the residual exception to the hearsay rule. *See* FED. R. EVID. 807. But after both parties provided more information, the court excluded the note, finding that it was not as trustworthy or uniquely probative as it had first appeared. Furthermore, neither party had proven the note's authenticity. The court also explained that the note was cumulative: "there is

other evidence indicating Ms. Maurya's previous untruthfulness that does not involve the suicide note." Exclusion of the note on these grounds was well within the bounds of the district court's discretion.

*Second*, Hardwick argues that we should reverse the exclusion of the video because the district court excluded it "without providing a basis for its ruling." To start, the failure of the district court to supply an explanation for an evidentiary exclusion is not grounds for reversal. In any case, at trial the government offered two bases for the court's ruling: the video was hearsay, and the video lacked a foundation. We can fairly assume that the district court agreed with one or both of these grounds for exclusion, and Hardwick challenges neither. We see no abuse of discretion in the court's decision to exclude the video.

*Third* and finally, the witnesses.[4] Hardwick tried to call two witnesses from each of two companies where Maurya had

---

[4] The district court made no determination on the admissibility of testimony from Maurya herself. The government decided not to call Maurya as a witness, and Hardwick could not question Maurya directly because she indicated that she would invoke her Fifth Amendment right not to incriminate herself if called to the stand.

Hardwick also argues that the court abused its discretion when it "limited which defense attorney would be allowed to present evidence regarding Maurya"—that is, conduct the examination. But he offers no explanation as to how the court's instruction harmed his defense. We consider the judge's instruction to be within the district court's broad discretion to regulate criminal trial procedure. *See* FED. R. CRIM. P. 57(b).

previously worked.  The court limited the defense to one witness from each company because it wanted to avoid making the trial "a mini-trial about Ms. Maurya."  The defense initially agreed.  But it soon switched gears and objected, claiming that "it takes two witnesses [per company] to adequately show" Maurya's pattern of deception.

"A district court may limit the number of defense witnesses" when the proposed testimony "would be cumulative."  *United States v. Wuagneux*, 683 F.2d 1343, 1355 (11th Cir. 1982).  That's what happened here.  Hardwick insists that "the likely cumulative impact of the allowed and excluded testimony, taken together, should not be underestimated since corroboration is a fundamental tool of persuasion."  (Quotation and brackets omitted).  And he argues that remedies less extreme than exclusion were possible. But as proof, he offers only generalized statements that his defense was seriously hampered by the court's exclusion of two witnesses. Indeed, he admits that had four witnesses been called, "it is likely and expected that their testimonies would have overlapped in some respects."  The district court did not abuse its discretion when it declined to admit the testimony of the two excluded witnesses.

## C.

Hardwick also faults the district court for allowing evidence it should not have.  His target is Exhibit 1001, a chart showing MHS's net income from 2011 to 2013 along with payments made from MHS to Hardwick (or on his behalf) during that same period. Hardwick asserts that the Exhibit inaccurately represents MHS's

16                    Opinion of the Court                    19-10746

income, and is misleading because it shows distributions made to
Hardwick out of their proper context.

We review a district court's decision to allow a summary
chart for abuse of discretion. *United States v. Richardson*, 233 F.3d
1285, 1293 (11th Cir. 2000). Summary charts are "permitted
generally by Federal Rule of Evidence 1006." *Id.* But to curb abuse,
those charts are admissible only when any assumptions they make
are "supported by evidence in the record." *Id.* at 1294 (quotation
omitted).

That requirement is satisfied here. The chart's net income
numbers come directly from MHS's audited financial statements.
Hardwick argues that Maurya might have "manipulated" the
documents underlying those statements; he also points to
discrepancies between the audits and MHS's tax returns. But an
auditor testified that the statements *were* trustworthy, and it was
for the jury to decide who to believe.

Hardwick further argues that, even if accurate, the chart is
misleading because it places two unrelated figures side-by-side:
MHS's profits and its distributions to him. He insists that
comparing the two numbers was something that "no one in the
law firm ever did," and it was therefore unfair to ask the jury to do
so. We disagree. Hardwick can hardly argue that a comparison of
the two figures is irrelevant when he had earlier claimed that he
"believed that the money [he] received came from [his] share of the
profits." The district court did not abuse its discretion by allowing
Exhibit 1001 into evidence.

## D.

Hardwick mounts his final evidentiary challenge against a question the government asked one of Maurya's employers from after her time at MHS: "Did you know back at the time that Ms. Maurya was working for you, did you know whether she had agreed to plead guilty to conspiracy in connection with her prior employment?"   Hardwick objects to the question as lacking a foundation, as including "inadmissible hearsay," and as causing unfair prejudice because "the Government was allowed to introduce evidence that Maurya admitted to joining a conspiracy without ever calling her to testify and allowing the Defense to cross-examine her." (Emphasis omitted).

Hardwick suggests a number of possible grounds for exclusion, but because the defense had already informed the jury of Maurya's plea deal, we find no error in the district court's ruling. The government's single question regarding Maurya's guilty plea was asked after the defense had already told the jury about Maurya's plea during its opening statement.   There, defense counsel explained:

> [U]ltimately [Maurya] sold her story to the government and became a witness.  Went down, decided to cut a deal.  Now, here is the woman that had stolen almost nine hundred thousand dollars. She cuts a deal with the government: I will testify for you.  She believes that they will go lenient on her, and they give her a five-year cap on crimes that could take—you could get a life sentence on.  She gets a cap,

and that deal says you have to be truthful.  You have
to tell the truth.  She signs that deal . . . .

The district court allowed the question after specifically
noting that the subject of Maurya's guilty plea had already been
raised in opening.  The defense's only response was that an opening
statement "is not evidence."  That is true—but even so, a party
cannot repeatedly emphasize a fact at length in an opening
statement and then hope to persuade us that prejudice has resulted
when the opposing party references it in a single question.  The
defense repeatedly told the jury that Maurya had entered a plea
deal; Hardwick cannot possibly complain that the government led
the jury to believe his own assertion.  The district court did not
abuse its discretion in allowing the question.

### E.

Hardwick also challenges the sufficiency of the evidence,
arguing that the court erred in denying his motion for judgment of
acquittal because his convictions were unsupported by the record.
We review a denial of a motion for judgment of acquittal de novo.
*United States v. Broughton*, 689 F.3d 1260, 1276 (11th Cir. 2012).
The evidence is sufficient if, taking it in the light most favorable to
the government, "a reasonable trier of fact could find that the
evidence established guilt beyond a reasonable doubt." *Id.*

We consider each of Hardwick's convictions in turn,
beginning with conspiracy to commit wire fraud under 18 U.S.C.
§ 1349.  To prove conspiracy, the government needed to show that

"(1) a conspiracy existed; (2) the defendant knew of it; and (3) the defendant knowingly and voluntarily joined it." *United States v. Moran*, 778 F.3d 942, 960 (11th Cir. 2015).

Hardwick argues that "[t]heoretically, the only evidence that could link Hardwick to a conspiracy with Maurya was Maurya's testimony, which the Government chose not to rely upon." But the record belies that assertion. To begin, the government introduced several communications between Hardwick and Maurya suggesting an understanding between the two about the fraudulent nature of the transfers. And further evidence suggested that Hardwick knowingly received far more money than he could have expected from ordinary distributions. It is true that inferences were required to connect the dots; as in many white-collar trials, the government produced not a smoking gun but a pile of documents and figures. And here those documents and figures gave the jury ample evidence to find that Hardwick and Maurya were entangled in an embezzlement conspiracy.

We next consider Hardwick's 21 convictions of wire fraud under 18 U.S.C. § 1343, which required the government to prove both "(1) intentional participation in a scheme to defraud and (2) use of the interstate wires in furtherance of the scheme." *United States v. Hasson*, 333 F.3d 1264, 1270 (11th Cir. 2003). Hardwick conceded the second element of this offense at trial. And as we have just explained, the government offered substantial evidence to support its allegations that Hardwick intentionally participated in a scheme to defraud MHS. On appeal, Hardwick argues that

§ 1343 impliedly required the government to also show "what Hardwick was actually entitled to receive." But that argument finds no support in § 1343's text or this Circuit's precedent. The evidence supports Hardwick's fraud convictions.

Finally, we turn to Hardwick's conviction under 18 U.S.C. § 1014 for making a false statement to an FDIC-insured financial institution. For this offense, the government needed to prove that Hardwick "made a false statement or report" and that he did so on an application for the purpose of influencing a federally insured financial institution. *Williams v. United States*, 458 U.S. 279, 284 (1982) (quotation omitted).

Here, Hardwick undeniably made a false statement—he claimed that there were no pending lawsuits against him, when in fact there were two. And he made that statement in an application for a line of credit. Given the context and content of his statement, a reasonable jury could infer that he made it to influence the bank's willingness to extend him credit. Hardwick now asserts that the line-of-credit application was a "mere formality" and that his false statement was simply an oversight. But the jury heard evidence to the contrary. For instance, a loan officer from the bank providing the application testified that "based on underwriting criteria, with the kind of payments [seen] here, there's no way that [Hardwick] would have qualified for the loan." The jury was free to believe that testimony over Hardwick's.

In sum, we find that the evidence was sufficient to convict Hardwick on all counts and that the district court did not err in denying his motion for a judgment of acquittal.

### F.

We turn next to the jury instructions.  The district court instructed the jury on deliberate ignorance, explaining that if "a defendant's knowledge of a fact is an essential part of a crime, it's enough that the defendant was aware of a high probability that the fact existed, unless the defendant actually believed the fact did not exist."  Hardwick argues that this was error because "there was no evidence to support such a charge," since "the Government had throughout the trial indicated that Hardwick was fully aware of the fraud and participated in the alleged conspiracy."

Challenges to jury instructions present questions of law, so we apply de novo review.  *United States v. Stone*, 9 F.3d 934, 937 (11th Cir. 1993).  District courts "should not instruct the jury on deliberate ignorance when the relevant evidence points only to *actual knowledge*, rather than deliberate avoidance."  *United States v. Steed*, 548 F.3d 961, 977 (11th Cir. 2008) (quotations omitted). But "instructing the jury on deliberate ignorance is harmless error where the jury was also instructed and could have convicted on an alternative, sufficiently supported theory of actual knowledge."  *Id.*

The district court also instructed the jury that it could convict Hardwick based on actual knowledge and, as we have already explained, there was enough evidence to support

Hardwick's convictions on that theory.  We therefore hold that any error on this point was harmless.

## G.

In a final bid to have his convictions vacated, Hardwick argues that the district court's errors "pervaded every stage of the proceedings" such that they cumulatively rendered the trial "fundamentally unfair."  We review the cumulative impact of trial errors de novo, and reverse only "if, in total, the non-reversible errors result in a denial of the constitutional right to a fair trial." *United States v. Pendergrass*, 995 F.3d 858, 881 (11th Cir. 2021).

Having already considered each alleged error, we find that Hardwick's claim of cumulative error also fails.  Any error in the jury instructions did not deny Hardwick a fair trial; our precedent makes clear that such error would be harmless.  *Steed*, 548 F.3d at 977.  And aside from that issue, we have identified no other errors in Hardwick's trial.  A single harmless error cannot possibly render Hardwick's trial fundamentally unfair—especially given the quantity and quality of evidence in this case.

## IV.

Hardwick makes one final argument: that his sentence is substantively unreasonable.  He contends that the district court improperly departed upward from the Sentencing Guidelines recommendation of 108 to 135 months by imposing a sentence of 180 months, and that the court further failed to properly weigh his "overwhelming positive characteristics."

We review the substantive reasonableness of a sentence for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 41 (2007). A court abuses its discretion when it "(1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors"—that is, "when it considers the proper factors but balances them unreasonably." *United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (en banc) (quotation omitted). We vacate a sentence as substantively unreasonable only when we are "left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *Id.* at 1190 (quotation omitted).

The district court once again acted within its discretion here. Hardwick's insistence that the court "made no mention of ever considering Hardwick's positive characteristics or history" finds no support in the record. The district judge read Hardwick's sentencing memorandum and listened to his parents' testimony, the defense's arguments, and Hardwick's supplications during the sentencing hearing. The court also explicitly considered the letters written on Hardwick's behalf—even noting that it had never had a case with so many letters. And the court explained that it was well aware of Hardwick's role as a family man and his history as a lawyer.

Ultimately, the court found that the factors in Hardwick's favor simply did not outweigh those supporting a longer sentence. It imposed an upward variation in light of Hardwick's "egregious behavior," his "lack of remorse," and the fact that his crimes "affected so many other people who suffered so many losses as a result." Indeed, the court's decision was made only "after considering *all* of the sentencing factors pursuant to 18 U.S.C. Section 3553(a)." (Emphasis added). What's more, Hardwick's 180-month sentence is far below the statutory maximum of 470 years—a fact we consider an "indicator of a reasonable sentence." *United States v. Dougherty*, 754 F.3d 1353, 1362 (11th Cir. 2014).

The district court fully considered the factors favoring Hardwick—it just gave them less weight than he would prefer. We affirm his sentence as substantively reasonable.

\*          \*          \*

We **VACATE** the restitution order for Hardwick and Maurya, along with the rest of Maurya's sentence; **AFFIRM** Hardwick's convictions and his sentence apart from the restitution order; and **REMAND** to the district court for further proceedings consistent with this opinion.

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

February 01, 2022

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  19-10746-CC  ; 19-11040 -CC   ; 19-12108 -CC  ; 19-12140 -CC
Case Style:  USA v. Asha Maurya
District Court Docket No:  1:16-cr-00065-ELR-CMS-2

Electronic Filing

All counsel must file documents electronically using the Electronic Case Files ("ECF") system,
unless exempted for good cause. Non-incarcerated pro se parties are permitted to use the ECF
system by registering for an account at www.pacer.gov. Information and training materials
related to electronic filing are available on the Court's website. Enclosed is a copy of the court's
decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36.
The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for
filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise
provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is
timely only if received in the clerk's office within the time specified in the rules. Costs are
governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for
attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested
Persons a complete list of all persons and entities listed on all certificates previously filed by
any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be
reheard must be included in any petition for rehearing or petition for rehearing en banc. See
11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming
compensation for time spent on the appeal no later than 60 days after either issuance of mandate
or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via
the eVoucher system. Please contact the CJA Team at (404) 335-6167 or
cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher
system.

For questions concerning the issuance of the decision of this court, please call the number
referenced in the signature block below. For all other questions, please call Carol R. Lewis, CC

at (404) 335-6179.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Djuanna H. Clark
Phone #: 404-335-6151

OPIN-1 Ntc of Issuance of Opinion